**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

# TRANSMITTAL SHEET
(Notice of Appellate Action)

---

Date Notice filed: 4-30-2021

Style of Case: Cyprus Amax Minerals Company v. TCI Pacific Communications, Inc. Et al

Appellant: TCI Pacific Communications, LLC

District Court No: 11-cv-00252-CVE-CDL

Tenth Circuit Case No:

---

[ ] Amended NOA [ ] Cross Appeal

[ ] Interlocutory Appeal [ ] Successive Petition (2254 or 2255) (no fee)

---

Notice of appeal is enclosed to all parties (except to appellant in civil cases); Notice of Appeal, docket entries and district court order are enclosed to 10th Circuit Court of Appeals:

District Court Judge: Claire V. Eagan, U.S. District Judge

**APPEAL FILED BY PRO SE**

| | |
|---|---|
| Appeal Fee Paid | [ ] |
| IFP Granted | [ ] |
| Motion for IFP on Appeal Form Mailed/Given | [ ] |
| Motion for IFP on Appeal Filed | [ ] |

**APPEAL FILED BY COUNSEL**

| | |
|---|---|
| Appeal Fee Paid | [x] |
| IFP Granted | [ ] |
| Motion for IFP on Appeal Form Made Available | [ ] |
| Motion for IFP on Appeal Filed | [ ] |
| Court Appointed Counsel (CJA/FPD) | [ ] |
| USA | [ ] |

---

Signature of: S. Clark, Deputy Clerk May 3, 2021 Phone: (918) 699-4700

APPEAL,CLOSED,DISCREF,LC−1,PROTO

# U.S. District Court
# U.S. District Court for the Northern District of Oklahoma (Tulsa)
# CIVIL DOCKET FOR CASE #: 4:11−cv−00252−CVE−CDL

Cyprus Amax Minerals Company v. TCI Pacific Communications, Inc. et al
Assigned to: Judge Claire V Eagan
Referred to: Magistrate Judge Christine D Little
Cause: 42:9607 Real Property Tort to Land

Date Filed: 04/26/2011
Date Terminated: 03/31/2021
Jury Demand: None
Nature of Suit: 893 Environmental Matters
Jurisdiction: Federal Question

**Plaintiff**

**Cyprus Amax Minerals Company** represented by

**Michael Franklin Smith**
McAfee & Taft (Tulsa)
TWO W SECOND ST STE 1100
TULSA, OK 74103
918−587−0000
Fax: 918−599−9317
Email: michael.smith@mcafeetaft.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amy L Piccola**
Saul Ewing Arnstein & Lehr LLP (Philadelphia)
1500 MARKET ST 38TH FL
PHILADELPHIA, PA 19102−2186
215−972−8405
Fax: 215−972−1871
Email: apiccola@saul.com
*ATTORNEY TO BE NOTICED*

**Cathleen M Devlin**
Saul Ewing Arnstein & Lehr LLP (Philadelphia)
1500 MARKET ST 38TH FL
PHILADELPHIA, PA 19102−2186
215−972−8562
Fax: 215−972−1835
Email: cathleen.devlin@saul.com
*ATTORNEY TO BE NOTICED*

**Christina D Riggs**
Saul Ewing Arnstein & Lehr LLP (Philadelphia)
1500 MARKET ST 38TH FL
PHILADELPHIA, PA 19102−2186
215−972−1095
Fax: 215−972−1921
Email: criggs@saul.com

*ATTORNEY TO BE NOTICED*

**John F Stoviak**
Saul Ewing Arnstein & Lehr LLP (Philadelphia)
1500 MARKET ST 38TH FL
PHILADELPHIA, PA 19102−2186
215−972−1095
Fax: 215−972−1921
Email: John.Stoviak@saul.com
*ATTORNEY TO BE NOTICED*

**Patrick Michael Hromisin**
Saul Ewing Arnstein & Lehr LLP (Philadelphia)
1500 MARKET ST 38TH FL
PHILADELPHIA, PA 19102−2186
215−972−8396
Fax: 215−972−2280
Email: phromisin@saul.com
*ATTORNEY TO BE NOTICED*

**Reid Edward Robison**
McAfee & Taft
211 N ROBINSON 10TH FL
OKLAHOMA CITY, OK 73102
405−235−9621
Fax: 405−235−0439
Email: reid.robison@mcafeetaft.com
*TERMINATED: 02/12/2020*

**Timothy James Bomhoff**
McAfee & Taft
211 N ROBINSON 10TH FL
OKLAHOMA CITY, OK 73102
405−235−9621
Fax: 405−228−7339
Email: tim.bomhoff@mcafeetaft.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **TCI Pacific Communications, LLC**<br>*previously named as*<br>TCI Pacific Communications, Inc. | represented by | **Mark D Coldiron**<br>Ryan Whaley Coldiron Shandy PLLC<br>119 N ROBINSON RM 900<br>OKLAHOMA CITY, OK 73102<br>405−239−6040<br>Fax: 405−239−6766<br>Email: mcoldiron@ryanwhaley.com<br>*LEAD ATTORNEY* |

*ATTORNEY TO BE NOTICED*

**Paul Douglas Steinman**
Eckert Seamans Cherin & Mellott
600 GRANT ST FLR 44
PITTSBURGH, PA 15219
412−566−6000
Fax: 412−566−6099
Email: psteinman@cozen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paula M Jantzen**
Ryan Whaley Coldiron Shandy PLLC
119 N ROBINSON RM 900
OKLAHOMA CITY, OK 73102
405−239−6040
Fax: 405−239−6766
Email: pjantzen@ryanwhaley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth Dale Coldiron**
Goolsby Proctor Heffner & Gibbs
701 N BROADWAY AVE STE 400
OKLAHOMA CITY, OK 73102−6006
405−524−2400
Fax: 405−525−6004
Email: scoldiron@gphglaw.com
*TERMINATED: 03/12/2012*
*LEAD ATTORNEY*

**Keith Jefferson Klein**
Ryan Whaley Coldiron Shandy PLLC
119 N ROBINSON RM 900
OKLAHOMA CITY, OK 73102
405−239−6040
Fax: 405−239−6766
Email: kklein@ryanwhaley.com
*TERMINATED: 07/27/2011*

**Wendy West Feinstein**
Eckert Seamans Cherin & Mellott
600 GRANT ST FLR 44
PITTSBURGH, PA 15219
412−566−6000
Fax: 412−566−6099
Email: wfeinstein@eckertseamans.com
*TERMINATED: 11/03/2017*

**Defendant**

represented by

**Viacom, Inc.**
*TERMINATED: 03/05/2012*

**Mark D Coldiron**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Douglas Steinman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paula M Jantzen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth Dale Coldiron**
(See above for address)
*TERMINATED: 03/12/2012*
*LEAD ATTORNEY*

**Keith Jefferson Klein**
(See above for address)
*TERMINATED: 07/27/2011*

**Defendant**

**CBS Corporation**
*TERMINATED: 04/02/2012*

represented by

**Mark D Coldiron**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Douglas Steinman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paula M Jantzen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth Dale Coldiron**
(See above for address)
*TERMINATED: 03/12/2012*
*LEAD ATTORNEY*

**Keith Jefferson Klein**
(See above for address)
*TERMINATED: 07/27/2011*

**Defendant**

represented by

**CBS Operations, Inc.**
*TERMINATED: 12/03/2013*

**Mark D Coldiron**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Douglas Steinman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paula M Jantzen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth Dale Coldiron**
(See above for address)
*TERMINATED: 03/12/2012*
*LEAD ATTORNEY*

**Keith Jefferson Klein**
(See above for address)
*TERMINATED: 07/27/2011*

**Wendy West Feinstein**
(See above for address)
*TERMINATED: 11/03/2017*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 04/26/2011 | 1 | | CIVIL COVER SHEET by Cyprus Amax Minerals Company (Robison, Reid) (Entered: 04/26/2011) |
| 04/26/2011 | 2 | | COMPLAINT against All Defendants (paid $350 filing fee; receipt number 1085−847288) by Cyprus Amax Minerals Company (Robison, Reid) (Entered: 04/26/2011) |
| 04/26/2011 | 3 | | MINUTE ORDER by Court Clerk, directing Cyprus Amax Minerals Company to file a Corporate Disclosure Statement pursuant to FRCvP 7.1 within five (5) days of this order, if they have not already done so. The parties shall use the form entitled Corporate Disclosure Statement available on the Courts website (please do not refile if already filed on non−court form unless directed to do so). If you have already filed your Corporate Disclosure Statement in this case, you are reminded to file a Supplemental Corporate Disclosure Statement within a reasonable time of any change in the information that the statement requires. (s−srl, Dpty Clk) (Entered: 04/26/2011) |
| 04/26/2011 | 4 | | CORPORATE DISCLOSURE STATEMENT (identifying: Corporate Parent Freeport McMoRan Corporation, Corporate Parent Freeport−McMoRan Copper & Gold Inc. for Cyprus Amax Minerals Company) by Cyprus Amax Minerals Company (Robison, Reid) (Entered: 04/26/2011) |
| 04/26/2011 | 5 | | |

| | | | |
|---|---|---|---|
| | | | ATTORNEY APPEARANCE by Reid Edward Robison on behalf of Cyprus Amax Minerals Company (Robison, Reid) (Entered: 04/26/2011) |
| 04/26/2011 | 6 | | ATTORNEY APPEARANCE by Timothy James Bomhoff on behalf of Cyprus Amax Minerals Company (Bomhoff, Timothy) (Entered: 04/26/2011) |
| 04/26/2011 | 7 | | SUMMONS Issued by Court Clerk as to CBS Operations, Inc., TCI Pacific Communications, Inc., Viacom, Inc. (sdc, Dpty Clk) (Entered: 04/26/2011) |
| 04/26/2011 | 8 | | SUMMONS Issued by Court Clerk as to CBS Corporation (sdc, Dpty Clk) (Entered: 04/27/2011) |
| 04/29/2011 | 9 | | MOTION for Attorney(s) John F. Stoviak to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 1085−849248) by Cyprus Amax Minerals Company (With attachments) (Bomhoff, Timothy) (Entered: 04/29/2011) |
| 04/29/2011 | 10 | | MOTION for Attorney(s) Christina D. Riggs to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 1085−849261) by Cyprus Amax Minerals Company (With attachments) (Bomhoff, Timothy) (Entered: 04/29/2011) |
| 04/29/2011 | 11 | | MOTION for Attorney(s) Cathleen M. Devlin to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 1085−849294) by Cyprus Amax Minerals Company (With attachments) (Bomhoff, Timothy) (Entered: 04/29/2011) |
| 05/02/2011 | 12 | | MINUTE ORDER by Judge Terence Kern *re: Attorney John F. Stoviak* ; granting 9 Motion for Admission Pro Hac Vice (vah, Chambers) (Entered: 05/02/2011) |
| 05/02/2011 | 13 | | MINUTE ORDER by Judge Terence Kern *re: Attorney Christina D. Riggs* ; granting 10 Motion for Admission Pro Hac Vice (vah, Chambers) (Entered: 05/02/2011) |
| 05/02/2011 | 14 | | MINUTE ORDER by Judge Terence Kern *re: Attorney Cathleen M. Devlin* ; granting 11 Motion for Admission Pro Hac Vice (vah, Chambers) (Entered: 05/02/2011) |
| 05/18/2011 | 15 | | SUMMONS Returned Executed re: TCI Pacific Communications, Inc. (Re: 2 Complaint ) by Cyprus Amax Minerals Company (Bomhoff, Timothy) (Entered: 05/18/2011) |
| 05/18/2011 | 16 | | SUMMONS Returned Executed re: Viacom, Inc. (Re: 2 Complaint ) by Cyprus Amax Minerals Company (Bomhoff, Timothy) (Entered: 05/18/2011) |
| 05/18/2011 | 17 | | SUMMONS Returned Executed re: CBS Operations, Inc. (Re: 2 Complaint ) by Cyprus Amax Minerals Company (Bomhoff, Timothy) (Entered: 05/18/2011) |
| 05/18/2011 | 18 | | SUMMONS Returned Executed re: CBS Corporation (Re: 2 Complaint ) by Cyprus Amax Minerals Company (Bomhoff, Timothy) (Entered: 05/18/2011) |
| 05/19/2011 | 19 | | Unopposed MOTION for Extension of Time to Answer *or Otherwise Plead* (Re: 2 Complaint ) by CBS Corporation, CBS Operations, Inc., TCI Pacific Communications, Inc., Viacom, Inc. (Jantzen, Paula) (Entered: 05/19/2011) |
| 05/19/2011 | 20 | | ATTORNEY APPEARANCE by Paula M Jantzen on behalf of All Defendants (Jantzen, Paula) (Entered: 05/19/2011) |

| | | | |
|---|---|---|---|
| 05/23/2011 | 21 | | MINUTE ORDER by Judge Terence Kern *Defendants have until June 24, 2011 to answer or otherwise respond to the Complaint.* ; granting 19 Motion for Extension of Time to Answer (Re: 2 Complaint ) (vah, Chambers) (Entered: 05/23/2011) |
| 05/23/2011 | 22 | | MINUTE ORDER by Court Clerk, directing TCI Pacific Communications, Inc., Viacom, Inc., CBS Corporation, CBS Operations, Inc. to file a Corporate Disclosure Statement pursuant to FRCvP 7.1 within five (5) days of this order, if they have not already done so. The parties shall use the form entitled Corporate Disclosure Statement available on the Courts website (please do not refile if already filed on non−court form unless directed to do so). If you have already filed your Corporate Disclosure Statement in this case, you are reminded to file a Supplemental Corporate Disclosure Statement within a reasonable time of any change in the information that the statement requires. (s−srl, Dpty Clk) (Entered: 05/23/2011) |
| 05/25/2011 | 23 | | ATTORNEY APPEARANCE by Mark D Coldiron on behalf of All Defendants (Coldiron, Mark) (Entered: 05/25/2011) |
| 05/25/2011 | 24 | | CORPORATE DISCLOSURE STATEMENT (identifying: Corporate Parent Comcast Cable Holdings, LLC, Other Affiliate Comcast Cable Communications, LLC, Other Affiliate Comcast Holdings Corporation, Other Affiliate Comcast Corporation for TCI Pacific Communications, Inc.) by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 05/25/2011) |
| 05/25/2011 | 25 | | CORPORATE DISCLOSURE STATEMENT (identifying: Corporate Parent National Amusements, Inc. for Viacom, Inc.) by Viacom, Inc. (Coldiron, Mark) (Entered: 05/25/2011) |
| 05/25/2011 | 26 | | CORPORATE DISCLOSURE STATEMENT (identifying: Corporate Parent National Amusements, Inc. for CBS Corporation) by CBS Corporation (Coldiron, Mark) (Entered: 05/25/2011) |
| 05/25/2011 | 27 | | CORPORATE DISCLOSURE STATEMENT (identifying: Corporate Parent CBS Corporation, Other Affiliate National Amusements, Inc. for CBS Operations, Inc.) by CBS Operations, Inc. (Coldiron, Mark) (Entered: 05/25/2011) |
| 05/25/2011 | 28 | | ATTORNEY APPEARANCE by Seth Dale Coldiron on behalf of All Defendants (Coldiron, Seth) (Entered: 05/25/2011) |
| 06/07/2011 | 29 | | MOTION for Attorney(s) Paul D. Steinman to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 1085−865244) by CBS Corporation, CBS Operations, Inc., TCI Pacific Communications, Inc., Viacom, Inc. (With attachments) (Coldiron, Mark) (Entered: 06/07/2011) |
| 06/08/2011 | 30 | | MINUTE ORDER by Judge Terence Kern *re: Attorney Paul D Steinman* ; granting 29 Motion for Admission Pro Hac Vice (vah, Chambers) (Entered: 06/08/2011) |
| 06/20/2011 | 31 | | Amended CORPORATE DISCLOSURE STATEMENT (identifying: Corporate Parent National Amusements, Inc., Corporate Parent NAI Entertainment Holdings LLC for CBS Corporation) by CBS Corporation (Coldiron, Mark) (Entered: 06/20/2011) |
| 06/20/2011 | 32 | | |

| | | | |
|---|---|---|---|
| | | | Amended CORPORATE DISCLOSURE STATEMENT (identifying: Corporate Parent CBS Corporation, Corporate Parent National Amusements, Inc., Corporate Parent NAI Entertainment Holdings LLC for CBS Operations, Inc.) by CBS Operations, Inc. (Coldiron, Mark) (Entered: 06/20/2011) |
| 06/23/2011 | 33 | | MOTION for Attorney(s) Keith J. Klein to be Admitted Pro Hac Vice (includes a request to waive the fee) by CBS Corporation, CBS Operations, Inc., TCI Pacific Communications, Inc., Viacom, Inc. (With attachments) (Coldiron, Mark) (Entered: 06/23/2011) |
| 06/24/2011 | 34 | | MINUTE ORDER by Judge Terence Kern *: Granting Defendants' Motion for admission pro hac vice as to Keith Klein provided that within 7 days they submit their CM/ECF Registration form pursuant to the Court's Administrative Guide* ; granting 33 Motion for Admission Pro Hac Vice (pll, Dpty Clk) (Entered: 06/24/2011) |
| 06/24/2011 | 35 | | ANSWER (Re: 2 Complaint ) by CBS Corporation (Coldiron, Mark) (Entered: 06/24/2011) |
| 06/24/2011 | 36 | | ANSWER (Re: 2 Complaint ) by CBS Operations, Inc. (Coldiron, Mark) (Entered: 06/24/2011) |
| 06/24/2011 | 37 | | ANSWER (Re: 2 Complaint ) by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 06/24/2011) |
| 06/24/2011 | 38 | | ANSWER (Re: 2 Complaint ) by Viacom, Inc. (Coldiron, Mark) (Entered: 06/24/2011) |
| 06/29/2011 | 39 | | ORDER by Judge Terence Kern, directing parties to file joint status report( Status Report due by 7/29/2011) (cds, Dpty Clk) (Entered: 06/29/2011) |
| 07/05/2011 | 40 | | MOTION for Attorney(s) Patrick M. Hromisin to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 1085−876720) by Cyprus Amax Minerals Company (With attachments) (Bomhoff, Timothy) (Entered: 07/05/2011) |
| 07/06/2011 | 41 | | MINUTE ORDER by Judge Terence Kern *Patrick M. Hromisin* ; ; granting 40 Motion for Admission Pro Hac Vice (cds, Dpty Clk) (Entered: 07/06/2011) |
| 07/27/2011 | 42 | | MOTION to Withdraw Attorney(s) *Keith J. Klein* by CBS Corporation, CBS Operations, Inc., TCI Pacific Communications, Inc., Viacom, Inc. (Klein, Keith) (Entered: 07/27/2011) |
| 07/27/2011 | 43 | | MINUTE ORDER by Judge Terence Kern ; terminating attorney Keith Jefferson Klein ; granting 42 Motion to Withdraw Attorney(s) (cds, Dpty Clk) (Entered: 07/27/2011) |
| 07/29/2011 | 44 | | JOINT STATUS REPORT by Cyprus Amax Minerals Company, CBS Corporation, CBS Operations, Inc., TCI Pacific Communications, Inc., Viacom, Inc. (Riggs, Christina) Modified on 8/1/2011 to add all filers (sac, Dpty Clk). (Entered: 07/29/2011) |
| 08/01/2011 | | | NOTICE of Docket Entry Modification; Error: not all filers were selected; Correction: added defendants as filers (Re: 44 Joint Status Report per Local Rule 16.1 ) (sac, Dpty Clk) (Entered: 08/01/2011) |
| 08/01/2011 | 45 | | MINUTE ORDER by Judge Terence Kern *referring case to Magistrate Paul Cleary for scheduling conference* (cds, Dpty Clk) (Entered: 08/01/2011) |

| | | | |
|---|---|---|---|
| 08/04/2011 | 46 | | MINUTE ORDER by Magistrate Judge Paul J Cleary *setting Scheduling Conference to be held in Courtroom #1, Third Floor*, setting/resetting deadline(s)/hearing(s): ( Scheduling Conference set for 8/16/2011 at 03:00 PM before Magistrate Judge Paul J Cleary) (kjp, Dpty Clk) (Entered: 08/04/2011) |
| 08/11/2011 | 47 | | MINUTE ORDER by Magistrate Judge Paul J Cleary *STRIKING 8/16/11 conference and resetting for 8/22/11*, setting/resetting deadline(s)/hearing(s): *to be held in Courtroom #1, Third Floor* ( Scheduling Conference set for 8/22/2011 at 10:30 AM before Magistrate Judge Paul J Cleary) (kjp, Dpty Clk) (Entered: 08/11/2011) |
| 08/22/2011 | 48 | | MINUTES of Proceedings − held before Magistrate Judge Paul J Cleary: Scheduling Conference held on 8/22/2011, striking/terminating deadline(s)/Hearing(s) (Court Reporter: C1) (kjp, Dpty Clk) (Entered: 08/22/2011) |
| 08/22/2011 | 49 | | SCHEDULING ORDER by Magistrate Judge Paul J Cleary *(Corporate Issues Phase)*, setting/resetting deadline(s)/hearing(s): ( Discovery due by 6/22/2012, Miscellaneous Deadline set for 8/14/2012) (kjp, Dpty Clk) (Entered: 08/22/2011) |
| 11/01/2011 | 50 | | MINUTE ORDER by Judge Terence Kern changing case number to 11−cv−252−GKF−PJC, reassigning case to Judge Gregory K Frizzell, Judge Terence Kern no longer assigned to case, recusing Judge Terence Kern. Judge Gregory K Frizzell reassigned to case. Modified on 11/10/2011 to show name of Judge issuing order(cds, Dpty Clk). (Entered: 11/01/2011) |
| 12/23/2011 | 51 | | MOTION for Attorney(s) Amy L Piccola to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 1085−948766) by Cyprus Amax Minerals Company (With attachments) (Bomhoff, Timothy) (Entered: 12/23/2011) |
| 12/28/2011 | 52 | | ORDER by Judge Gregory K Frizzell *(Adding attorney Amy L. Piccola)* ; ; granting 51 Motion for Admission Pro Hac Vice (cds, Dpty Clk) (Entered: 12/28/2011) |
| 01/27/2012 | 53 | | MOTION Choice of Law Determination *and Integrated Memorandum in Support* by CBS Corporation, CBS Operations, Inc., TCI Pacific Communications, Inc., Viacom, Inc. (With attachments) (Coldiron, Mark) (Entered: 01/27/2012) |
| 02/09/2012 | 54 | | Joint MOTION Extend Deadlines by CBS Corporation, CBS Operations, Inc., Cyprus Amax Minerals Company, TCI Pacific Communications, Inc., Viacom, Inc. (Coldiron, Mark) (Entered: 02/09/2012) |
| 02/10/2012 | 55 | | SCHEDULING ORDER by Judge Gregory K Frizzell *First Amended* ; setting/resetting deadline(s)/hearing(s): ( Discovery due by 7/13/2012, Miscellaneous Deadline set for 8/21/2012); granting 54 Motion for Miscellaneous Relief (hbo, Dpty Clk) (Entered: 02/10/2012) |
| 02/17/2012 | 56 | | RESPONSE in Opposition to Motion (Re: 53 MOTION Choice of Law Determination *and Integrated Memorandum in Support* ) by Cyprus Amax Minerals Company ; (With attachments) (Robison, Reid) (Entered: 02/17/2012) |
| 03/02/2012 | 57 | | REPLY to Response to Motion (Re: 53 MOTION Choice of Law Determination *and Integrated Memorandum in Support* ) by CBS Corporation, |

| | | | |
|---|---|---|---|
| | | | CBS Operations, Inc., TCI Pacific Communications, Inc., Viacom, Inc. ; (Jantzen, Paula) (Entered: 03/02/2012) |
| 03/05/2012 | 58 | | Joint MOTION for Hearing *REGARDING DEFENDANTS' MOTION FOR CHOICE OF LAW DETERMINATION AND BRIEF IN SUPPORT* (Re: 57 Reply to Response to Motion, 53 MOTION Choice of Law Determination *and Integrated Memorandum in Support*, 56 Response in Opposition to Motion ) by Cyprus Amax Minerals Company, TCI Pacific Communications, Inc., Viacom, Inc., CBS Corporation, CBS Operations, Inc. (Robison, Reid) Modified on 3/6/2012 to add filers (tjc, Dpty Clk). (Entered: 03/05/2012) |
| 03/05/2012 | 59 | | STIPULATION of Dismissal, dismissing Viacom Inc., dismissing Complaint against Defendant Viacom Inc., by Cyprus Amax Minerals Company, TCI Pacific Communications, Inc., Viacom, Inc., CBS Corporation, CBS Operations, Inc. (Robison, Reid) Modified on 3/6/2012 to add filers (tjc, Dpty Clk). (Entered: 03/05/2012) |
| 03/06/2012 | 60 | | MINUTE ORDER by Judge Gregory K Frizzell *The parties' motion is denied without prejudice. A hearing will be set if the court determines oral argument would be helpful.* ; denying 58 Motion for Hearing (GKF2, Chambers) (Entered: 03/06/2012) |
| 03/06/2012 | | | NOTICE of Docket Entry Modification; Error: Not all filers were selected when filed; Correction: Edited docket text to add filers (Re: 58 Joint MOTION for Hearing *REGARDING DEFENDANTS' MOTION FOR CHOICE OF LAW DETERMINATION AND BRIEF IN SUPPORT* ) (tjc, Dpty Clk) (Entered: 03/06/2012) |
| 03/06/2012 | | | NOTICE of Docket Entry Modification; Error: Not all filers were selected when filed; Correction: Edited docket text to add filers (Re: 59 Stipulation of Dismissal, ) (tjc, Dpty Clk) (Entered: 03/06/2012) |
| 03/12/2012 | 61 | | MOTION to Withdraw Attorney(s) *Seth D. Coldiron* by CBS Corporation, CBS Operations, Inc., TCI Pacific Communications, Inc., Viacom, Inc. (Coldiron, Seth) (Entered: 03/12/2012) |
| 03/12/2012 | 62 | | ORDER by Judge Gregory K Frizzell ; terminating attorney Mark D Coldiron and Seth Dale Coldiron ; granting 61 Motion to Withdraw Attorney(s) (hbo, Dpty Clk) (Entered: 03/12/2012) |
| 04/02/2012 | 63 | | STIPULATION of Dismissal, dismissing CBS Corporation, dismissing Complaint, by CBS Corporation, CBS Operations, Inc., Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Robison, Reid) (Entered: 04/02/2012) |
| 04/25/2012 | 64 | | Joint MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) by CBS Operations, Inc., Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Robison, Reid) (Entered: 04/25/2012) |
| 04/26/2012 | 65 | | SCHEDULING ORDER by Chief Judge Gregory K Frizzell *Second Amended Scheduling Order for Initial Corporate Issues Phase of Discovery* ; setting/resetting scheduling order date(s): ( Discovery due by 9/14/2012, Dispositive Motions due by 3/1/2013); granting 64 Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (hbo, Dpty Clk) (Entered: 04/26/2012) |

| | | | |
|---|---|---|---|
| 05/24/2012 | 66 | | Joint MOTION for Protective Order by CBS Operations, Inc., Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 05/24/2012) |
| 05/25/2012 | 67 | | PROTECTIVE ORDER by Magistrate Judge Paul J Cleary ; granting 66 Motion for Protective Order (kjp, Dpty Clk) (Entered: 05/25/2012) |
| 06/18/2012 | 68 | | MOTION to Compel *with Brief in Support of Motion to Compel* by Cyprus Amax Minerals Company (With attachments) (Robison, Reid) Modified on 6/19/2012 to remove text re: second motion part; See Doc #70 for second motion part (lml, Dpty Clk). (Entered: 06/18/2012) |
| 06/18/2012 | 69 | | MOTION for Protective Order *and Integrated Brief in Support* by CBS Operations, Inc., TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 06/18/2012) |
| 06/18/2012 | 70 | | MOTION to Expedite Ruling *(SUBMITTED AS DOC # 68 )* by Cyprus Amax Minerals Company (lml, Dpty Clk) (Entered: 06/19/2012) |
| 06/19/2012 | | | NOTICE of Docket Entry Modification; Error: Document No. 68 is a multi−part motion, but only one part was filed; Correction: The second motion part was filed by our office as Document No. 70 (Re: 70 MOTION to Expedite Ruling *(SUBMITTED AS DOC # 68 )*, 68 MOTION to Compel *with Brief in Support of Motion to Compel* ) (lml, Dpty Clk) (Entered: 06/19/2012) |
| 06/19/2012 | | | ***Motion(s) Referred to Magistrate Judge Cleary (Re: 70 MOTION to Expedite Ruling *(SUBMITTED AS DOC # 68 )* ) (lml, Dpty Clk) (Entered: 06/19/2012) |
| 06/28/2012 | 71 | | RESPONSE in Opposition to Motion (Re: 69 MOTION for Protective Order *and Integrated Brief in Support* ) by Cyprus Amax Minerals Company ; (With attachments) (Bomhoff, Timothy) (Entered: 06/28/2012) |
| 06/28/2012 | 72 | | RESPONSE in Support of Motion (Re: 70 MOTION to Expedite Ruling *(SUBMITTED AS DOC # 68 )* ) by CBS Operations, Inc., TCI Pacific Communications, Inc. ; (Coldiron, Mark) (Entered: 06/28/2012) |
| 06/28/2012 | 73 | | RESPONSE in Opposition to Motion (Re: 68 MOTION to Compel *with Brief in Support of Motion to Compel* ) by CBS Operations, Inc., TCI Pacific Communications, Inc. ; (With attachments) (Coldiron, Mark) (Entered: 06/28/2012) |
| 07/03/2012 | 74 | | ORDER by Magistrate Judge Paul J Cleary ; denying 68 Motion to Compel; denying 70 Motion to Expedite Ruling (kjp, Dpty Clk) (Entered: 07/03/2012) |
| 07/05/2012 | 75 | | NOTICE Joint Notice Regarding Submission of Discovery Materials Related to Docket Nos. 68, 69, 70, and 74 (Re: 74 Order, Ruling on Motion to Compel, Ruling on Motion to Expedite Ruling ) by CBS Operations, Inc., Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 07/05/2012) |
| 07/05/2012 | 76 | | MOTION to Reconsider (Re: 74 Order, Ruling on Motion to Compel, Ruling on Motion to Expedite Ruling ) by Cyprus Amax Minerals Company (Robison, Reid) (Entered: 07/05/2012) |
| 07/10/2012 | 77 | | |

| | | | |
|---|---|---|---|
| | | | REPLY to Response to Motion (Re: 69 MOTION for Protective Order *and Integrated Brief in Support* ) by CBS Operations, Inc., TCI Pacific Communications, Inc. ; (Coldiron, Mark) (Entered: 07/10/2012) |
| 07/11/2012 | 78 | | MINUTE ORDER by Chief Judge Gregory K Frizzell, referring motion(s) to Magistrate Judge Cleary (Re: 76 MOTION to Reconsider ) (This entry is the Official Order of the Court. No document is attached.) (hbo, Dpty Clk) (Entered: 07/11/2012) |
| 07/11/2012 | 79 | | REPLY (Re: 68 Motion to Compel) by Cyprus Amax Minerals Company (Bomhoff, Timothy) Modified on 7/12/2012 to add link (sac, Dpty Clk). (Entered: 07/11/2012) |
| 07/19/2012 | 80 | | MINUTE ORDER by Magistrate Judge Paul J Cleary *Telephone Discovery Conference scheduled as follows.*, setting/resetting deadline(s)/hearing(s): *Plaintiff Cyprus shall contact the court with a call−in telephone number* ( Discovery Hearing set for 8/10/2012 at 03:00 PM before Magistrate Judge Paul J Cleary) (This entry is the Official Order of the Court. No document is attached.) (jcm, Dpty Clk) (Entered: 07/19/2012) |
| 08/10/2012 | 81 | | MINUTES of Proceedings − held before Magistrate Judge Paul J Cleary: Discovery Hearing held on 8/10/2012 *(Telephonic)* ; striking/terminating deadline(s)/Hearing(s); reinstating document(s); granting 76 Motion to Reconsider (Re: 68 MOTION to Compel *with Brief in Support of Motion to Compel* ) (Court Reporter: C1) (kjp, Dpty Clk) (Main Document 81 replaced on 8/13/2012 with corrected PDF) (kjp, Dpty Clk) (Entered: 08/10/2012) |
| 08/13/2012 | 82 | | NOTICE of Docket Entry Modification; Error: wrong hearing date on Minute; Correction: hearing date corrected to 8−10−2012 (Re: 81 Minutes of Discovery Hearing, Striking/Terminating Deadline(s)/Hearing(s), Reinstating Document(s), Ruling on Motion to Reconsider,, Striking/Terminating Deadline(s)/Hearing(s), Reinstating Document(s), ) (kjp, Dpty Clk) (Entered: 08/13/2012) |
| 08/15/2012 | 83 | | MOTION for Attorney(s) Wendy West Feinstein to be Admitted Pro Hac Vice (paid $75 PHV fee; receipt number 1085−1043283) by CBS Operations, Inc., TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 08/15/2012) |
| 08/16/2012 | 84 | | ORDER by Chief Judge Gregory K Frizzell ; granting 83 Motion for Admission Pro Hac Vice (hbo, Dpty Clk) (Entered: 08/16/2012) |
| 08/24/2012 | 85 | | Joint MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (Re: 65 Scheduling Order,, Setting/Resetting Scheduling Order Date(s), Setting/Resetting Scheduling Order Date(s), Ruling on Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s), Ruling on Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) ) by CBS Operations, Inc., Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Robison, Reid) (Entered: 08/24/2012) |
| 08/24/2012 | 86 | | SCHEDULING ORDER by Chief Judge Gregory K Frizzell *Third Amended* ; setting/resetting scheduling order date(s): ( Discovery due by 1/18/2013, Dispositive Motions due by 7/12/2013); granting 85 Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (hbo, Dpty Clk) (Entered: 08/24/2012) |

| | | | |
|---|---|---|---|
| 09/04/2012 | | | *** Motion to Compel Referred to Magistrate Judge Cleary (Re: 68 MOTION to Compel *with Brief in Support of Motion to Compel* ) (see document number 81 referral wasn't done after reinstatement of Motion]) (kjp, Dpty Clk) (Entered: 09/04/2012) |
| 09/04/2012 | 87 | | MINUTE ORDER by Magistrate Judge Paul J Cleary *setting hearing to be held in Courtroom #2, Third Floor*, setting/resetting deadline(s)/hearing(s): ( Motion Hearing set for 9/11/2012 at 10:30 AM before Magistrate Judge Paul J Cleary) (Re: 68 MOTION to Compel *with Brief in Support of Motion to Compel*, 69 MOTION for Protective Order *and Integrated Brief in Support* ) (This entry is the Official Order of the Court. No document is attached.) (kjp, Dpty Clk) (Entered: 09/04/2012) |
| 09/11/2012 | 88 | | MINUTES of Proceedings − held before Magistrate Judge Paul J Cleary: Motion Hearing held on 9/11/2012, setting/resetting deadline(s)/hearing(s): *(Miscellaneous Deadlines: 9/18/12 and 9/25/12)* (Re: 69 MOTION for Protective Order *and Integrated Brief in Support*, 68 MOTION to Compel *with Brief in Support of Motion to Compel* ) (Court Reporter: C2) (kjp, Dpty Clk) (Entered: 09/11/2012) |
| 09/12/2012 | 89 | | OPINION AND ORDER by Chief Judge Gregory K Frizzell ; granting 53 Motion for Miscellaneous Relief (hbo, Dpty Clk) (Entered: 09/12/2012) |
| 09/18/2012 | 90 | | Supplemental Brief(Re: 71 Response in Opposition to Motion, 88 Minutes of Motion Hearing,, Setting/Resetting Deadline(s)/Hearing(s), Setting/Resetting Deadline(s)/Hearing(s), 69 MOTION for Protective Order *and Integrated Brief in Support*, 68 MOTION to Compel *with Brief in Support of Motion to Compel* ) by Cyprus Amax Minerals Company (With attachments) (Robison, Reid) Modified on 9/19/2012 to correct event (tjc, Dpty Clk). (Entered: 09/18/2012) |
| 09/19/2012 | | | NOTICE of Docket Entry Modification; Error: This was filed using the incorrect event (Supplement); Correction: Edited docket text to reflect the correct event (Brief) (Re: 90 Supplement, ) (tjc, Dpty Clk) (Entered: 09/19/2012) |
| 09/25/2012 | 91 | | RESPONSE in Support of Motion (Re: 69 MOTION for Protective Order *and Integrated Brief in Support* ) by CBS Operations, Inc., TCI Pacific Communications, Inc. ; (With attachments) (Coldiron, Mark) (Entered: 09/25/2012) |
| 10/10/2012 | 92 | | Joint STIPULATION by CBS Operations, Inc., Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Jantzen, Paula) (Entered: 10/10/2012) |
| 10/12/2012 | 93 | | OPINION AND ORDER by Magistrate Judge Paul J Cleary ; setting/resetting deadline(s)/hearing(s): ( Miscellaneous Deadline set for 10/26/2012); denying 68 Motion to Compel; granting 69 Motion for Protective Order (kjp, Dpty Clk) (Entered: 10/12/2012) |
| 10/26/2012 | 94 | | Unopposed MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (Re: 93 Opinion and Order, Setting/Resetting Deadline(s)/Hearing(s), Ruling on Motion to Compel, Ruling on Motion for Protective Order ) by Cyprus Amax Minerals Company (Robison, Reid) (Entered: 10/26/2012) |

| | | | |
|---|---|---|---|
| 10/26/2012 | 95 | | NOTICE to the Court Regarding Status of Discovery Disputes (Re: 93 Opinion and Order, Setting/Resetting Deadline(s)/Hearing(s), Ruling on Motion to Compel, Ruling on Motion for Protective Order ) by CBS Operations, Inc., Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 10/26/2012) |
| 10/29/2012 | 96 | | MINUTE ORDER by Chief Judge Gregory K Frizzell ; granting 94 Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (Re: 93 Opinion and Order, Setting/Resetting Deadline(s)/Hearing(s), Ruling on Motion to Compel, Ruling on Motion for Protective Order ) (This entry is the Official Order of the Court. No document is attached.) (hbo, Dpty Clk) (Entered: 10/29/2012) |
| 11/02/2012 | 97 | | OBJECTION to Magistrate Judge's Order (Re: 93 Opinion and Order, Setting/Resetting Deadline(s)/Hearing(s), Ruling on Motion to Compel, Ruling on Motion for Protective Order ) by Cyprus Amax Minerals Company (Bomhoff, Timothy) Modified on 11/5/2012 to correct title of event (lml, Dpty Clk). (Entered: 11/02/2012) |
| 11/02/2012 | 98 | | NOTICE to the Court Regarding Status of Discovery Disputes (Re: 93 Opinion and Order, Setting/Resetting Deadline(s)/Hearing(s), Ruling on Motion to Compel, Ruling on Motion for Protective Order ) by CBS Operations, Inc., Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 11/02/2012) |
| 11/05/2012 | | | NOTICE of Docket Entry Modification; Error: This was filed using the incorrect event (Objection); Correction: Edited docket text to reflect correct event (Re: 97 OBJECTION to Magistrate Judge's Order ) (lml, Dpty Clk) (Entered: 11/05/2012) |
| 11/09/2012 | 99 | | NOTICE To the Court Regarding Status of Discovery Disputes by CBS Operations, Inc., TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 11/09/2012) |
| 11/13/2012 | 100 | | MOTION for Protective Order *and Integrated Memorandum in Support* by CBS Operations, Inc., TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 11/13/2012) |
| 11/16/2012 | 101 | | RESPONSE (Re: 97 OBJECTION to Magistrate Judge's Order ) by CBS Operations, Inc., TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 11/16/2012) |
| 11/30/2012 | 102 | | REPLY (Re: 97 OBJECTION to Magistrate Judge's Order ) by Cyprus Amax Minerals Company (With attachments) (Devlin, Cathleen) (Entered: 11/30/2012) |
| 12/04/2012 | 103 | | RESPONSE in Opposition to Motion (Re: 100 MOTION for Protective Order *and Integrated Memorandum in Support* ) by Cyprus Amax Minerals Company ; (With attachments) (Robison, Reid) (Entered: 12/04/2012) |
| 12/18/2012 | 104 | | REPLY to Response to Motion (Re: 100 MOTION for Protective Order *and Integrated Memorandum in Support* ) by CBS Operations, Inc., TCI Pacific Communications, Inc. ; (With attachments) (Jantzen, Paula) (Entered: 12/18/2012) |
| 01/04/2013 | 105 | | MINUTE ORDER *by Court Clerk pursuant to General Order 12−07,* reassigning case to Judge John E Dowdell, Chief Judge Gregory K Frizzell no |

| | | | |
|---|---|---|---|
| | | | longer assigned to case, changing case number to 11−CV−252−JED−PJC (This entry is the Official Order of the Court. No document is attached.) (sac, Dpty Clk) (Entered: 01/04/2013) |
| 01/18/2013 | 106 | | AMENDED COMPLAINT against CBS Operations, Inc., TCI Pacific Communications, Inc. (Re: 2 Complaint ) by Cyprus Amax Minerals Company (Robison, Reid) (Entered: 01/18/2013) |
| 01/18/2013 | 107 | | MOTION for Judgment as a Matter of Law *On the Pleadings* by CBS Operations, Inc., TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 01/18/2013) |
| 01/18/2013 | 108 | | Unopposed MOTION for Leave to File Amended Answer and Counterclaim (Re: 2 Complaint ) by CBS Operations, Inc., TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 01/18/2013) |
| 01/22/2013 | 109 | | Joint MOTION to Clarify by CBS Operations, Inc., Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Coldiron, Mark) Modified on 1/23/2013; this is a two−part motion of which only one part was filed − see 111 for Motion to Amend (sac, Dpty Clk). (Entered: 01/22/2013) |
| 01/22/2013 | 110 | | OPINION AND ORDER by Judge John E Dowdell ; denying 97 Objection to Magistrate Judge's Order (SAS, Chambers) (Entered: 01/22/2013) |
| 01/22/2013 | 111 | | Joint MOTION to Amend *(submitted as part of 109 )* by CBS Operations, Inc., Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (sac, Dpty Clk) (Entered: 01/23/2013) |
| 01/23/2013 | | | NOTICE of Docket Entry Modification; Error: this is a two−part motion of which only one part was filed; Correction: see 111 for Motion to Amend (Re: 109 Joint MOTION to Clarify ) (sac, Dpty Clk) (Entered: 01/23/2013) |
| 01/24/2013 | 112 | | ORDER by Judge John E Dowdell ; terminating document(s); granting 109 Motion to Clarify (Re: 108 Unopposed MOTION for Leave to File Amended Answer and Counterclaim, 107 MOTION for Judgment as a Matter of Law *On the Pleadings* ) (Documents Terminated: 108 Unopposed MOTION for Leave to File Amended Answer and Counterclaim, 107 MOTION for Judgment as a Matter of Law *On the Pleadings* ) (SAS, Chambers) (Entered: 01/24/2013) |
| 01/25/2013 | 113 | | MINUTE ORDER by Judge John E Dowdell *that 111 the motion to amend is moot per 112* ; finding as moot 111 Motion to Amend (Re: 109 Joint MOTION to Clarify, 112 Order,, Terminating Document(s), Terminating Document(s), Ruling on Motion to Clarify, 111 MOTION to Amend *(submitted as part of 109 )* ) (This entry is the Official Order of the Court. No document is attached.) (SAS, Chambers) (Entered: 01/25/2013) |
| 02/04/2013 | 114 | | MOTION to Dismiss *Claims in Plaintiff's Amended Complaint and Integrated Brief in Support* by CBS Operations, Inc., TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 02/04/2013) |
| 02/06/2013 | 115 | | ORDER by Magistrate Judge Paul J Cleary, setting/resetting deadline(s)/hearing(s): ( Miscellaneous Deadline set for 2/22/2013) (Re: 100 MOTION for Protective Order *and Integrated Memorandum in Support* ) (kjp, Dpty Clk) (Entered: 02/06/2013) |
| 02/20/2013 | 116 | | |

| | | | |
|---|---|---|---|
| | | | NOTICE To the Court Regarding the Status of Defendants' Motion for Entry of Protective Order (Re: 115 Order, Setting/Resetting Deadline(s)/Hearing(s), 100 MOTION for Protective Order *and Integrated Memorandum in Support* ) by CBS Operations, Inc., Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 02/20/2013) |
| 02/21/2013 | 117 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 114 MOTION to Dismiss *Claims in Plaintiff's Amended Complaint and Integrated Brief in Support* ) by Cyprus Amax Minerals Company (With attachments) (Stoviak, John) (Entered: 02/21/2013) |
| 02/21/2013 | 118 | | OPINION AND ORDER by Magistrate Judge Paul J Cleary ; finding as moot 100 Motion for Protective Order (kjp, Dpty Clk) (Entered: 02/21/2013) |
| 02/21/2013 | 119 | | MINUTE ORDER by Judge John E Dowdell *that Plaintiff's Unopposed Motion for Extension of Time (Doc. 117) is granted. Plaintiff's shall file their response to Defendants' Motion to Dismiss Claims in Plaintiff's Amended Complaint no later than 3/7/2013* ; setting/resetting deadline(s)/hearing(s): ( Responses due by 3/7/2013, Replies due by 3/21/2013); granting 117 Motion for Extension of Time to Respond to Motion (Re: 114 MOTION to Dismiss *Claims in Plaintiff's Amended Complaint and Integrated Brief in Support* ) (This entry is the Official Order of the Court. No document is attached.) (SAS, Chambers) (Entered: 02/21/2013) |
| 03/07/2013 | 120 | | RESPONSE in Opposition to Motion (Re: 114 MOTION to Dismiss *Claims in Plaintiff's Amended Complaint and Integrated Brief in Support* ) by Cyprus Amax Minerals Company ; (Devlin, Cathleen) (Entered: 03/07/2013) |
| 03/21/2013 | 121 | | REPLY to Response to Motion (Re: 114 MOTION to Dismiss *Claims in Plaintiff's Amended Complaint and Integrated Brief in Support* ) by CBS Operations, Inc., TCI Pacific Communications, Inc. ; (Coldiron, Mark) (Entered: 03/21/2013) |
| 06/05/2013 | 122 | | Joint MOTION Extension of Deadlines by CBS Operations, Inc., Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 06/05/2013) |
| 06/07/2013 | 123 | | ORDER by Judge John E Dowdell *the Joint Motion for Extension of Current Deadlines (Doc. 122) is granted. The deadline to submit Daubert motions relating to experts on corporate issues is extended to 7/10/2013. The parties shall file summary judgment motions relating to corporate issues by 9/20/2013. A Joint Status Report on mediation or other form of ADR is due no later than 10/11/2013.* ; setting/resetting deadline(s)/hearing(s): ( Dispositive Motions due by 9/20/2013, Status Report due by 10/11/2013); granting 122 Motion for Miscellaneous Relief (Re: 86 Scheduling Order,, Setting/Resetting Scheduling Order Date(s),, Ruling on Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s), ) (SAS, Chambers) (Entered: 06/07/2013) |
| 07/10/2013 | 124 | | MOTION to Exclude Opinions of Defendants' Expert Jennifer Stevens, Ph.D. and Brief in Support by Cyprus Amax Minerals Company (With attachments) (Riggs, Christina) (Entered: 07/10/2013) |
| 07/10/2013 | 125 | | MOTION to Exclude Testimony of James Burrows *and Integrated Brief in Support* by CBS Operations, Inc., TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 07/10/2013) |

| | | | |
|---|---|---|---|
| 07/10/2013 | 126 | | MOTION to Exclude Testimony of Bala Dharan *and Integrated Brief in Support* by CBS Operations, Inc., TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 07/10/2013) |
| 07/10/2013 | 127 | | MOTION to Exclude Testimony of Irwin Steinhorn *and Integrated Brief in Support* by CBS Operations, Inc., TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 07/10/2013) |
| 07/11/2013 | 128 | | MINUTE ORDER by Judge John E Dowdell , Counsel for Cyprus Amax Minerals Company is directed to provide forthwith for use by the Court a manual copy in a three−ring binder notebook of the pleading and/or exhibits as filed at Dkt. # 124 . Said manual copies shall be EXACT duplicates of the pleading and/or exhibits AFTER said pleading(s) was filed with the Court, including the case and docket number information at the top of each page. Do not reorganize the document or insert other separately docketed items. If copies of sealed items are hereby ordered by the Court, then said copies shall be a separate and complete submission. (Re: 124 MOTION to Exclude Opinions of Defendants' Expert Jennifer Stevens, Ph.D. and Brief in Support ) (This entry is the Official Order of the Court. No document is attached.) (SAS, Chambers) (Entered: 07/11/2013) |
| 07/11/2013 | 129 | | MINUTE ORDER by Judge John E Dowdell , Counsel for CBS Operations, Inc., and TCI Pacific Communications, Inc. is directed to provide forthwith for use by the Court a manual copy in a three−ring binder notebook of the pleading and/or exhibits as filed at Dkt. # [125 and 126]. Said manual copies shall be EXACT duplicates of the pleading and/or exhibits AFTER said pleading(s) was filed with the Court, including the case and docket number information at the top of each page. Do not reorganize the document or insert other separately docketed items. If copies of sealed items are hereby ordered by the Court, then said copies shall be a separate and complete submission. (Re: 125 MOTION to Exclude Testimony of James Burrows *and Integrated Brief in Support*, 126 MOTION to Exclude Testimony of Bala Dharan *and Integrated Brief in Support* ) (This entry is the Official Order of the Court. No document is attached.) (SAS, Chambers) (Entered: 07/11/2013) |
| 07/31/2013 | 130 | | RESPONSE in Opposition to Motion (Re: 124 MOTION to Exclude Opinions of Defendants' Expert Jennifer Stevens, Ph.D. and Brief in Support ) by CBS Operations, Inc., TCI Pacific Communications, Inc. ; (With attachments) (Coldiron, Mark) (Entered: 07/31/2013) |
| 07/31/2013 | 131 | | RESPONSE in Opposition to Motion (Re: 126 MOTION to Exclude Testimony of Bala Dharan *and Integrated Brief in Support* ) by Cyprus Amax Minerals Company ; (With attachments) (Devlin, Cathleen) (Entered: 07/31/2013) |
| 07/31/2013 | 132 | | RESPONSE in Opposition to Motion (Re: 127 MOTION to Exclude Testimony of Irwin Steinhorn *and Integrated Brief in Support* ) by Cyprus Amax Minerals Company ; (With attachments) (Devlin, Cathleen) (Entered: 07/31/2013) |
| 07/31/2013 | 133 | | RESPONSE in Opposition to Motion (Re: 125 MOTION to Exclude Testimony of James Burrows *and Integrated Brief in Support* ) by Cyprus Amax Minerals Company ; (With attachments) (Devlin, Cathleen) (Entered: 07/31/2013) |

| | | | |
|---|---|---|---|
| 08/14/2013 | 134 | | REPLY to Response to Motion (Re: 125 MOTION to Exclude Testimony of James Burrows *and Integrated Brief in Support* ) by CBS Operations, Inc., TCI Pacific Communications, Inc. ; (With attachments) (Coldiron, Mark) Modified on 8/15/2013 to change text to reflect the correct event (sac, Dpty Clk). (Entered: 08/14/2013) |
| 08/14/2013 | 135 | | REPLY to Response to Motion (Re: 126 MOTION to Exclude Testimony of Bala Dharan *and Integrated Brief in Support* ) by CBS Operations, Inc., TCI Pacific Communications, Inc. ; (With attachments) (Coldiron, Mark) Modified on 8/15/2013 to change text to reflect correct event (sac, Dpty Clk). (Entered: 08/14/2013) |
| 08/14/2013 | 136 | | REPLY to Response to Motion (Re: 127 MOTION to Exclude Testimony of Irwin Steinhorn *and Integrated Brief in Support* ) by CBS Operations, Inc., TCI Pacific Communications, Inc. ; (Coldiron, Mark) Modified on 8/15/2013 to change text to reflect correct event (sac, Dpty Clk). (Entered: 08/14/2013) |
| 08/14/2013 | 137 | | REPLY to Response to Motion (Re: 124 MOTION to Exclude Opinions of Defendants' Expert Jennifer Stevens, Ph.D. and Brief in Support ) by Cyprus Amax Minerals Company ; (With attachments) (Devlin, Cathleen) Modified on 8/15/2013 to change text to reflect correct event (sac, Dpty Clk). (Entered: 08/14/2013) |
| 08/15/2013 | | | NOTICE of Docket Entry Modification; Error: wrong event selected (Brief in Support of Motion); Correction: changed text to reflect the correct event (Reply to Response to Motion) (Re: 134 Brief in Support of Motion, ) (sac, Dpty Clk) (Entered: 08/15/2013) |
| 08/15/2013 | | | NOTICE of Docket Entry Modification; Error: wrong event selected (Brief in Support of Motion); Correction: changed text to reflect the correct event (Reply to Response to Motion) (Re: 135 Brief in Support of Motion, ) (sac, Dpty Clk) (Entered: 08/15/2013) |
| 08/15/2013 | | | NOTICE of Docket Entry Modification; Error: wrong event selected (Brief in Support of Motion); Correction: changed text to reflect the correct event (Reply to Response to Motion) (Re: 136 Brief in Support of Motion, ) (sac, Dpty Clk) (Entered: 08/15/2013) |
| 08/15/2013 | | | NOTICE of Docket Entry Modification; Error: wrong event selected (Response in Support of Motion); Correction: changed text to reflect the correct event (Reply to Response to Motion) (Re: 137 Response in Support of Motion, ) (sac, Dpty Clk) (Entered: 08/15/2013) |
| 08/29/2013 | 138 | | MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) by CBS Operations, Inc., TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 08/29/2013) |
| 09/04/2013 | 139 | | RESPONSE in Opposition to Motion (Re: 138 MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) ) by Cyprus Amax Minerals Company ; (Devlin, Cathleen) (Entered: 09/04/2013) |
| 09/06/2013 | 140 | | REPLY to Response to Motion (Re: 138 MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) ) by CBS Operations, Inc., TCI Pacific Communications, Inc. ; (Coldiron, Mark) (Entered: 09/06/2013) |
| 09/10/2013 | 141 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by Judge John E Dowdell *The Defendants' Motion for Extension of Current Deadlines (Doc. 138) is granted.* ; setting/resetting scheduling order date(s): ; granting 138 Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (Re: 123 Order,,, Setting/Resetting Deadline(s)/Hearing(s),,,,,, Ruling on Motion for Miscellaneous Relief,, ) (SAS, Chambers) (Entered: 09/10/2013) |
| 12/03/2013 | 142 | | OPINION AND ORDER by Judge John E Dowdell ; terminating party CBS Operations, Inc. ; granting 114 Motion to Dismiss (Re: 106 Amended Complaint ) (SAS, Chambers) (Entered: 12/03/2013) |
| 12/17/2013 | 143 | | ANSWER (Re: 106 Amended Complaint ) by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 12/17/2013) |
| 01/29/2014 | 144 | | MINUTE ORDER *by Judge John E Dowdell randomly reassigning case,* recusing Judge John E Dowdell. Judge Claire V Eagan reassigned to case., changing case number to 11−CV−252−CVE−PJC (This entry is the Official Order of the Court. No document is attached.) (lml, Dpty Clk) (Entered: 01/29/2014) |
| 02/21/2014 | 145 | | OPINION AND ORDER by Judge Claire V Eagan *ruling on Daubert motions; and directing that the parties' motions for summary judgment on the issue of TFMC's and NJ Zinc's corporate relationship, including any arguments as to piercing the corporate veil, are due no later that April 21, 2014. Response and replies are due pursuant to LCvR 7.2. This matter will be set for a settlement conference before the summary judgment briefing is completed.* ; setting/resetting deadline(s)/hearing(s): ( Dispositive Motions due by 4/21/2014); denying 124 Motion to Exclude; denying 125 Motion to Exclude; denying 126 Motion to Exclude; granting 127 Motion to Exclude (Re: 106 Amended Complaint ) (RGG, Chambers) (Entered: 02/21/2014) |
| 02/25/2014 | 146 | | SETTLEMENT CONFERENCE ORDER by Magistrate Judge T Lane Wilson , setting/resetting deadline(s)/hearing(s): ( Settlement Conference set for 5/21/2014 at 01:30 PM before Magistrate Judge T Lane Wilson) (crp, Dpty Clk) (Entered: 02/25/2014) |
| 04/08/2014 | 147 | | Joint MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *Summary Judgment* by Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Coldiron, Mark) Modified on 4/8/2014; to correct event (srt, Dpty Clk). (Entered: 04/08/2014) |
| 04/08/2014 | 148 | | Joint MOTION for Leave to Exceed Page Limitation *for Summary Judgment* by Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 04/08/2014) |
| 04/08/2014 | 149 | | MINUTE ORDER by Judge Claire V Eagan *that motions for summary judgment are due 4/24/14; response due 5/15/14; replies due 5/29/14* ; setting/resetting scheduling order date(s): ( Dispositive Motions due by 4/24/2014); granting 147 Motion to Accelerate/Extend/Reset Settlement Deadline(s)/Conference (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 04/08/2014) |
| 04/08/2014 | 150 | | MINUTE ORDER by Judge Claire V Eagan *that motion for summary judgment briefs in chief may not exceed 40 pages; responses may not exceed 30 pages* ; granting in part 148 Motion for Leave to Exceed Page Limitation |

| | | | |
|---|---|---|---|
| | | | (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 04/08/2014) |
| 04/08/2014 | | | NOTICE of Docket Entry Modification; Error: wrong event (Motion to Accelerate/Extend/Reset Settlement Deadline(s)/Conference; Correction: corrected event (Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s)) (Re: 147 MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) ) (srt, Dpty Clk) (Entered: 04/08/2014) |
| 04/24/2014 | 151 | | MOTION for Partial Summary Judgment by Cyprus Amax Minerals Company (With attachments) (Stoviak, John) (Entered: 04/24/2014) |
| 04/24/2014 | 152 | | MINUTE ORDER by Judge Claire V Eagan , Counsel for Cyprus Amax Minerals Company is directed to provide forthwith for use by the Court a manual copy in a three−ring binder notebook of the pleading and/or exhibits as filed at Dkt. # 151 . Said manual copies shall be EXACT duplicates of the pleading and/or exhibits AFTER said pleading(s) was filed with the Court, including the case and docket number information at the top of each page. Do not reorganize the document or insert other separately docketed items. If copies of sealed items are hereby ordered by the Court, then said copies shall be a separate and complete submission. (Re: 151 MOTION for Partial Summary Judgment ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 04/24/2014) |
| 04/24/2014 | 153 | | ADDITIONAL ATTACHMENT(S) to document exceeding the file size limit per docket entry (Re: 151 MOTION for Partial Summary Judgment ) by Cyprus Amax Minerals Company (With attachments) (Stoviak, John) (Entered: 04/24/2014) |
| 04/24/2014 | 154 | | MINUTE ORDER by Judge Claire V Eagan *directing plaintiff to include documents filed at 153 with its manual copy of 151 (see 152 )* (Re: 152 Minute Order,,,, Directing Party to Submit Courtesy Copy of Document(s),,,,,,, 153 Additional Attachment(s) to Document Exceeding File Size Limit ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 04/24/2014) |
| 04/24/2014 | 155 | | ADDITIONAL ATTACHMENT(S) to document exceeding the file size limit per docket entry (Re: 151 MOTION for Partial Summary Judgment ) by Cyprus Amax Minerals Company (With attachments) (Stoviak, John) (Entered: 04/24/2014) |
| 04/24/2014 | 156 | | ADDITIONAL ATTACHMENT(S) to document exceeding the file size limit per docket entry (Re: 151 MOTION for Partial Summary Judgment ) by Cyprus Amax Minerals Company (With attachments) (Stoviak, John) (Entered: 04/24/2014) |
| 04/24/2014 | 157 | | ADDITIONAL ATTACHMENT(S) to document exceeding the file size limit per docket entry (Re: 151 MOTION for Partial Summary Judgment ) by Cyprus Amax Minerals Company (With attachments) (Stoviak, John) (Entered: 04/24/2014) |
| 04/24/2014 | 158 | | ADDITIONAL ATTACHMENT(S) to document exceeding the file size limit per docket entry (Re: 151 MOTION for Partial Summary Judgment ) by Cyprus Amax Minerals Company (With attachments) (Stoviak, John) (Entered: 04/24/2014) |

| | | | |
|---|---|---|---|
| 04/24/2014 | 159 | | ADDITIONAL ATTACHMENT(S) to document exceeding the file size limit per docket entry (Re: 151 MOTION for Partial Summary Judgment ) by Cyprus Amax Minerals Company (With attachments) (Stoviak, John) (Entered: 04/24/2014) |
| 04/24/2014 | 160 | | MINUTE ORDER by Judge Claire V Eagan *directing plaintiff to include documents filed at [155−159] with its manual copy of 151 ; plaintiff shall include with its manual submission any further additional documents filed as part of its motion 151 if any*. (Re: 159 Additional Attachment(s) to Document Exceeding File Size Limit, 157 Additional Attachment(s) to Document Exceeding File Size Limit, 158 Additional Attachment(s) to Document Exceeding File Size Limit, 151 MOTION for Partial Summary Judgment , 156 Additional Attachment(s) to Document Exceeding File Size Limit, 155 Additional Attachment(s) to Document Exceeding File Size Limit ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 04/24/2014) |
| 04/24/2014 | 161 | | MOTION for Summary Judgment by TCI Pacific Communications, Inc. (With attachments) (Jantzen, Paula) (Entered: 04/24/2014) |
| 04/24/2014 | 162 | | ADDITIONAL ATTACHMENT(S) *Appendix− Volume 1* to document exceeding the file size limit per docket entry (Re: 161 MOTION for Summary Judgment ) by TCI Pacific Communications, Inc. (Jantzen, Paula) (Entered: 04/24/2014) |
| 04/24/2014 | 163 | | ADDITIONAL ATTACHMENT(S) *Appendix− Volume 2* to document exceeding the file size limit per docket entry by TCI Pacific Communications, Inc. (Jantzen, Paula) (Entered: 04/24/2014) |
| 04/24/2014 | 164 | | ADDITIONAL ATTACHMENT(S) *Appendix− Volume 3* to document exceeding the file size limit per docket entry by TCI Pacific Communications, Inc. (Jantzen, Paula) (Entered: 04/24/2014) |
| 04/24/2014 | 165 | | ADDITIONAL ATTACHMENT(S) *Appendix− Volume 4* to document exceeding the file size limit per docket entry (Re: 161 MOTION for Summary Judgment ) by TCI Pacific Communications, Inc. (Jantzen, Paula) (Entered: 04/24/2014) |
| 04/24/2014 | 166 | | ADDITIONAL ATTACHMENT(S) *Appendix− Volume 5* to document exceeding the file size limit per docket entry (Re: 161 MOTION for Summary Judgment ) by TCI Pacific Communications, Inc. (Jantzen, Paula) (Entered: 04/24/2014) |
| 04/24/2014 | 167 | | ADDITIONAL ATTACHMENT(S) *Appendix− Volume 6* to document exceeding the file size limit per docket entry (Re: 161 MOTION for Summary Judgment ) by TCI Pacific Communications, Inc. (Jantzen, Paula) (Entered: 04/24/2014) |
| 04/25/2014 | 168 | | MINUTE ORDER by Judge Claire V Eagan , Counsel for TCI Pacific Communications, Inc. is directed to provide forthwith for use by the Court a manual copy in a three−ring binder notebook of the pleading and/or exhibits as filed at Dkt. # [161, 162−167]. Said manual copies shall be EXACT duplicates of the pleading and/or exhibits AFTER said pleading(s) was filed with the Court, including the case and docket number information at the top of each page. Do not reorganize the document or insert other separately docketed |

| | | | |
|---|---|---|---|
| | | | items. If copies of sealed items are hereby ordered by the Court, then said copies shall be a separate and complete submission. (Re: 164 Additional Attachment(s) to Document Exceeding File Size Limit, 165 Additional Attachment(s) to Document Exceeding File Size Limit, 167 Additional Attachment(s) to Document Exceeding File Size Limit, 163 Additional Attachment(s) to Document Exceeding File Size Limit, 162 Additional Attachment(s) to Document Exceeding File Size Limit, 161 MOTION for Summary Judgment , 166 Additional Attachment(s) to Document Exceeding File Size Limit ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 04/25/2014) |
| 05/09/2014 | 169 | | MOTION to Appear *to Modify Certain Attendance Requirements for Settlement Conference* (Re: 146 Settlement Conference Order, Setting/Resetting Deadline(s)/Hearing(s) ) by Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Jantzen, Paula) Modified on 5/12/2014 to change text to reflect as a one part motion and the correct event (sac, Dpty Clk). (Entered: 05/09/2014) |
| 05/09/2014 | | | ***Motion(s) Referred to Magistrate Wilson (Re: 169 MOTION for Leave to Appear ) (sac, Dpty Clk) (Entered: 05/12/2014) |
| 05/12/2014 | | | NOTICE of Docket Entry Modification; Error: filed as a two−part motion, but is a one part motion; wrong event selected; Correction: deleted second part of motion and changed text to reflect correct event (Re: 169 MOTION for Leave to Appear ) (sac, Dpty Clk) (Entered: 05/12/2014) |
| 05/15/2014 | 170 | | RESPONSE in Opposition to Motion (Re: 161 MOTION for Summary Judgment ) by Cyprus Amax Minerals Company ; (With attachments) (Stoviak, John) (Entered: 05/15/2014) |
| 05/15/2014 | 171 | | ADDITIONAL ATTACHMENT(S) to document exceeding the file size limit per docket entry (Re: 170 Response in Opposition to Motion ) by Cyprus Amax Minerals Company (With attachments) (Stoviak, John) (Entered: 05/15/2014) |
| 05/15/2014 | 172 | | MINUTE ORDER by Judge Claire V Eagan , Counsel for Cyprus Amax Minerals Company is directed to provide forthwith for use by the Court a manual copy in a three−ring binder notebook of the pleading and/or exhibits as filed at Dkt. # [170−171]. Said manual copies shall be EXACT duplicates of the pleading and/or exhibits AFTER said pleading(s) was filed with the Court, including the case and docket number information at the top of each page. Do not reorganize the document or insert other separately docketed items. If copies of sealed items are hereby ordered by the Court, then said copies shall be a separate and complete submission. (Re: 170 Response in Opposition to Motion, 171 Additional Attachment(s) to Document Exceeding File Size Limit ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 05/15/2014) |
| 05/15/2014 | 173 | | MINUTE ORDER by Judge Claire V Eagan , terminating motion referral(s), referring motion(s) to Magistrate Judge Cleary (Re: 169 MOTION for Leave to Appear ) (This entry is the Official Order of the Court. No document is attached.) (crp, Dpty Clk) (Entered: 05/15/2014) |
| 05/15/2014 | 174 | | RESPONSE in Opposition to Motion (Re: 151 MOTION for Partial Summary Judgment ) by TCI Pacific Communications, Inc. ; (With attachments) |

| | | | |
|---|---|---|---|
| | | | (Jantzen, Paula) (Entered: 05/15/2014) |
| 05/16/2014 | 175 | | MINUTE ORDER by Judge Claire V Eagan , Counsel for TCI Pacific Communications, Inc. is directed to provide forthwith for use by the Court a manual copy in a three−ring binder notebook of the pleading and/or exhibits as filed at Dkt. # 174 . Said manual copies shall be EXACT duplicates of the pleading and/or exhibits AFTER said pleading(s) was filed with the Court, including the case and docket number information at the top of each page. Do not reorganize the document or insert other separately docketed items. If copies of sealed items are hereby ordered by the Court, then said copies shall be a separate and complete submission. (Re: 174 Response in Opposition to Motion ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 05/16/2014) |
| 05/16/2014 | 176 | | ORDER by Magistrate Judge Paul J Cleary ; granting in part and denying in part 169 Motion for Leave to Appear (kjp, Dpty Clk) (Entered: 05/16/2014) |
| 05/16/2014 | 177 | | MINUTE ORDER by Magistrate Judge Paul J Cleary *setting the 5/21/2014 Settlement Conference before ASJ Mark Banner*, setting/resetting deadline(s)/hearing(s): ( Settlement Conference set for 5/21/2014 at 01:30 PM before Adjunct Judge) (Re: 146 Settlement Conference Order, Setting/Resetting Deadline(s)/Hearing(s) ) (This entry is the Official Order of the Court. No document is attached.) (kjp, Dpty Clk) (Entered: 05/16/2014) |
| 05/21/2014 | 178 | | SETTLEMENT CONFERENCE REPORT by Adjunct Judge *Mark Banner − litigation was not settled*, striking/terminating deadline(s)/Hearing(s) (kjp, Dpty Clk) (Entered: 05/21/2014) |
| 05/29/2014 | 179 | | REPLY to Response to Motion (Re: 151 MOTION for Partial Summary Judgment ) by Cyprus Amax Minerals Company ; (With attachments) (Stoviak, John) (Entered: 05/29/2014) |
| 05/29/2014 | 180 | | REPLY to Response to Motion (Re: 161 MOTION for Summary Judgment ) by TCI Pacific Communications, Inc. ; (With attachments) (Coldiron, Mark) (Entered: 05/29/2014) |
| 06/03/2014 | 181 | | MINUTE ORDER by Judge Claire V Eagan − *Directing the parties to file a joint status report no later than 6/18/14 as to whether additional mediation or settlement conference is requested.* (Re: 141 Minute Order,, Setting/Resetting Scheduling Order Date(s),,,, Ruling on Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s), 178 Settlement Conference Report, Striking/Terminating Deadline(s)/Hearing(s) ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 06/03/2014) |
| 06/16/2014 | 182 | | Joint STATUS REPORT by Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 06/16/2014) |
| 02/02/2015 | 183 | | OPINION AND ORDER by Judge Claire V Eagan *that Plaintiff Cyprus Amax Mineral Company's Motion for Partial Summary Judgment and Integrated Brief in Support (Dkt. # 151) is granted, and Defendant's Motion for Summary Judgment and Integrated Memorandum in Support (Dkt. # 161) is denied. The parties are directed to file no later than February 13, 2015 a joint status report on the issues remaining for adjudication and a proposed scheduling order. This matter is referred to Magistrate Judge T. Lane Wilson for a* |

| | | | |
|---|---|---|---|
| | | | *supplemental settlement conference in light of this Opinion and Order.* ; setting/resetting deadline(s)/hearing(s): ( Status Report due by 2/13/2015); granting 151 Motion for Partial Summary Judgment; denying 161 Motion for Summary Judgment (Re: 2 Complaint ) (RGG, Chambers) (Entered: 02/02/2015) |
| 02/09/2015 | 184 | | MINUTE ORDER *by Court Clerk*, reassigning case to Magistrate Judge Frank H McCarthy, Magistrate Judge Paul J Cleary no longer assigned to case, changing case number to 11−CV−252−CVE−FHM (This entry is the Official Order of the Court. No document is attached.) (djh, Dpty Clk) (Entered: 02/09/2015) |
| 02/13/2015 | 185 | | Joint REPORT *Joint Status Report Regarding Issues Remaining For Adjudication And Proposed Scheduling Order* by Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Robison, Reid) (Entered: 02/13/2015) |
| 02/19/2015 | 186 | | SCHEDULING ORDER by Judge Claire V Eagan , setting/resetting scheduling order date(s): ( Discovery due by 1/29/2016, Dispositive Motions due by 2/22/2016, Proposed Pretrial Order due by 4/18/2016, Pretrial Conference set for 5/6/2016 at 10:00 AM before Judge Claire V Eagan, Nonjury Trial set for 6/1/2016 at 09:15 AM before Judge Claire V Eagan) (djh, Dpty Clk) (Entered: 02/19/2015) |
| 02/25/2015 | 187 | | MINUTE ORDER by Magistrate Judge Paul J Cleary *setting Telephone Hearing to discuss time frame for the setting of an early Settlement Conference*, setting/resetting deadline(s)/hearing(s): *Counsel is directed to contact (by email or phone) Judge Cleary's courtroom deputy with a phone number for the court to initiate the conference call* ( Miscellaneous Hearing set for 3/16/2015 at 10:00 AM before Magistrate Judge Paul J Cleary) (This entry is the Official Order of the Court. No document is attached.) (kjp, Dpty Clk) (Entered: 02/25/2015) |
| 03/16/2015 | 188 | | MINUTES of Proceedings − held before Magistrate Judge Paul J Cleary: Miscellaneous Hearing held on 3/16/2015 *discussing setting of a Settlement Conference*, striking/terminating deadline(s)/Hearing(s) (Court Reporter: C2) (kjp, Dpty Clk) (Entered: 03/16/2015) |
| 03/17/2015 | 189 | | MINUTE ORDER by Magistrate Judge Paul J Cleary *scheduling a Telephone Conference for 7/22/2015 to discuss status of case relating to settlement and a date for setting of a Settlement Conference*, setting/resetting deadline(s)/hearing(s): *Plaintiff's counsel is to arrange the conference call and notify all counsel and the Courtroom Deputy of the call−in number* ( Miscellaneous Hearing set for 7/22/2015 at 10:30 AM before Magistrate Judge Paul J Cleary) (This entry is the Official Order of the Court. No document is attached.) (kjp, Dpty Clk) (Entered: 03/17/2015) |
| 06/24/2015 | 190 | | Joint MOTION to Amend *Protective Order* (Re: 67 Protective Order, Ruling on Motion for Protective Order ) by Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 06/24/2015) |
| 06/25/2015 | 191 | | MINUTE ORDER by Judge Claire V Eagan , referring motion(s) to Magistrate Judge McCarthy (Re: 190 Joint MOTION to Amend *Protective Order* ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 06/25/2015) |

| | | | |
|---|---|---|---|
| 06/25/2015 | 192 | | ORDER by Magistrate Judge Frank H McCarthy ; granting 190 Motion to Amend (Re: 67 Protective Order, Ruling on Motion for Protective Order ) (tjc, Dpty Clk) (Entered: 06/25/2015) |
| 07/21/2015 | 193 | | Oral MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *Reschedule telephone conference now set on 7/22/2015 before Magistrate Judge Cleary* (Re: 189 Minute Order, Setting/Resetting Deadline(s)/Hearing(s),,,, ) by Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (kjp, Dpty Clk) (Entered: 07/21/2015) |
| 07/21/2015 | 194 | | MINUTE ORDER by Magistrate Judge Paul J Cleary *striking 7/22/2015 Telephone Conference and resetting for 9/23/2015 at 10:30 a.m. Plaintiff's counsel is directed to arrange the conference call and notify all counsel and Courtroom Deputy of the call−in number* ; setting/resetting deadline(s)/hearing(s): ( Miscellaneous Hearing set for 9/23/2015 at 10:30 AM before Magistrate Judge Paul J Cleary); granting 193 Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (This entry is the Official Order of the Court. No document is attached.) (kjp, Dpty Clk) (Entered: 07/21/2015) |
| 07/24/2015 | 195 | | Joint MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (Re: 186 Scheduling Order, Setting/Resetting Scheduling Order Date(s),, ) by Cyprus Amax Minerals Company, TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 07/24/2015) |
| 07/27/2015 | 196 | | SCHEDULING ORDER by Judge Claire V Eagan *(Amended)* ; setting/resetting scheduling order date(s): ( Discovery due by 6/29/2016, Dispositive Motions due by 7/22/2016, Proposed Pretrial Order due by 9/19/2016, Pretrial Conference set for 10/6/2016 at 10:00 AM before Judge Claire V Eagan, Nonjury Trial set for 11/9/2016 at 09:15 AM before Judge Claire V Eagan); granting 195 Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (djh, Dpty Clk) (Entered: 07/27/2015) |
| 07/31/2015 | 197 | | MINUTE ORDER by Judge Claire V Eagan *: It is hereby ordered that the 11/9/2016 Non−Jury Trial in this matter is passed/continued to 11/16/2016 at 9:15 a.m. All other deadlines remain as previously set.*, setting/resetting deadline(s)/hearing(s): ( Nonjury Trial set for 11/16/2016 at 09:15 AM before Judge Claire V Eagan) (This entry is the Official Order of the Court. No document is attached.) (djh, Dpty Clk) (Entered: 07/31/2015) |
| 09/23/2015 | 198 | | MINUTES of Proceedings − held before Magistrate Judge Paul J Cleary: Miscellaneous Hearing held on 9/23/2015 , setting/resetting deadline(s)/hearing(s): ( Miscellaneous Hearing set for 1/7/2016 at 10:00 AM before Magistrate Judge Paul J Cleary) (Court Reporter: C1) (kjp, Dpty Clk) (Entered: 09/23/2015) |
| 09/23/2015 | 199 | | MINUTE ORDER by Magistrate Judge Paul J Cleary *directing Plaintiff's counsel to arrange the conference call and notify all counsel and Courtroom Deputy of the call−in number for the 1/7/2016 Telephone Conference* (Re: 198 Minutes of Miscellaneous Hearing,, Setting/Resetting Deadline(s)/Hearing(s), ) (This entry is the Official Order of the Court. No document is attached.) (kjp, Dpty Clk) (Entered: 09/23/2015) |
| 01/06/2016 | 200 | | MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) January 7, 2016 Telephone Conference by Cyprus Amax Minerals Company (Stoviak, John) |

| | | | |
|---|---|---|---|
| | | | Modified on 1/6/2016 to correct event (srt, Dpty Clk). (Entered: 01/06/2016) |
| 01/06/2016 | 201 | | MINUTE ORDER by Judge Claire V Eagan , referring motion(s) to Magistrate Judge Cleary (Re: 200 MOTION Unopposed Motion to Postpone January 7, 2016 Telephone Conference ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 01/06/2016) |
| 01/06/2016 | 202 | | MINUTE ORDER by Magistrate Judge Paul J Cleary *resetting the 1/7/2016 telephone status hearing to January 14, 2016 at 2:30 p.m.* ; setting/resetting deadline(s)/hearing(s): *Directing Plaintiff's counsel to arrange the conference call and notify all counsel and Courtroom Deputy of the call−in number* ( Miscellaneous Hearing set for 1/14/2016 at 02:30 PM before Magistrate Judge Paul J Cleary); granting 200 Motion for Miscellaneous Relief (This entry is the Official Order of the Court. No document is attached.) (kjp, Dpty Clk) (Entered: 01/06/2016) |
| 01/06/2016 | | | NOTICE of Docket Entry Modification; Error: wrong event (Motion for Miscellaneous Relief); Correction: corrected event (Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s)) (Re: 200 MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) ) (srt, Dpty Clk) (Entered: 01/06/2016) |
| 01/14/2016 | 203 | | MINUTES of Proceedings − held before Magistrate Judge Paul J Cleary: Miscellaneous Hearing held on 1/14/2016 , striking/terminating deadline(s)/Hearing(s) (Court Reporter: C1) (tjc, Dpty Clk) (Entered: 01/14/2016) |
| 01/20/2016 | 204 | | SETTLEMENT CONFERENCE ORDER by Magistrate Judge Paul J Cleary , setting/resetting deadline(s)/hearing(s): ( Settlement Conference set for 7/26/2016 at 01:30 PM before Magistrate Judge Paul J Cleary) (kjp, Dpty Clk) (Entered: 01/20/2016) |
| 02/27/2016 | 205 | | Joint MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (Re: 196 Scheduling Order, Setting/Resetting Scheduling Order Date(s), Ruling on Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s),,, ) by TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 02/27/2016) |
| 02/29/2016 | 206 | | MINUTE ORDER by Judge Claire V Eagan *that the motion 205 is granted; fact discovery cutoff is extended to 3/31/16; plaintiff's expert identification and reports are due 4/13/16; defendants' expert identification and reports are due 5/16/16; all other deadlines remain unchanged.* ; granting 205 Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (Re: 196 Scheduling Order, Setting/Resetting Scheduling Order Date(s), Ruling on Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s),,, 197 Minute Order, Setting/Resetting Deadline(s)/Hearing(s),, ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 02/29/2016) |
| 06/03/2016 | 207 | | Joint MOTION to Amend *Scheduling Order* by TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 06/03/2016) |
| 06/03/2016 | 208 | | MINUTE ORDER by Judge Claire V Eagan *that the expert discovery cutoff is extended to 6/30/16 as requested* ; granting 207 Motion to Amend (This entry is the Official Order of the Court. No document is attached.) (RGG, |

| | | | |
|---|---|---|---|
| | | | Chambers) (Entered: 06/03/2016) |
| 07/06/2016 | 209 | | Joint MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *to Exchange Preliminary Lists of Witnesses and Exhibits* (Re: 196 Scheduling Order, Setting/Resetting Scheduling Order Date(s), Ruling on Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s),,, ) by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 07/06/2016) |
| 07/07/2016 | 210 | | MINUTE ORDER by Judge Claire V Eagan − *Parties are to exchange preliminary lists of witnesses and exhibits by 7/18/16* ; granting 209 Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 07/07/2016) |
| 07/18/2016 | 211 | | Joint MOTION for Leave to Exceed Page Limitation *Joint Motion For Enlargement Of Page Limit For Summary Judgment Briefs* by Cyprus Amax Minerals Company (Bomhoff, Timothy) (Entered: 07/18/2016) |
| 07/19/2016 | 212 | | MINUTE ORDER by Judge Claire V Eagan *that summary judgment briefs and response briefs may be up to 45 pages each; reply briefs not to exceed 15 pages each* ; granting 211 Motion for Leave to Exceed Page Limitation (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 07/19/2016) |
| 07/22/2016 | 213 | | MOTION for Partial Summary Judgment *as to TCI's CERCLA Liability and Integrated Brief* by Cyprus Amax Minerals Company (With attachments) (Stoviak, John) (Entered: 07/22/2016) |
| 07/22/2016 | 214 | | NOTICE Potential Record Citation Error in February 2, 2015 Order on Alter Ego Status (Re: 183 Opinion and Order, Setting/Resetting Deadline(s)/Hearing(s),, Ruling on Motion for Partial Summary Judgment, Ruling on Motion for Summary Judgment,,,,,,,,,,,,,, ) by TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 07/22/2016) |
| 07/22/2016 | 215 | | MOTION to Clarify −*Declare the Temporal Scope of the February 2, 2015 Order on Alter Ego Status* (Re: 183 Opinion and Order, Setting/Resetting Deadline(s)/Hearing(s),, Ruling on Motion for Partial Summary Judgment, Ruling on Motion for Summary Judgment,,,,,,,,,,,,,, ) by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 07/22/2016) |
| 07/22/2016 | 216 | | MOTION for Summary Judgment by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 07/22/2016) |
| 07/22/2016 | 217 | | ADDITIONAL ATTACHMENT(S) − *Appendix* − to document exceeding the file size limit per docket entry (Re: 216 MOTION for Summary Judgment ) by TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 07/23/2016) |
| 07/25/2016 | 218 | | MINUTE ORDER by Judge Claire V Eagan , : Counsel for Cyprus Amax Minerals Company is directed to provide, forthwith and in a three−ring binder notebook for use by the Court, a paper copy of the document and/or exhibit(s) as filed at Dkt. # 213 . Said paper copy shall be a COMPLETE and EXACT duplicate of the filing AFTER it is filed with the Court, including the case and docket number information at the top of each page. Counsel shall not |

| | | | |
|---|---|---|---|
| | | | reorganize the filing or insert other separately docketed items. If a copy of a sealed item is ordered by the Court, then said copy shall be a separate and complete submission. (Re: 213 MOTION for Partial Summary Judgment *as to TCI's CERCLA Liability and Integrated Brief* ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 07/25/2016) |
| 07/25/2016 | 219 | | MINUTE ORDER by Judge Claire V Eagan , : Counsel for TCI Pacific Communications, Inc. is directed to provide, forthwith and in a three−ring binder notebook for use by the Court, a paper copy of the document and/or exhibit(s) as filed at Dkt. #[216 and 217]. Said paper copy shall be a COMPLETE and EXACT duplicate of the filing AFTER it is filed with the Court, including the case and docket number information at the top of each page. Counsel shall not reorganize the filing or insert other separately docketed items. If a copy of a sealed item is ordered by the Court, then said copy shall be a separate and complete submission. (Re: 216 MOTION for Summary Judgment , 217 Additional Attachment(s) to Document Exceeding File Size Limit ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 07/25/2016) |
| 07/25/2016 | 220 | | ERRATA/CORRECTION (Re: 216 MOTION for Summary Judgment , 217 Additional Attachment(s) to Document Exceeding File Size Limit ) by TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 07/25/2016) |
| 07/25/2016 | 221 | | MINUTE ORDER by Judge Claire V Eagan , : Counsel for TCI Pacific Communications, Inc. is directed to provide, forthwith and in a three−ring binder notebook for use by the Court, a paper copy of the document and/or exhibit(s) as filed at Dkt. # 220 . Said paper copy shall be a COMPLETE and EXACT duplicate of the filing AFTER it is filed with the Court, including the case and docket number information at the top of each page. Counsel shall not reorganize the filing or insert other separately docketed items. If a copy of a sealed item is ordered by the Court, then said copy shall be a separate and complete submission. (Re: 220 Errata/Correction to Document ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 07/25/2016) |
| 07/27/2016 | 222 | | SETTLEMENT CONFERENCE REPORT by Magistrate Judge Paul J Cleary *litigation was not settled*, striking/terminating deadline(s)/Hearing(s) (sdc, Dpty Clk) (Entered: 07/27/2016) |
| 08/03/2016 | 223 | | Joint MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *for Certain Pretrial Deadlines* (Re: 196 Scheduling Order,, Setting/Resetting Scheduling Order Date(s),, Ruling on Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s), 206 Minute Order,,,,,, Ruling on Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s),, ) by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 08/03/2016) |
| 08/03/2016 | 224 | | ORDER by Judge Claire V Eagan *granting extension of deadlines as requested* ; setting/resetting deadline(s)/hearing(s): ( Responses due by 8/19/2016, Replies due by 9/2/2016); setting/resetting scheduling order date(s): ( Proposed Pretrial Order due by 9/26/2016); granting 223 Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (Re: 216 MOTION for Summary Judgment , 213 MOTION for Partial Summary Judgment *as to TCI's* |

| | | | |
|---|---|---|---|
| | | | *CERCLA Liability and Integrated Brief*, 196 Scheduling Order,, Setting/Resetting Scheduling Order Date(s),, Ruling on Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s), ) (RGG, Chambers) (Entered: 08/03/2016) |
| 08/12/2016 | 225 | | RESPONSE (Re: 214 Notice (Other), ) by Cyprus Amax Minerals Company (Stoviak, John) (Entered: 08/12/2016) |
| 08/12/2016 | 226 | | RESPONSE in Opposition to Motion (Re: 215 MOTION to Clarify *−Declare the Temporal Scope of the February 2, 2015 Order on Alter Ego Status* ) by Cyprus Amax Minerals Company ; (Stoviak, John) (Entered: 08/12/2016) |
| 08/19/2016 | 227 | | RESPONSE in Opposition to Motion (Re: 216 MOTION for Summary Judgment ) by Cyprus Amax Minerals Company ; (With attachments) (Stoviak, John) (Entered: 08/19/2016) |
| 08/19/2016 | 228 | | RESPONSE in Opposition to Motion (Re: 213 MOTION for Partial Summary Judgment *as to TCI's CERCLA Liability and Integrated Brief* ) by TCI Pacific Communications, Inc. ; (Coldiron, Mark) (Entered: 08/19/2016) |
| 08/19/2016 | 229 | | EXHIBIT(S) *1−10* (Re: 228 Response in Opposition to Motion ) by TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 08/19/2016) |
| 08/19/2016 | 230 | | EXHIBIT(S) *11−20* (Re: 229 Exhibit(s) in Support of Document(s), 228 Response in Opposition to Motion ) by TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 08/19/2016) |
| 08/19/2016 | 231 | | EXHIBIT(S) *21−28* (Re: 230 Exhibit(s) in Support of Document(s), 229 Exhibit(s) in Support of Document(s), 228 Response in Opposition to Motion ) by TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 08/19/2016) |
| 08/22/2016 | 232 | | MINUTE ORDER by Judge Claire V Eagan , : Counsel for Defendant TCI Pacific Communications, Inc. is directed to provide, forthwith and in a three−ring binder notebook for use by the Court, a paper copy of the document and/or exhibit(s) as filed at Dkt. #[228, 229, 230, and 231]. Said paper copy shall be a COMPLETE and EXACT duplicate of the filing AFTER it is filed with the Court, including the case and docket number information at the top of each page. Counsel shall not reorganize the filing or insert other separately docketed items. If a copy of a sealed item is ordered by the Court, then said copy shall be a separate and complete submission. (Re: 231 Exhibit(s) in Support of Document(s), 230 Exhibit(s) in Support of Document(s), 229 Exhibit(s) in Support of Document(s), 228 Response in Opposition to Motion ) (This entry is the Official Order of the Court. No document is attached.) (djh, Dpty Clk) (Entered: 08/22/2016) |
| 08/22/2016 | 233 | | MINUTE ORDER by Judge Claire V Eagan , : Counsel for Plaintiff Cyprus Amax Minerals Company is directed to provide, forthwith and in a three−ring binder notebook for use by the Court, a paper copy of the document and/or exhibit(s) as filed at Dkt. # 227 . Said paper copy shall be a COMPLETE and EXACT duplicate of the filing AFTER it is filed with the Court, including the case and docket number information at the top of each page. Counsel shall not reorganize the filing or insert other separately docketed items. If a copy of a sealed item is ordered by the Court, then said copy shall be a separate and |

| | | | |
|---|---|---|---|
| | | | complete submission. (Re: 227 Response in Opposition to Motion ) (This entry is the Official Order of the Court. No document is attached.) (djh, Dpty Clk) (Entered: 08/22/2016) |
| 08/26/2016 | 234 | | REPLY (Re: 214 Notice (Other), 225 Response ) by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 08/26/2016) |
| 08/26/2016 | 235 | | REPLY to Response to Motion (Re: 215 MOTION to Clarify −*Declare the Temporal Scope of the February 2, 2015 Order on Alter Ego Status* ) by TCI Pacific Communications, Inc. ; (Coldiron, Mark) (Entered: 08/26/2016) |
| 09/02/2016 | 236 | | REPLY to Response to Motion (Re: 213 MOTION for Partial Summary Judgment *as to TCI's CERCLA Liability and Integrated Brief* ) by Cyprus Amax Minerals Company ; (With attachments) (Stoviak, John) (Entered: 09/02/2016) |
| 09/02/2016 | 237 | | REPLY to Response to Motion (Re: 216 MOTION for Summary Judgment ) by TCI Pacific Communications, Inc. ; (With attachments) (Coldiron, Mark) (Entered: 09/02/2016) |
| 09/06/2016 | 238 | | MINUTE ORDER by Judge Claire V Eagan , : Counsel for Cyprus Amax Minerals Company is directed to provide, forthwith and in a three−ring binder notebook for use by the Court, a paper copy of the document and/or exhibit(s) as filed at Dkt. # 236 . Said paper copy shall be a COMPLETE and EXACT duplicate of the filing AFTER it is filed with the Court, including the case and docket number information at the top of each page. Counsel shall not reorganize the filing or insert other separately docketed items. If a copy of a sealed item is ordered by the Court, then said copy shall be a separate and complete submission. (Re: 236 Reply to Response to Motion ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 09/06/2016) |
| 09/12/2016 | 239 | | DESIGNATIONS (DEPOSITION/INTERROGATORY) re: deposition/interrogatories of Amy Brittain, Mark Ruck, Jayson Burkard, Michael Cooper, Charles Janson, John Shonfelt and Mark Gardiner by Cyprus Amax Minerals Company (Stoviak, John) (Entered: 09/12/2016) |
| 09/12/2016 | 240 | | DESIGNATIONS (DEPOSITION/INTERROGATORY) re: deposition/interrogatories of Amy Brittain, John Brunner, Jayson Burkard, Michael Cooper, John Fenn, Mark Gardiner, Charles Janson, Mark Ruck, John Shonfelt and Alicia Voss by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 09/12/2016) |
| 09/15/2016 | 241 | | Joint MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *FOR PARTIES' PRETRIAL EXCHANGE OF DEMONSTRATIVE EXHIBITS* (Re: 196 Scheduling Order, Setting/Resetting Scheduling Order Date(s), Ruling on Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s),,, ) by Cyprus Amax Minerals Company (Stoviak, John) (Entered: 09/15/2016) |
| 09/19/2016 | 242 | | ORDER by Judge Claire V Eagan *that all remaining deadlines in the amended scheduling order (Dkt. # 196), including the pretrial conference set for October 6, 2016 and non−jury trial set for November 16, 2016, are stricken. An amended scheduling order will be entered following a ruling on the parties' summary judgment motions.* ; striking/terminating deadline(s)/Hearing(s); finding as moot 241 Motion to Accelerate/Extend/Reset |

| | | | |
|---|---|---|---|
| | | | Hearing(s)/Deadline(s) (RGG, Chambers) (Entered: 09/19/2016) |
| 03/31/2017 | 243 | | OPINION AND ORDER by Judge Claire V Eagan *that defendant's Motion to Declare the Temporal Scope of the Court's February 2, 2015 Order on Alter Ego Status (Dkt. # 215) is denied.* ; denying 215 Motion to Clarify (RGG, Chambers) (Entered: 03/31/2017) |
| 06/20/2017 | 244 | | OPINION AND ORDER by Judge Claire V Eagan ; setting/resetting deadline(s)/hearing(s): ( Status Report due by 7/11/2017); denying 213 Motion for Partial Summary Judgment; denying 216 Motion for Summary Judgment (RGG, Chambers) (Entered: 06/20/2017) |
| 07/11/2017 | 245 | | JOINT STATUS REPORT by Cyprus Amax Minerals Company (Stoviak, John) (Entered: 07/11/2017) |
| 07/12/2017 | 246 | | SCHEDULING ORDER by Judge Claire V Eagan *(Second Amended)*, setting/resetting scheduling order date(s): ( Proposed Pretrial Order due by 12/1/2017, Pretrial Conference set for 1/11/2018 at 09:30 AM before Judge Claire V Eagan, Nonjury Trial set for 2/26/2018 at 09:15 AM before Judge Claire V Eagan) (djh, Dpty Clk) (Entered: 07/12/2017) |
| 07/26/2017 | 247 | | SETTLEMENT CONFERENCE ORDER by Magistrate Judge Paul J Cleary , setting/resetting deadline(s)/hearing(s): ( Settlement Conference set for 8/29/2017 at 10:00 AM before Magistrate Judge Paul J Cleary) (sdc, Dpty Clk) (Entered: 07/26/2017) |
| 08/02/2017 | 248 | | Amended DESIGNATIONS (DEPOSITION/INTERROGATORY) re: deposition/interrogatories of Amy Brittain, Mark Ruck, Jayson Burkard, Michael Cooper, Charles Janson, John Shonfelt and Mark Gardiner by Cyprus Amax Minerals Company (Stoviak, John) (Entered: 08/02/2017) |
| 08/02/2017 | 249 | | Amended DESIGNATIONS (DEPOSITION/INTERROGATORY) re: deposition/interrogatories of Amy Brittain, John Brunner, Jayson Burkard, Michael Cooper, John Fenn, Mark Gardiner, Charles Janson, Mark Ruck, John Shonfelt, and Alicia Voss by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 08/02/2017) |
| 08/09/2017 | 250 | | COUNTER DEPOSITION DESIGNATIONS by Cyprus Amax Minerals Company (Stoviak, John) (Entered: 08/09/2017) |
| 08/09/2017 | 251 | | COUNTER DEPOSITION DESIGNATIONS by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 08/09/2017) |
| 08/11/2017 | 252 | | MINUTE ORDER by Magistrate Judge Paul J Cleary *resetting Settlement Conference*, setting/resetting deadline(s)/hearing(s): *Plaintiff's Settlement Conference Statements will be due September 7, 2017. Defendant's Settlement Conference Statements will be due September 14, 2017* ( Settlement Conference set for 9/21/2017 at 10:00 AM before Magistrate Judge Paul J Cleary) (This entry is the Official Order of the Court. No document is attached.) (sdc, Dpty Clk) (Entered: 08/11/2017) |
| 09/08/2017 | 253 | | Unopposed MOTION for Leave to Appear *for Settlement Conference by Telephone* by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 09/08/2017) |
| 09/11/2017 | 254 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by Judge Claire V Eagan , referring motion(s) to Magistrate Judge Cleary (Re: 253 Unopposed MOTION for Leave to Appear *for Settlement Conference by Telephone* ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 09/11/2017) |
| 09/12/2017 | 255 | | MINUTE ORDER by Magistrate Judge Paul J Cleary ; granting 253 Motion for Leave to Appear (This entry is the Official Order of the Court. No document is attached.) (sdc, Dpty Clk) (Entered: 09/12/2017) |
| 09/13/2017 | 256 | | Joint OBJECTION to Deposition Designations by Cyprus Amax Minerals Company (Stoviak, John) (Entered: 09/13/2017) |
| 09/18/2017 | 257 | | MOTION in Limine *Regarding Smelter Air Emissions Evidence* by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 09/18/2017) |
| 09/18/2017 | 258 | | MOTION in Limine *Regarding Ulterior Business Motives* by Cyprus Amax Minerals Company (With attachments) (Stoviak, John) (Entered: 09/18/2017) |
| 09/18/2017 | 259 | | MOTION in Limine *Regarding Road−Building Evidence* by TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 09/18/2017) |
| 09/18/2017 | 260 | | MOTION in Limine *to Exclude Memorandum of Oklahoma State Department of Health* by TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 09/18/2017) |
| 09/18/2017 | 261 | | MOTION to Exclude Testimony of Richard Lane White *and Memorandum in Support* by TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 09/18/2017) |
| 09/18/2017 | 262 | | MOTION to Exclude Testimony of A. J. Gravel *and Memorandum in Support* by TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 09/18/2017) |
| 09/18/2017 | 263 | | MOTION to Exclude Testimony of Dr. Roberto Gasparini *and Memorandum in Support* by TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 09/18/2017) |
| 09/19/2017 | 264 | | MINUTE ORDER by Judge Claire V Eagan , : Counsel for TCI Pacific Communications, Inc. is directed to provide, forthwith and in a three−ring binder notebook for use by the Court, a paper copy of the document and/or exhibit(s) as filed at Dkt. #[#261]. Said paper copy shall be a COMPLETE and EXACT duplicate of the filing AFTER it is filed with the Court, including the case and docket number information at the top of each page. Counsel shall not reorganize the filing or insert other separately docketed items. If a copy of a sealed item is ordered by the Court, then said copy shall be a separate and complete submission. (Re: 261 MOTION to Exclude Testimony of Richard Lane White *and Memorandum in Support* ) (This entry is the Official Order of the Court. No document is attached.) (djh, Dpty Clk) (Entered: 09/19/2017) |
| 09/21/2017 | 265 | | SETTLEMENT CONFERENCE REPORT by Magistrate Judge Paul J Cleary *litigation was not settled*, striking/terminating deadline(s)/Hearing(s) (sdc, Dpty Clk) (Entered: 09/25/2017) |
| 10/10/2017 | 266 | | RESPONSE in Opposition to Motion (Re: 257 MOTION in Limine *Regarding Smelter Air Emissions Evidence* ) by Cyprus Amax Minerals Company ; |

| | | | |
|---|---|---|---|
| | | | (Stoviak, John) (Entered: 10/10/2017) |
| 10/10/2017 | 267 | | RESPONSE in Opposition to Motion (Re: 263 MOTION to Exclude Testimony of Dr. Roberto Gasparini *and Memorandum in Support* ) by Cyprus Amax Minerals Company ; (With attachments) (Stoviak, John) (Entered: 10/10/2017) |
| 10/10/2017 | 268 | | MINUTE ORDER by Judge Claire V Eagan , : Counsel for Cyprus Amax Minerals Company is directed to provide, forthwith and in a three−ring binder notebook for use by the Court, a paper copy of the document and/or exhibit(s) as filed at Dkt. # 267 . Said paper copy shall be a COMPLETE and EXACT duplicate of the filing AFTER it is filed with the Court, including the case and docket number information at the top of each page. Counsel shall not reorganize the filing or insert other separately docketed items. If a copy of a sealed item is ordered by the Court, then said copy shall be a separate and complete submission. (Re: 267 Response in Opposition to Motion ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 10/10/2017) |
| 10/10/2017 | 269 | | RESPONSE in Opposition to Motion (Re: 259 MOTION in Limine *Regarding Road−Building Evidence* ) by Cyprus Amax Minerals Company ; (With attachments) (Stoviak, John) (Entered: 10/10/2017) |
| 10/10/2017 | 270 | | RESPONSE in Opposition to Motion (Re: 258 MOTION in Limine *Regarding Ulterior Business Motives* ) by TCI Pacific Communications, Inc. ; (With attachments) (Coldiron, Mark) (Entered: 10/10/2017) |
| 10/10/2017 | 271 | | RESPONSE in Opposition to Motion (Re: 260 MOTION in Limine *to Exclude Memorandum of Oklahoma State Department of Health* ) by Cyprus Amax Minerals Company ; (With attachments) (Stoviak, John) (Entered: 10/10/2017) |
| 10/10/2017 | 272 | | RESPONSE in Opposition to Motion (Re: 262 MOTION to Exclude Testimony of A. J. Gravel *and Memorandum in Support* ) by Cyprus Amax Minerals Company ; (With attachments) (Stoviak, John) (Entered: 10/10/2017) |
| 10/10/2017 | 273 | | RESPONSE in Opposition to Motion (Re: 261 MOTION to Exclude Testimony of Richard Lane White *and Memorandum in Support* ) by Cyprus Amax Minerals Company ; (With attachments) (Stoviak, John) (Entered: 10/10/2017) |
| 10/24/2017 | 274 | | MINUTE ORDER by Judge Claire V Eagan , referring motion(s) to Magistrate Judge McCarthy (Re: 256 Joint OBJECTION to Deposition Designations ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 10/24/2017) |
| 10/24/2017 | 275 | | REPLY to Response to Motion (Re: 259 MOTION in Limine *Regarding Road−Building Evidence* ) by TCI Pacific Communications, Inc. ; (With attachments) (Coldiron, Mark) (Entered: 10/24/2017) |
| 10/24/2017 | 276 | | REPLY to Response to Motion (Re: 260 MOTION in Limine *to Exclude Memorandum of Oklahoma State Department of Health* ) by TCI Pacific Communications, Inc. ; (Coldiron, Mark) (Entered: 10/24/2017) |
| 10/24/2017 | 277 | | REPLY to Response to Motion (Re: 258 MOTION in Limine *Regarding Ulterior Business Motives* ) by Cyprus Amax Minerals Company ; (Stoviak, John) (Entered: 10/24/2017) |

| | | | |
|---|---|---|---|
| 10/24/2017 | 278 | | REPLY to Response to Motion (Re: 261 MOTION to Exclude Testimony of Richard Lane White *and Memorandum in Support* ) by TCI Pacific Communications, Inc. ; (Coldiron, Mark) (Entered: 10/24/2017) |
| 10/24/2017 | 279 | | REPLY to Response to Motion (Re: 257 MOTION in Limine *Regarding Smelter Air Emissions Evidence* ) by TCI Pacific Communications, Inc. ; (Coldiron, Mark) (Entered: 10/24/2017) |
| 10/24/2017 | 280 | | REPLY to Response to Motion (Re: 262 MOTION to Exclude Testimony of A. J. Gravel *and Memorandum in Support* ) by TCI Pacific Communications, Inc. ; (Coldiron, Mark) (Entered: 10/24/2017) |
| 10/24/2017 | 281 | | REPLY to Response to Motion (Re: 263 MOTION to Exclude Testimony of Dr. Roberto Gasparini *and Memorandum in Support* ) by TCI Pacific Communications, Inc. ; (With attachments) (Coldiron, Mark) (Entered: 10/24/2017) |
| 11/03/2017 | 282 | | MOTION to Withdraw Attorney(s) *Wendy West Feinstein* by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 11/03/2017) |
| 11/03/2017 | 283 | | MINUTE ORDER by Judge Claire V Eagan ; terminating attorney Wendy West Feinstein ; granting 282 Motion to Withdraw Attorney(s) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 11/03/2017) |
| 11/03/2017 | 284 | | Joint MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 11/03/2017) |
| 11/03/2017 | 285 | | SCHEDULING ORDER by Judge Claire V Eagan *extending deadlines as requested* ; setting/resetting scheduling order date(s): *(Exhange of pre−marked exhibits due 11/10/17; Pretrial disclosures due 12/15/17; Final Witness and Exhibit Lists due 12/15/17)* ( Proposed Pretrial Order due by 12/15/2017); granting 284 Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (Re: 246 Scheduling Order, Setting/Resetting Scheduling Order Date(s),, ) (RGG, Chambers) (Entered: 11/03/2017) |
| 11/06/2017 | 286 | | Supplemental CORPORATE DISCLOSURE STATEMENT (identifying: Corporate Parent Comcast Cable Communications, LLC, Corporate Parent Comcast Holdings Corporation, Corporate Parent Comcast Corporation for TCI Pacific Communications, Inc.) by TCI Pacific Communications, Inc. (With attachments) (Coldiron, Mark) (Entered: 11/06/2017) |
| 11/07/2017 | 287 | | NOTICE of Party Name Correction by TCI Pacific Communications, Inc. (Coldiron, Mark) (Entered: 11/07/2017) |
| 11/07/2017 | 288 | | MINUTE ORDER by Court Clerk , directing the party name for TCI Pacific Communications, Inc. be corrected as indicated in the Notice of Party Name Correction. If any other party to this case objects to this Party Name Correction, they shall file a Motion to Reconsider Party Name Correction within seven (7) days of this order. (Re: 287 Notice of Party Name Correction ) (This entry is the Official Order of the Court. No document is attached.) (jln, Dpty Clk) (Entered: 11/07/2017) |
| 11/14/2017 | 289 | | MINUTE ORDER by Judge Claire V Eagan , terminating motion referral(s) (Re: 256 Joint OBJECTION to Deposition Designations ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) |

| | | | |
|---|---|---|---|
| | | | (Entered: 11/14/2017) |
| 11/14/2017 | 290 | | ORDER by Judge Claire V Eagan ; finding as moot 256 Objection to Deposition Designations; finding as moot 257 Motion in Limine; finding as moot 258 Motion in Limine; finding as moot 259 Motion in Limine; finding as moot 260 Motion in Limine; finding as moot 261 Motion to Exclude; finding as moot 262 Motion to Exclude; finding as moot 263 Motion to Exclude (RGG, Chambers) (Entered: 11/14/2017) |
| 12/01/2017 | 291 | | Joint MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (Re: 285 Scheduling Order, Setting/Resetting Scheduling Order Date(s),, Ruling on Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s),,,, ) by Cyprus Amax Minerals Company (Stoviak, John) (Entered: 12/01/2017) |
| 12/04/2017 | 292 | | MINUTE ORDER by Judge Claire V Eagan *extending certain deadlines as requested (Pretrial disclosures due 1/5/18; Agreed proposed pretrial order due 1/5/18; and Final witness and exhibit lists due 1/5/18)* ; setting/resetting scheduling order date(s): ( Proposed Pretrial Order due by 1/5/2018); granting 291 Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (Re: 291 Joint MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 12/04/2017) |
| 01/05/2018 | 293 | | FINAL EXHIBIT LIST by Cyprus Amax Minerals Company (With attachments) (Stoviak, John) Modified on 1/9/2018 **− STRICKEN per 294** (sac−qc, Dpty Clk). (Entered: 01/05/2018) |
| 01/05/2018 | | | PROPOSED PRETRIAL ORDER by Cyprus Amax Minerals Company, TCI Pacific Communications, LLC (jln, Dpty Clk) (Entered: 01/08/2018) |
| 01/08/2018 | 294 | | MINUTE ORDER by Judge Claire V Eagan *advising the parties that a proposed pretrial order should NOT be filed of record. It is to be submitted through CM/ECF Intake as a proposed order. Final exhibit lists and witness lists are to be filed of record. Regardless, the pleading at Dkt. # 293 docketed as a final exhibit list actually has attached the parties proposed pretial order. Therefore, the pleading filed at Dkt. # 293 is stricken. The parties are instructed to properly re−submit their proposed pretrial order with attachments. The parties may choose to file final witness and exhibit lists, or may let them remain as exhibits to the proposed pretrial order.*, striking/withdrawing document(s) (Re: 293 Final Exhibit List, 292 Minute Order,,, Setting/Resetting Scheduling Order Date(s),,,,,, Ruling on Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s),, ) (Documents Terminated: 293 Final Exhibit List ) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 01/08/2018) |
| 01/08/2018 | 295 | | ORDER by Judge Claire V Eagan *that the parties shall submit a proposed pretrial order conforming with this Order no later than the close of business on January 9, 2018.*, setting/resetting deadline(s)/hearing(s): ( Proposed Pretrial Order due by 1/9/2018) (Re: Proposed Pretrial Order ) (RGG, Chambers) (Entered: 01/08/2018) |
| 01/08/2018 | 296 | | FINAL WITNESS LIST by TCI Pacific Communications, LLC (Coldiron, Mark) (Entered: 01/08/2018) |
| 01/08/2018 | 297 | | |

| | | | |
|---|---|---|---|
| | | | FINAL EXHIBIT LIST by TCI Pacific Communications, LLC (With attachments) (Coldiron, Mark) (Entered: 01/08/2018) |
| 01/08/2018 | 298 | | FINAL WITNESS LIST by Cyprus Amax Minerals Company (Stoviak, John) (Entered: 01/08/2018) |
| 01/08/2018 | 299 | | FINAL EXHIBIT LIST by Cyprus Amax Minerals Company (With attachments) (Stoviak, John) (Entered: 01/08/2018) |
| 01/08/2018 | 300 | | FINAL EXHIBIT LIST by Cyprus Amax Minerals Company (With attachments) (Stoviak, John) (Entered: 01/08/2018) |
| 01/09/2018 | | | PROPOSED PRETRIAL ORDER by Cyprus Amax Minerals Company, TCI Pacific Communications, LLC (jln, Dpty Clk) (Entered: 01/09/2018) |
| 01/11/2018 | 301 | | MINUTES of Proceedings − held before Judge Claire V Eagan: Pretrial Conference held on 1/11/2018 , striking/terminating deadline(s)/Hearing(s) (Court Reporter: Greg Bloxom) (pll, Dpty Clk) (Entered: 01/11/2018) |
| 01/11/2018 | 302 | | PRETRIAL ORDER by Judge Claire V Eagan (Re: 301 Minutes of Pretrial Conference, Striking/Terminating Deadline(s)/Hearing(s) ) (RGG, Chambers) (Entered: 01/11/2018) |
| 01/16/2018 | 303 | | TRANSCRIPT of Proceedings (Unredacted) of Pretrial Conference held on 01−11−2018 before Judge Claire V Eagan (Court Reporter: Greg Bloxom 918−699−4878) (Pages: 1 − 18). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 301 Minutes of Pretrial Conference, Striking/Terminating Deadline(s)/Hearing(s)) (tgb, Crt Rptr) Modified on 4/16/2018 to remove transcript access restriction (sac, Dpty Clk). (Entered: 01/16/2018) |
| 02/15/2018 | 304 | | Joint STIPULATION *as to Plaintiff's Claimed Costs and Supporting Cost Documentation* by TCI Pacific Communications, LLC (Coldiron, Mark) (Entered: 02/15/2018) |
| 02/26/2018 | 305 | | MINUTES of Proceedings − held before Judge Claire V Eagan: Nonjury Trial began *on 2/26/2018* (Court Reporter: G. Bloxom) (djh, Dpty Clk) (Entered: 02/26/2018) |
| 02/26/2018 | 306 | | MINUTES of Proceedings − held before Judge Claire V Eagan: Nonjury Trial held *on 2/26/2018*, setting/resetting deadline(s)/hearing(s): Continuation of ( Nonjury Trial set for 2/27/2018 at 09:00 AM before Judge Claire V Eagan) (Court Reporter: G. Bloxom & B. Neil) (djh, Dpty Clk) (Entered: 02/26/2018) |
| 02/26/2018 | 307 | | TRANSCRIPT of Proceedings (Unredacted) of Nonjury Trial − Volume I − Morning Session held on 02−26−2018 before Judge Claire V Eagan (Court Reporter: Greg Bloxom 918−699−4878) (Pages: 1 − 142). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the |

| | | | |
|---|---|---|---|
| | | | transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 305 Minutes of Nonjury Trial, 306 Minutes of Nonjury Trial ) (tgb, Crt Rptr) Modified on 3/5/2018 to replace pdf (srt, Dpty Clk). Modified on 5/29/2018 to remove transcript access restriction (sac, Dpty Clk). (Entered: 02/26/2018) |
| 02/27/2018 | 308 | | TRANSCRIPT of Proceedings (Unredacted) of Nonjury Trial − Volume I − P.M. held on 2/26/2018 before Judge Claire V Eagan (Court Reporter: Brian Neil) (Pages: 143−263). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 306 Minutes of Nonjury Trial ) (bpn, CrtRptr) Modified on 3/5/2018 to replace pdf (srt, Dpty Clk). Modified on 5/29/2018 to remove transcript access restriction (sac, Dpty Clk). (Entered: 02/27/2018) |
| 02/27/2018 | 309 | | MINUTES of Proceedings − held before Judge Claire V Eagan: Nonjury Trial held *on 2/27/2018*, setting/resetting deadline(s)/hearing(s): *Continuation of* ( Nonjury Trial set for 2/28/2018 at 09:00 AM before Judge Claire V Eagan) (Court Reporter: G. Bloxom and B. Neil) (djh, Dpty Clk) (Entered: 02/27/2018) |
| 02/27/2018 | 310 | | TRANSCRIPT of Proceedings (Unredacted) of Nonjury Trial − Volume II − A.M. held on 2/27/2018 before Judge Claire V Eagan (Court Reporter: Brian Neil) (Pages: 264−405). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 309 Minutes of Nonjury Trial, Setting/Resetting Deadline(s)/Hearing(s), ) (bpn, CrtRptr) Modified on 3/5/2018 to replace pdf (srt, Dpty Clk). Modified on 5/29/2018 to remove transcript access restriction (sac, Dpty Clk). (Entered: 02/27/2018) |
| 02/27/2018 | 311 | | TRANSCRIPT of Proceedings (Unredacted) of Nonjury Trial − Volume II − Afternoon Session held on 02−27−2018 before Judge Claire V Eagan (Court Reporter: Greg Bloxom 918−699−4878) (Pages: 406 − 537). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 309 Minutes of Nonjury Trial, Setting/Resetting Deadline(s)/Hearing(s)) (tgb, Crt Rptr) Modified on 3/5/2018 to replace pdf (srt, Dpty Clk). Modified on 5/29/2018 to remove transcript access restriction (sac, Dpty Clk). (Entered: 02/27/2018) |

| | | | |
|---|---|---|---|
| 02/28/2018 | 312 | | MINUTES of Proceedings − held before Judge Claire V Eagan: Nonjury Trial held *on 2/28/2018*, setting/resetting deadline(s)/hearing(s): *Continuation of* ( Nonjury Trial set for 3/1/2018 at 09:00 AM before Judge Claire V Eagan) (Court Reporter: G. Bloxom & B. Neil) (djh, Dpty Clk) (Entered: 02/28/2018) |
| 02/28/2018 | 313 | | TRANSCRIPT of Proceedings (Unredacted) of Nonjury Trial − Volume III − Morning Session held on 02−28−2018 before Judge Claire V Eagan (Court Reporter: Greg Bloxom 918−699−4878) (Pages: 538 − 672). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 312 Minutes of Nonjury Trial, Setting/Resetting Deadline(s)/Hearing(s)) (tgb, Crt Rptr) Modified on 3/5/2018 to replace pdf (srt, Dpty Clk). Modified on 5/29/2018 to remove transcript access restriction (sac, Dpty Clk). (Entered: 02/28/2018) |
| 02/28/2018 | 314 | | TRANSCRIPT of Proceedings (Unredacted) of Nonjury Trial − Volume III − P.M. held on 2/28/2018 before Judge Claire V Eagan (Court Reporter: Brian Neil) (Pages: 673−796). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 312 Minutes of Nonjury Trial, Setting/Resetting Deadline(s)/Hearing(s)) (bpn, CrtRptr). Modified on 3/5/2018 to replace pdf (srt, Dpty Clk). Modified on 5/29/2018 to remove transcript access restriction (sac, Dpty Clk). (Entered: 02/28/2018) |
| 03/01/2018 | 315 | | MINUTES of Proceedings − held before Judge Claire V Eagan: Nonjury Trial held *on 3/1/2018*, setting/resetting deadline(s)/hearing(s): *Continuation of* ( Nonjury Trial set for 3/2/2018 at 09:00 AM before Judge Claire V Eagan) (Court Reporter: G. Bloxom and B. Neil) (djh, Dpty Clk) (Entered: 03/01/2018) |
| 03/01/2018 | 316 | | TRANSCRIPT of Proceedings (Unredacted) of Nonjury Trial − Volume IV − A.M. held on 3/1/2018 before Judge Claire V Eagan (Court Reporter: Brian Neil) (Pages: 797−908). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 315 Minutes of Nonjury Trial, Setting/Resetting Deadline(s)/Hearing(s)) (bpn, CrtRptr). Modified on 3/5/2018 to replace pdf (srt, Dpty Clk). Modified on 5/30/2018 to remove transcript access restriction (sac, Dpty Clk). (Entered: 03/01/2018) |
| 03/01/2018 | 317 | | TRANSCRIPT of Proceedings (Unredacted) of Nonjury Trial − Volume IV − Afternoon Session held on 03−01−2018 before Judge Claire V Eagan (Court |

| | | | |
|---|---|---|---|
| | | | Reporter: Greg Bloxom (918−699−4878)) (Pages: 909 − 914). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 315 Minutes of Nonjury Trial, Setting/Resetting Deadline(s)/Hearing(s)) (tgb, Crt Rptr) Modified on 3/5/2018 to replace pdf (srt, Dpty Clk). Modified on 5/30/2018 to remove transcript access restriction (sac, Dpty Clk). (Entered: 03/01/2018) |
| 03/02/2018 | 318 | | MINUTES of Proceedings − held before Judge Claire V Eagan: Nonjury Trial completed *on 3/2/2018*, striking/terminating deadline(s)/Hearing(s) (Re: 309 Minutes of Nonjury Trial,, Setting/Resetting Deadline(s)/Hearing(s), 306 Minutes of Nonjury Trial, 305 Minutes of Nonjury Trial, 312 Minutes of Nonjury Trial,, Setting/Resetting Deadline(s)/Hearing(s), 315 Minutes of Nonjury Trial,, Setting/Resetting Deadline(s)/Hearing(s), 106 Amended Complaint, 2 Complaint ) (Court Reporter: G. Bloxom and B. Neil) (With attachments) (djh, Dpty Clk) (Entered: 03/02/2018) |
| 03/02/2018 | 319 | | TRANSCRIPT of Proceedings (Unredacted) of Nonjury Trial − Volume V held on 03−02−2018 before Judge Claire V Eagan (Court Reporter: Greg Bloxom 918−699−4878) (Pages: 915 − 963). NOTICE RE REDACTION OF TRANSCRIPTS: A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may view the transcript at the court public terminal at no charge or may purchase a copy from the court reporter. (Re: 318 Minutes of Nonjury Trial, Striking/Terminating Deadline(s)/Hearing(s)) (tgb, Crt Rptr) Modified on 3/5/2018 to replace pdf (srt, Dpty Clk). Modified on 5/31/2018 to remove transcript access restriction (sac, Dpty Clk). (Entered: 03/02/2018) |
| 04/02/2018 | 320 | | Joint MOTION to Accelerate/Extend/Reset Hearing(s)/Deadline(s) *FOR PARTIES' SUBMISSION OF PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW* (Re: 318 Minutes of Nonjury Trial,,, Striking/Terminating Deadline(s)/Hearing(s),,,,, ) by Cyprus Amax Minerals Company (Stoviak, John) (Entered: 04/02/2018) |
| 04/03/2018 | 321 | | MINUTE ORDER by Judge Claire V Eagan − *The parties proposed findings of fact and conclusions of law shall be submitted no later than 5/11/18 as requested.* ; setting/resetting deadline(s)/hearing(s): ( Miscellaneous Deadline set for 5/11/2018); granting 320 Motion to Accelerate/Extend/Reset Hearing(s)/Deadline(s) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 04/03/2018) |
| 05/11/2018 | 322 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by Cyprus Amax Minerals Company (Stoviak, John) (Entered: 05/11/2018) |
| 05/11/2018 | 323 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by TCI Pacific Communications, LLC (Coldiron, Mark) (Entered: 05/11/2018) |
| 05/21/2018 | 324 | | |

| | | | |
|---|---|---|---|
| | | | OBJECTION (Re: 323 Proposed FINDINGS OF FACT AND CONCLUSIONS OF LAW) by Cyprus Amax Minerals Company (Stoviak, John) Modified on 5/22/2018 to edit docket text to reflect correct event and create link to # 323 (srt, Dpty Clk). (Entered: 05/21/2018) |
| 05/22/2018 | | | NOTICE of Docket Entry Modification; Error: wrong event (Proposed Findings of Fact and Conclusions of Law); Correction: edited docket text to reflect correct event (Objection) and a link created to # 323 (Re: 324 Proposed Findings of Fact and Conclusions of Law ) (srt, Dpty Clk) (Entered: 05/22/2018) |
| 05/25/2018 | 325 | | RESPONSE (Re: 324 Proposed Findings of Fact and Conclusions of Law ) by TCI Pacific Communications, LLC (Coldiron, Mark) (Entered: 05/25/2018) |
| 12/18/2019 | 326 | | NOTICE of Change of Address by Mark D Coldiron by on behalf of TCI Pacific Communications, LLC (Coldiron, Mark) (Entered: 12/18/2019) |
| 02/11/2020 | 327 | | MOTION to Withdraw Attorney(s) by Cyprus Amax Minerals Company (Robison, Reid) (Entered: 02/11/2020) |
| 02/12/2020 | 328 | | MINUTE ORDER by Judge Claire V Eagan ; terminating attorney Reid Edward Robison ; granting 327 Motion to Withdraw Attorney(s) (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 02/12/2020) |
| 05/11/2020 | 329 | | NOTICE of Change of Address by Paula M Jantzen by on behalf of TCI Pacific Communications, LLC (Jantzen, Paula) (Entered: 05/11/2020) |
| 07/16/2020 | 330 | | ATTORNEY APPEARANCE by Michael Franklin Smith on behalf of Cyprus Amax Minerals Company [Note: Attorney Michael Franklin Smith added to party Cyprus Amax Minerals Company(pty:pla).] (Smith, Michael) (Entered: 07/16/2020) |
| 11/04/2020 | 331 | | MINUTE ORDER *by Court Clerk reassigning the magistrate judge in this case pursuant to General Order 20−37*, reassigning case to Magistrate Judge Christine D Little, Magistrate Judge Frank H McCarthy no longer assigned to case, changing case number to 11−cv−252−CVE−CDL (This entry is the Official Order of the Court. No document is attached.) (a−hc, Dpty Clk) (Entered: 11/04/2020) |
| 03/31/2021 | 332 | | FINDINGS OF FACT AND CONCLUSIONS OF LAW by Judge Claire V Eagan − *Judgment will be entered in favor of plaintiff Cyprus Amax Minerals Company and against defendant TCI Pacific Communications, LLC as to Counts III and V of the amended complaint in the amount of $14,265,070.20, plus post−judgment interest thereon from this date at the rate of.07 % per annum, plus the costs of this action. A declaratory judgment will be entered in favor of plaintiff Cyprus Amax Minerals Company declaring that defendant TCI Pacific Communications, LLC is liable for 45 percent of future response costs, if any, incurred by plaintiff to complete the CSP. Judgment will be entered in favor of TCI Pacific Communications, LLC and against plaintiff Cyprus Amax Minerals Company as to Counts IV and VI of the amended complaint.* (Re: 318 Minutes of Nonjury Trial,,, Striking/Terminating Deadline(s)/Hearing(s),,,,, 305 Minutes of Nonjury Trial, 309 Minutes of Nonjury Trial,, Setting/Resetting Deadline(s)/Hearing(s), 312 Minutes of Nonjury Trial,, Setting/Resetting Deadline(s)/Hearing(s), 315 Minutes of |

| | | | |
|---|---|---|---|
| | | | Nonjury Trial,, Setting/Resetting Deadline(s)/Hearing(s), 306 Minutes of Nonjury Trial, 106 Amended Complaint ) (RGG, Chambers) (Entered: 03/31/2021) |
| 03/31/2021 | 333 | | JUDGMENT by Judge Claire V Eagan , entering judgment in favor of plaintiff against defendant TCI Pacific Communications, LLC (terminates case) (Re: 332 Findings of Fact and Conclusions of Law,,,,,,,,,, ) (RGG, Chambers) (Entered: 03/31/2021) |
| 03/31/2021 | | | ***Civil Case Terminated (see document number 333 ) (sac, Dpty Clk) (Entered: 03/31/2021) |
| 04/14/2021 | 334 | | BILL OF COSTS by Cyprus Amax Minerals Company (With attachments) (Devlin, Cathleen) Modified on 4/15/2021 to seal exhibits 3 and 10 as they were filed unredacted; counsel will re−file using the Errata/Correction event (sc, Dpty Clk). (Entered: 04/14/2021) Contains One or More Restricted PDFs |
| 04/15/2021 | 335 | | MINUTE ORDER by Judge Claire V Eagan , referring 334 Bill of Costs to Court Clerk (This entry is the Official Order of the Court. No document is attached.) (RGG, Chambers) (Entered: 04/15/2021) |
| 04/15/2021 | 336 | | ERRATA/CORRECTION (Re: 334 Bill of Costs ) by Cyprus Amax Minerals Company (With attachments) (Devlin, Cathleen) (Entered: 04/15/2021) |
| 04/28/2021 | 337 | | MOTION to Alter Order/Judgment */Findings of Fact Pursuant to Fed.R.Civ.P. 52(b)* (Re: 333 Judgment, Entering Judgment, 332 Findings of Fact and Conclusions of Law,,,,,,,,,, ) by TCI Pacific Communications, LLC (Coldiron, Mark) (Entered: 04/28/2021) |
| 04/28/2021 | 338 | | NOTICE Plaintiff's Advice to the Court Regarding Prejudgment Interest Award by Cyprus Amax Minerals Company (With attachments) (Smith, Michael) (Entered: 04/28/2021) |
| 04/29/2021 | 339 | | Unopposed MOTION to Stay *Temporarily the Execution of Judgment* by TCI Pacific Communications, LLC (Coldiron, Mark) (Entered: 04/29/2021) |
| 04/30/2021 | 340 | | ORDER by Judge Claire V Eagan − *Defendant TCI Pacific Communications, LLC's Unopposed Motion for Temporary Stay of Execution of Judgment Pending Procurement of Supersedeas Bond (Dkt. # 339) is granted. The judgment (Dkt. # 333) is hereby automatically stayed up to and including June 1, 2021.* ; setting/resetting deadline(s)/hearing(s): ( Miscellaneous Deadline set for 6/1/2021); granting 339 Motion to Stay (Re: 333 Judgment, Entering Judgment, 339 Unopposed MOTION to Stay *Temporarily the Execution of Judgment* ) (RGG, Chambers) (Entered: 04/30/2021) |
| 04/30/2021 | 341 | | NOTICE OF APPEAL to Circuit Court (paid $505 appeal fee; receipt number AOKNDC−2402575) (Re: 333 Judgment, Entering Judgment, 243 Opinion and Order,, Ruling on Motion to Clarify, 244 Opinion and Order,, Setting/Resetting Deadline(s)/Hearing(s),, Ruling on Motion for Partial Summary Judgment,, Ruling on Motion for Summary Judgment, 183 Opinion and Order,,,, Setting/Resetting Deadline(s)/Hearing(s),,,,,,,, Ruling on Motion for Partial Summary Judgment,,,, Ruling on Motion for Summary Judgment,,, 332 Findings of Fact and Conclusions of Law,,,,,,,,,, ) by TCI Pacific Communications, LLC (Coldiron, Mark) (Entered: 04/30/2021) |

**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **CYPRUS AMAX MINERALS COMPANY,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **Case No. 11-CV-0252-CVE-PJC** |
| | **)** | |
| **TCI PACIFIC COMMUNICATIONS, INC.,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

**OPINION AND ORDER**

Now before the Court are Plaintiff Cyprus Amax Mineral Company's Motion for Partial Summary Judgment and Integrated Brief in Support (Dkt. # 151) and Defendant's Motion for Summary Judgment and Integrated Memorandum in Support (Dkt. # 161). Plaintiff Cyprus Amax Mineral Company (Cyprus) filed this case seeking contribution under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. (CERCLA), from defendant TCI Pacific Communications, Inc. (TCI). Cyprus alleges that TCI is the successor-in-interest to New Jersey Zinc Company (NJZ), and that Tulsa Fuel and Management Company (TFMC) was a subsidiary of NJZ. Cyprus claims that TCI is liable for environmental harm caused by TFMC's operations in Collinsville, Oklahoma, because TFMC was the alter ego of NJZ, and TCI has assumed responsibility for the liabilities of NJZ. The parties have filed cross-motions for summary judgment on the issue of the whether TFMC was operating as the alter ego of NJZ. Cyprus also argues that TCI is liable for contribution under a theory that NJZ directly managed TFMC's operations in Collinsville.[1]

---

[1] In a prior opinion and order (Dkt. # 145), the Court directed the parties to file motions for summary judgment as to the "corporate relationship" between TFMC and NJZ, but the Court did not request briefing on the ultimate issue of TCI's liability under CERCLA. This Opinion and Order is limited to the issue of whether TFMC was the alter ego of NJZ, and any issues going to TCI's liability under CERCLA will not be addressed in this Opinion and Order.

Case 4:11-cv-00252-CVE-TLW Document 183 Filed in USDC ND/OK on 09/02/15 Page 2 of 31

**I.**

In 1906, TFMC was incorporated under the laws of Kansas, and the incorporators identified in TFMC's application for a corporate charter were L.T. McRae, C.A.H. de Saulles, J.T. Price, A.D. Terrell, and G.C. Stebbins. Dkt. # 162, at 1-4. McCrae and de Saulles were officers or employees of Prime Western Spelter Company (Prime Western), and NJZ had acquired Prime Western in 1902. Dkt. # 170-1, at 16-17. TFMC's application for a corporate charter states that TFMC would have $50,000 in startup capital. Dkt. # 162, at 3. The historical record of TFMC's corporate activities is not complete, but TCI has produced evidence that TFMC held a shareholder's meeting in 1912. Id. at 29-31. TFMC filed an annual statement with the state of Kansas every year from 1907 to 1925. Id. at 37-107. Some of the documents produced by the parties are old and the copies are difficult to read, but it is clear that at least some of TFMC's annual statements were signed and notarized in the state of New York.[2] The annual statements show that TFMC elected corporate officers and had a board of directors, and the annual statements represented that individuals, rather than NJZ, were the actual shareholders of TFMC's stock. TFMC had a registered agent to accept service of process. Id. at 108-10.

Certain corporate officers of NJZ, including NJZ's president Edgar Palmer, held the same position with TFMC during much TFMC's existence. Id. at 118-19; Dkt. # 170-4, at 19. In 1912, de Saulles sold real property to TFMC for $1.00. Dkt. # 163, at 52. When the transaction took place, de Saulles was president of TFMC, and he owned 495 of the 500 shares issued by TFMC. Id. at 57. The deeds for TFMC's real property do not mention NJZ, but de Saulles was the general

---

[2] Cyprus asks the Court to infer that the annual statements were prepared by NJZ at its corporate offices in New York. Dkt. # 170, at 7-8.

manager and assistant superintendent of Prime Western before he became president of TFMC in 1908.[3] Dkt. # 170-1, at 17. By 1922, the NJZ president, vice president, general counsel, comptroller, treasurer, general sales manager of ore, and purchasing agent held the same positions with TFMC. Dkt. # 153-1, at 3, 5.

The historical record of TFMC's financial condition is somewhat limited, but TFMC's annual statements filed with the state of Kansas do provide some evidence of TFMC's finances. The annual statements show that TFMC was indebted up to $586,226 until 1914, but there was no indebtedness listed on the annual statements from 1915 to TFMC's dissolution in 1926. Dkt. # 162, at 38-76; Dkt. # 163, at 1-33. The annual statements do not identify the source of the loans or if the loans were repaid, and the parties dispute what the loans listed on the annual statements actually represent. Cyprus' accounting expert, Bala Dharan, Ph.D., CPA, opines that the loans were intercompany transfers from NJZ, because he believes that TFMC lacked the operating history or assets to independently borrow the amounts listed in its annual statements. Dkt. # 170-1, at 112. TCI's accounting expert, Raymond Dovell, CPA, concludes that TFMC borrowed money to fund the construction of its smelting plant and that the loans were repaid by 1915.[4] Dkt. # 161-2, at 15. The parties' experts also dispute whether TFMC was solvent during it existence or to what extent

---

[3] De Saulles was the president of TFMC from 1908 to 1912. Dkt. # 170-1, at 17. Palmer served as TFMC's president for the remainder of TFMC's existence. Dkt. # 162, at 38-76; Dkt. # 163, at 1-33.

[4] Both parties complain that the opposing expert's testimony on financial matters is unreliable due to the lack of financial documentation supporting the opposing expert's opinions, but they do agree that there is no evidence other than the annual statements to document the financial condition of TFMC. Both accounting experts make inferences to interpret the information in the annual statements, but there is no evidence in the record to show how TFMC's finances were managed on a day-to-day basis.

Case 4:11-cv-00252-CVE-PJC Document 183 Filed in USDC ND/OK on 02/02/15 Page 4 of 31

NJZ may have provided financial support for TFMC operations. Dkt. # 161-2, at 17-18; Dkt. # 170-1, at 113-19. According to the annual statements, TFMC generated a profit each year it was in existence, but the operating capital was never increased from $50,000.

As to TFMC's operations, there is no dispute that TFMC was incorporated in 1906 and that TFMC began conducting smelting operations in Collinsville in 1912. Dkt. # 164, at 7-8. However, the parties do dispute the extent to which NJZ and its officers were involved with the day-to-day operations of TFMC. TCI states that there is evidence that NJZ officers or directors visited the smelting plant in Collinsville a total of four times between 1912 and 1926. Dkt. # 164, at 9-11. However, in proceedings before the Interstate Commerce Commission (ICC),[5] NJZ represented that it "in fact and constant practice manages and directs the operations of its subsidiaries companies, including [TFMC], without regard to corporate lines of separation, and constantly exercises its authority to act for and in behalf of its subsidiaries in any all matters." Dkt. # 171, at 93. TFMC

[5] TCI objects to the admissibility of statements made during the ICC proceedings, because TCI was not a party to the ICC proceedings and there is no evidence showing that the statements were made on behalf of TCI. Dkt. # 174. However, courts have found that the statements of a predecessor-in-interest are admissible under the residual exception to the hearsay rule, even if the statements do not constitute a party admission under Fed. R. Evid. 801(d)(2). Cynergy, LLC v. First American Title Ins. Co., 706 F.3d 1321, 1329-30 (11th Cir. 2013). Under Fed. R. Evid. 807, a hearsay statement that would otherwise be excluded is admissible if "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice." The sworn statements of a witness under oath at an administrative hearing carry significant guarantees of trustworthiness, and the statements were offered by NJZ and/or TFMC as probative of a material fact. Given the passage of time, there is little other evidence available on which Cyprus could rely and Cyprus has made reasonable efforts to locate evidence. The Court also finds that admission of statements made during the ICC proceedings is consistent with the hearsay rules and would be in the best interests of justice. The Court finds that statements made by representatives of NJZ during the ICC proceedings are admissible under the residual exception to the hearsay rule.

was dissolved in 1926 and sold its real property to Tulsa County Coal Company. Id. at 56. Upon dissolution, NJ Zinc received a $500,000 dividend from TFMC. Dkt. # 171, at 156.

During its existence, TFMC was involved in court proceedings on its own behalf and sometimes with assistance from NJZ. TFMC designated an agent for service of process in Indian Territory. Dkt. # 164, at 15. TFMC was named as a party in at least two lawsuits in Oklahoma courts. Id. at 18-41; Dkt. # 165, at 1-30; Dkt. # 166, at 1-28. TFMC defended itself in its own name and NJZ was not a party to the cases.

TFMC was also involved in a dispute before the ICC concerning freight charges for the shipment of zinc concentrates. On April 8, 1922, TFMC filed a complaint alleging that it was charged excessive freight charges for the transportation of zinc concentrates. Dkt. # 167, at 39-41. The ICC held an administrative hearing on January 11, 1923, on the issue of whether TFMC paid excessive freight charges in March 1918 for the shipment of zinc concentrates from Minnequa, Colorado to Collinsville. Dkt. # 171, at 10. The issue was first raised by NJZ when it sent a letter to Cyrus Stafford of the United States Railroad Administration, and Stafford advised NJZ to file a claim with the ICC to toll the statute of limitations. Id. at 19-20. NJZ filed an informal complaint with the ICC on January 8, 1921, and the claim was amended on February 5, 1921. Id. at 20. NJZ conducted informal negotiations with the ICC in an attempt to resolve the claim, but the ICC advised NJZ that a formal complaint would have to be filed. Id. at 27. The formal complaint was filed by TFMC, rather than NJZ, and an issue arose as to whether TFMC's complaint was barred by the statute of limitations. At the January 11, 1923 administrative hearing, TFMC represented that it was a subsidiary of NJZ and that its entire stock was owned by NJZ. Id. at 28-29. TFMC further stated that NJZ "completely owns" TFMC. Id. at 31.

On May 9, 1923, a second administrative hearing was held "simply for the purpose of receiving further proof respecting the circumstances surrounding the filing of the informal complaint staying the running of the statute of limitations." Id. at 82. NJZ sought to substitute TFMC as the complainant in NJZ's informal complaint and to deem the filing of the informal complaint as the date of filing to trigger the statute of limitations. Id. at 83-84. NJZ called C.H. George, the general traffic manager of NJZ and all of its subsidiary companies, to testify at the hearing. Id. at 85. George testified that he had the authority to act on behalf of NJZ and all of NJZ's subsidiaries, including TFMC. Id. at 86. George also read a prepared statement into the record. George stated that the "entire capital stock [of TFMC] is owned by [NJZ]" and that NJZ owns the stock of all of its subsidiary companies. Id. at 86-87. According to George, NJZ "possesses consequent to that absolute ownership, complete control of all the affairs of its subsidiaries . . . and in fact and in actual practice does exercise complete control in the general conduct of its and their business, and it acts as agent for and in behalf of its subsidiaries." Id. at 87. NJZ presented organizational charts showing the overall structure of NJZ and its subsidiaries, and George stated that the "lines of authority of [NJZ's] personnel extend to all companies, so that its executives and their staff function without regard to corporate lines of division." Id. at 88. The organization chart for NJZ's manufacturing department shows that TFMC was considered part of NJZ's manufacturing department. Dkt. # 170-4, at 18. George's written statement was summarized by four key points:

> (1) That [NJZ] in fact and in constant practice manages and directs the operations of its subsidiary companies, including [TFMC], without regard to corporate lines of separation, and constantly exercises its authority to act for and in behalf of its subsidiaries in any and all matters.

Case 4:11-cv-04252-CVE-FHM Document 183 Filed in USDC ND/OK on 02/02/15 Page 7 of 31

(2) That the lines of authority and responsibility of the officers of [NJZ] and their staff members extend to all subsidiary companies.

(3) That in January, 1921, as now, I was general traffic manager of [NJZ], and also of [TFMC].

(4) And, that, therefore, I was authorized to act for and in behalf of [TFMC] not only in my capacitiy of General traffic manager of [TFMC], but, also as general traffic manager of [NJZ] through the authority of the latter to act for the former.

Id. at 93-94. NJZ did not take the position that it authorized George to act on behalf of TFMC for the specific transaction at issue but, instead, NJZ argued that it generally had the authority to act on behalf of its subsidiaries in all matters. Id. at 98. In supplemental briefing to the ICC, NJZ reiterated its argument that it "owns all the capital stock of its subsidiary companies . . . and, consequent to such absolute ownership, possesses complete control of all the affairs of its subsidiaries, and in fact and in actual practice does exercise such complete control in the general conduct of its and their business, and it acts as agent for and in behalf of its subsidiaries." Dkt. # 153-1, at 36. NJZ further explained that many of its officers occupy the same positions for NJZ and its subsidiaries and that its officers often acted on behalf of NJZ's subsidiaries. Id. NJZ also directed the ICC to the organizational charts presented at the May 9, 1923 hearing and stated that its use of the word "'company' whenever used shall be understood to include all allied companies." Id. at 37.

The ICC issued a written decision in favor of TFMC on its claim of excessive freight charges. Dkt. # 167, at 42-43. The ICC stated that the complaint was filed by NJZ on behalf of TFMC and that NJZ "owns all the capital stock of complainant." Id. at 42. The ICC found that George had authority to file a claim on behalf of TFMC due to his dual role as general traffic

manager for NJZ and TFMC, and the ICC awarded TFMC reparation in the amount of $2,234.97 plus interest. Id. at 43.

Cyprus has submitted additional evidence of statements by officers of NJZ while TFMC was still a going concern to support the argument that NJZ and its subsidiaries acted as a single entity. In an issue of Zinc magazine from 1918, NJZ vice president J.E. Hayes explained the overall structure of the company and he described the subsidiaries as part of a larger entity functioning under a single management system. Dkt. # 174-3, at 170-172. Hayes stated that it was often necessary for NJZ to form subsidiaries to operate in certain states, but the "the parent company and its lines of organization and routines carry through all the subsidiaries." Id. at 173. The parts of the organization further down the chain of command were encouraged "to the limit as long as your activity is related to zinc . . . ", and Hayes described higher levels of the corporate structure as responsible for serving as a "counselor and guide" and a "controller of excess enthusiasm and a spur to greater activity." Id. In a January 1918 NJZ "War Work" report to the Federal Trade Commission (FTC), NJZ stated that "all material is charged at cost as it passes into the next department" and, in reference to a subsidiary identified as New Jersey Zinc Co. (of Pa.), NJZ was responsible for keeping an inventory of the subsidiary's product and any profits from the sale of a finished product was credited to NJZ. Dkt. # 153-2, at 34. NJZ's president, Palmer, submitted an affidavit to the War Industries Board in an attempt to convince the Board that NJZ's operations were essential wartime activities. Dkt. # 153-3, at 14-15. Palmer stated that "[a]s the owner of the stock of its subsidiary companies it controls their operations, the purchase of all materials and the sale of all products." Id. at 15. TFMC is specifically identified as a wholly-owned subsidiary of NJZ. Id.

Case 4:11-cv-00252-CVE-CDL Document 183 Filed in USDC ND/OK on Page 9 of 31

The affidavit was apparently drafted in 1918, but the copy of the affidavit offered by Cyprus was not signed or dated by Palmer.[6]

Cyprus alleges that it is the successor-in-interest to the entity that owned the Bartlesville Zinc Smelter (BZ Smelter), and it states that the BZ Smelter is approximately a quarter mile from the Tulsa Fuel and Manufacturing Zinc Smelter (TFM Smelter) that formerly operated in Collinsville. Cyprus claims that it is cooperating with the Environmental Protection Agency (EPA) and the Oklahoma Department of Environmental Equality (ODEQ) in the cleanup of environmental contamination caused by zinc smelting. Dkt. # 2, at 5. Cyrpus entered a consent decree with the EPA and ODEQ providing for soil sampling and remediation near Collinsville. Id. at 6. Pursuant to the consent decree, Cyprus also agreed to undertake "comprehensive and costly response actions" and Cyrpus states that it has "incurred and will continue to incur cleanup and response costs, including reimbursement to ODEQ for investigative and response costs." Id. at 18.

On April 26, 2011, Cyprus filed this case alleging that NJZ was the parent company of TFMC and, under an alter ego theory, that NJZ was responsible for the debts and liabilities of TFMC. TFMC and NJZ are no longer in existence, but Cyprus claims that TCI, Viacom, CBS Corporation, and CBS Operations, Inc. are the successors-in-interest of NJZ. TCI has admitted that it is the successor-in-interest to NJZ. Dkt. # 143, at 1. Cyprus voluntarily dismissed defendants Viacom and CBS Corporation. Dkt. ## 59, 63. The remaining defendants, TCI and CBS Operations, Inc., filed a motion (Dkt. # 53) for a ruling as to whether Kansas or Oklahoma law applied to the issue of piercing the corporate veil under an alter ego theory. The judge then assigned

---

[6] The parties dispute the admissibility of the affidavit because it is unsigned. For the purpose of this Opinion and Order, the Court will not consider Palmer's unsigned affidavit in ruling on the pending motions for summary judgment.

to the case, the Honorable Gregory K. Frizzell, found that Kansas law applied to this case, because laws of the state of incorporation ordinarily governed the disputed issue and TFMC was incorporated in Kansas. Dkt. # 89. The case was reassigned to the Honorable John E. Dowdell. Dkt. # 105. TCI and CBS Operations, Inc. filed a motion to dismiss (Dkt. # 114) Cyprus' claims for failure to state a claim upon which relief can be granted. The motion to dismiss was granted in part and denied in part. Dkt. # 142. All pending claims against CBS Operations, Inc. were dismissed with prejudice, and the unjust enrichment claim and certain of Cyprus' CERCLA claims were dismissed as to TCI. However, Counts III through VII of the amended complaint remain pending against TCI. Neither Cyprus nor TCI has demanded a jury trial on any issue. The case was randomly reassigned to the undersigned following the recusal of Judge Dowdell. Dkt. # 144. Before Judge Dowdell had ruled on the motion to dismiss, Cyprus and TCI had filed motions to exclude expert testimony, and those motions were pending when the case was reassigned to the undersigned. The Court entered an opinion and order (Dkt. # 145) excluding the testimony of Cyprus' proposed expert on the law, but the Court denied the remaining Daubert motions. The Court directed the parties to submit motions for summary judgment "on the issue of TFMC's and [NJZ's] corporate relationship, including any arguments as to piercing the corporate veil . . . ." Dkt. # 145, at 20.

**II.**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

**III.**

TCI argues that NJZ did not own the stock of TFMC, that NJZ did not use its subsidiary to perpetrate a fraud or injustice on any person, and that piercing the corporate veil is not permitted under Kansas law. Dkt. # 161, at 18-23. TCI also argues that Kansas courts apply a ten factor test to determine if a subsidiary corporation is being treated as a mere instrumentality of a parent corporation, and application of the ten factor test does not support piercing the corporate veil. Id.

Case 4:10-cv-00252-CVE-PJC Document 183 Filed 02/02/15 Page 12 of 31

at 24. Cyprus responds no single factor should be considered dispositive on the issue of piercing the corporate veil, but that consideration of all of the factors shows that TFMC was the alter ego of NJZ.

Although TCI did not directly own or operate the TFM Smelter, the United States Supreme Court has established that parent corporations and their corporate successors can be held liable under CERCLA for the actions of a subsidiary corporation. In United States v. Bestfoods, 524 U.S. 51 (1998), the Court ruled that a corporate parent can be directly liable for operating a polluting facility or it can be indirectly liable for the acts of the subsidiary in situations when piercing the corporate veil is appropriate. Id. at 64-67. As to indirect liability, CERCLA does not replace or supersede state corporation law, and piercing the corporate veil is decided under state law. Id. at 62-63. As stated, law of the case is that Kansas law applies. Dkt. # 89.

Kansas follows the general rule that parent and subsidiary corporations are separate and distinct entities and, "[i]n the absence of fraud or other invidious and vitiating circumstances, the fact that one corporation is instrumental in the formation of another corporation and owns nearly all of the stock of the latter corporation does not have the legal effect of making the parent corporation liable for the debts of the subsidiary corporation." Dean Operations, Inc. v. One Seventy Associates, 896 P.2d 1012, 1016 (Kan. 1995). The mere fact that a parent corporation creates a subsidiary corporation to avoid liability is not sufficient to disregard the corporate entity of the subsidiary corporation. Id. at 1016. The Supreme Court of Kansas has identified ten factors that should be considered when a court is asked to disregard the corporate separateness of a subsidiary corporation:

> (1) the parent corporation owns all or a majority of the capital stock of the subsidiary; (2) the corporations have common directors or officers; (3) the parent corporation finances the subsidiary; (4) the parent corporation subscribed to all of the capital stock of the subsidiary or otherwise caused its incorporation; (5) the

> subsidiary has grossly inadequate capital; (6) the parent corporation pays the salaries or expenses or losses of the subsidiary; (7) the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation; (8) in the papers of the parent corporation, and in the statements of its officers, the subsidiary is referred to as a department or division; (9) the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; and (10) the formal legal requirements of the subsidiary as a separate and independent corporations are not observed.

Doughty v. CSX Transp., Inc., 905 P.2d 106, 111 (Kan. 1995). No single factor or combination of factors is determinative, and a court must consider on a case-by-case basis whether "there is such domination of finances, policy, and practices that the controlled corporation has no separate mind, will, or existence of its own and is but a business conduit for the principal." Moorhouse v. City of Wichita, 913 P.2d 172, 181 (Kan. 1996).

TCI disputes that NJZ was an owner or shareholder of TFMC because the evidence shows that the shares of TFMC were owned by individuals, and TCI argues that piercing the corporate veil is prohibited as a matter of Kansas law if NJZ did not own the stock in its subsidiary. TCI cites two decisions from the federal district courts in Kansas to support this argument. See Cotracom Commodity Trading AG v. Seaboard Corp., 94 F. Supp. 2d 1189 (D. Kan. 2000); Schmid v. Roehm Gmbh, 544 F. Supp. 272 (D. Kan. 1982). Cyprus responds that stock ownership is just one of the factors used to determine if the corporate entity should be disregarded and that many courts have found piercing the corporate veil appropriate in the absence of stock ownership by a parent company. Dkt. # 170, at 15-17. Doughty lists stock ownership as one of the non-exclusive factors used to determine if a corporate entity should be disregarded, and there are no cases from Kansas appellate courts standing for the proposition that stock ownership is a mandatory prerequisite for piercing the corporate veil of a subsidiary corporation. Cotracom Commodity Trading does not

Case 4:10-cv-00252-CVE-CDL Document 183 Filed 02/02/15 Page 14 of 31

support TCI's argument that stock ownership is absolutely required to pierce the corporate veil, but it simply stands for the proposition that the absence of stock ownership is one factor weighing against piercing the corporate veil. Cotracom Commodity Trading, 94 F. Supp. 2d at 1198-99. Schmid was decided well before Doughty and Dean, and the Supreme Court of Kansas stated in Dean that there was very little Kansas law on the issue of piercing the corporate veil of a subsidiary to reach the assets of a parent corporation. Dean, 896 P. 2d at 1016. Dean also specifically cited Schmid for the proposition that presence of some of the ten factors does not mandate a ruling in favor of the party seeking to pierce the corporate veil, but Schmid was not cited to support a rule that stock ownership is absolutely required before the corporate veil can be pierced. Dean, 896 P.2d at 1017-18. The Court rejects TCI's argument that stock ownership is an absolute requirement for piercing the corporate veil as a matter of Kansas law. Even if TCI were correct, there is sufficient evidence in the summary judgment record that NJZ held itself out as the owner of TFMC's stock. Dkt. # 171, 28-29 ("the entire stock is owned by [NJZ]"); id. at 31 (NJZ represented to the ICC that it "completely owns" TFMC); id. at 86-87 (George told the ICC that the "entire capital stock [of TFMC] is owned by [NJZ]). This is clear evidence that NJZ asserted its complete ownership of the stock of TFMC during the relevant time period, and the fact that the stock of TFMC was nominally owned by individuals associated with NJZ does not prevent the Court from considering whether the corporate veil of TFMC should be pierced.

TCI argues that there is no evidence that NJZ abused the corporate form for the purpose of effecting fraud or injustice on Cyprus, and that this prohibits the Court from even reaching the ten factor test for piercing the corporate veil. Kansas law is clear that the ultimate purpose of piercing the corporate veil is to prevent fraud or injustice. See Commerce Bank, N.A. v. Liebau-Woodall &

Associates, L.P., 20 P.3d 88, 93 (Kan. App. 2001) ("The veil piercing concept is to be used solely to avoid potential injury to third parties by perpetuating fraud, illegality, or injustice worked through the legal fiction of a corporate identity") ; Doughty, 905 P.2d at 111 ("The ultimate test for imposing alter ego status is whether, from all of the facts and circumstances, it is apparent that the relationship between the parent and subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and the assets of the two are so mingled that recognition of the subsidiary as a distinct entity would result in an injustice or fraud to third parties."). The Tenth Circuit, applying Oklahoma law, has stated that the mere inconvenience of enforcing a judgment against a subsidiary is not a sufficient reason to pierce the corporate veil. Luckett v. Bethlehem Steel Corp., 618 F.2d 1373, 1379 (10th Cir. 1980). However, the Tenth Circuit, applying Kansas law, has also stated that many cases concerning piercing the corporate veil "have involved fraud or a more blatant commingling . . . but proof of fraud is not a necessary element in finding alter ego." Milgo Elec. Corp. v. United Business Communications, Inc., 623 F.2d 645, 662 (10th Cir. 1980). The Court has found no Kansas or Tenth Circuit cases where a court has simply declined to consider other factors, such as the Doughty factors, on the ground that the party seeking to pierce the corporate veil had not produced direct evidence that a subsidiary was created for the express purpose of perpetrating fraud or injustice. The Court finds that the Doughty factors should be considered even though Cyprus has not produced direct evidence that NJZ used the corporate form to commit a fraud or injustice against Cyprus.[7]

[7] The Court notes that it would be a fraud or injustice to third parties for NJZ to affirmatively represent to the ICC that TFMC was effectively a department of NJZ for the purpose of recovering from a third party, while TCI attempts to argue in this case that NJZ and TFMC were entirely separate corporations in an effort to avoid liability under CERCLA.

Stock Ownership/Parent Caused Incorportation

Historical records show that at all times between 1906 and 1926 the stock of TFMC was owned by individuals, and there is no evidence showing that NJZ directly owned any stock of TFMC. Dkt. # 162, at 30-76; Dkt. # 162-1, at 31. There are no records expressly showing that any of the shareholders of TFMC held the stock for the benefit of NJZ, and TCI argues that this is significant evidence that TFMC was not the alter ego of NJZ. However, the fact that individuals, rather than NJZ, nominally owned TFMC's stock should be considered in light of the identity of those individuals. Cyprus' historical expert, James C. Burrows, Ph.D., points out that in 1912 certain individuals owned the stock of TFMC, but each of those individuals had a strong connection to NJZ. In particular, Edgar Palmer owned the vast majority of TFMC's stock and he was the president and chairman of the board of NJZ in 1912. Dkt. # 151-2, at 18. The rest of TFMC's stock was held by vice presidents, members of the board, and officers of NJZ. Palmer was the majority stockowner of TFMC from at least 1912 to 1926, and he was also a member of the board of TFMC during that time. In 1922, George represented to the ICC that the "entire capital stock [of TFMC] is owned by [NJZ]." Dkt. # 151-2, at 228. George added that NJZ "possesse[d], consequent to that absolute ownership, complete control of all the affairs of its subsidiaries . . . ." Id. at 229. The ICC relied on George's representations and made a specific finding that NJZ "owns all of the capital stock of [TFMC]." Dkt. # 167, at 42. Cyprus also points out that upon the dissolution of TFMC a dividend of $500,000 was paid to NJZ, not the individual shareholders, and this suggests that the true owner of TFMC was NJZ. Dkt. # 159-6, at 38.

While there is no dispute that NJZ did not directly own the stock of TFMC, there is significant evidence showing that persons closely associated with NJZ owned TFMC's stock and

that NJZ held itself out as the owner of TFMC's stock. TCI argues that NJZ could not be deemed the "equitable owner" of TFMC's stock as a matter of Kansas law, but the Court does not find that it is necessary to make that determination. See Dkt. # 174, at 21. Instead, the Court can rely on the statements of George as evidence that NJZ claimed to own the stock of TFMC, even if the nominal owners were individuals employed by NJZ, because this is strong evidence that NJZ claimed ownership and control over TFMC. The Court also finds that it is relevant that, upon its dissolution, TFMC paid a dividend directly to NJZ instead of the individual shareholders.[8] Even though there is no evidence that NJZ directly owned TFMC's stock, the Court will rely on NJZ's affirmative representations and the ICC's finding as evidence that NJZ owned or controlled the stock of TFMC.

Common Officers

The parties agree that NJZ and TFMC employed common officers and directors. Dkt. # 151, at 29; Dkt. # 161, at 26. For example, evidence submitted to the ICC in 1922 showed that the same persons held the positions of president, vice president, general counsel, comptroller, treasurer, general sales manager of ore, and purchasing agent for NJZ and TFMC. Dkt. # 153-1, at 3, 5. Although the parties do not dispute that there were common officers or directors, they disagree as to what weight this factor should be given. TCI's primary argument is that it would be inappropriate to pierce the corporate veil based only on the commonality of officers or directors between a parent and subsidiary company. Dkt. # 161, at 26. The Court agrees that this is not a dispositive factor under Kansas law. See Doughty, 905 P.2d at 114; Nelson v. A.O. Smith Harverstore Prods., Inc.,

---

[8] TCI argues that TFMC's equity substantially exceeded $500,000 at the time of its dissolution. Dkt. # 174, at 24. TCI speculates that the additional equity could have been paid to TFMC's shareholders or that TFMC was investing $500,000 in NJZ. Both of these arguments are speculative and not supported by evidence in the summary judgment record, and the Court will not consider these arguments.

Case 4:10-cv-00252-CVE-FHM Document 183 Filed 02/20/15 Page 18 of 31

1990 WL 252135, *4 (D. Kan. 1990). However, that does not mean that this factor is irrelevant or entitled to little weight, as TCI suggests, when it is considered in the context of other evidence tending to show that a parent company controls or dominates a subsidiary. In this case, Cyprus has submitted evidence that gives this factor additional weight. In the ICC proceedings, NJZ expressly relied on the commonality of officers between NJZ and TFMC as evidence that "the line of authority shown on the [NJZ] 'general organization' chart extends to all companies, and the word 'company' whenever used shall be understood to include all allied companies." Dkt. # 153-1, at 37. NJZ used this evidence in an attempt to convince the ICC that NJZ "in fact and in constant practice manages and directs the operation of its subsidiary companies, including [TFMC], without regard to corporate lines of separation . . . ." Id. These statements were made in a brief that NJZ submitted to the ICC. These statements by NJZ give this factor additional weight because, when viewed in the context of other evidence, the commonality of officers and directors between NJZ and TFMC tends to show that NJZ exerted substantial control over the operations of TFMC.

Parent Corporation Finances the Subsidiary/Inadequate Capitalization

The Court will consider the third and fifth Doughty factors together due to the substantial overlap of evidence relating to both factors. The third factor (parent finances subsidiary) concerns the parent company's financial ties with its subsidiary and whether the subsidiary could have survived as an independent entity without financial assistance from the parent. See Milgo Elec. Corp., 623 F.2d at 660-61; Dean Operations, Inc., 896 P.2d at 1019. The fifth factor (inadequate capitalization) requires the Court to consider whether the subsidiary has sufficient capital to function independently of the parent. Cuiksa v. Hallmark Hall of Fame Prods., Inc., 252 F. Supp. 2d 1166,

1177 (D. Kan. 2003). Both parties rely on the opinions of experts to support their differing conclusions as to financial independence of TFMC and the adequacy of its capitalization.

The parties do not dispute that TFMC had initial capital of $50,000 when it was formed in 1906. Dkt. # 159-6, at 11. Each subsequent annual report lists TFMC's capital as $50,000. Dkt. # 153-4. TCI relies on the expert opinions of Dovell to support its argument that TFMC was able to meet its obligations and function independently from it parent corporation. Dovell states that he conducted a balance sheet test based on information contained in TFMC's annual reports to the state of Kansas, and he determined that TFMC was solvent throughout its existence. Dkt. # 161-2, at 11. He determined that TFMC had sufficient capital on hand to operate its business, because he considered the accumulated profit listed in the annual reports as capital, in addition to the initial capital investment of $50,000. Id. at 13. He noted that TFMC initially had debt that allowed it to remain solvent between 1907 and 1914, but he could not determine the source of the loans. Id. at 10, 14. Dovell also opined that TFMC maintained sufficient funds to pay its debts and obligations. Id. at 16. His report does not opine as to the day-to-day financial relationship of TFMC and NJZ, but he does state that the $500,000 dividend payment to NJZ "was not improper." Id. at 17.

Cyprus' accounting expert, Dharan, disputes Dovell's conclusion that TFMC was profitable, and he states that Dovell fails to account for intercompany transfers between TFMC and NJZ. Dkt. # 151-2, at 110. He also states that TFMC lacked sufficient capital or operating history to obtain the loans identified in its annual statements, and the loans were likely intercompany transfers that were listed as loans on TFMC's annual statement. Id. Dharan does not include the profits listed on the annual statements as part of TFMC's capital, because he does not believe those profits were actually retained by TFMC. Instead, he has reviewed historical documents concerning NJZ's

Case 4:10-cv-00252-CVE-PJC Document 183 Filed 02/20/15 Page 20 of 31

accounting practices and he states that NJZ used a central accounting system in which the funds of a subsidiary were treated as if the funds belonged to a department of NJZ. Id. at 112-13. He concludes that NJZ used a similar centralized accounting practice with TFMC, even though he could not find any financial records showing that TFMC's finances were integrated with those of its parent company. Id. at 114. Based on NJZ's accounting practices, Dharan believes that financial decisions concerning all of NJZ's subsidiaries were made by the Executive Committee of NJZ, but he has no evidence specific to the operation of TFMC. Id. at 115-16. Dharan states that he reviewed evidence supporting a finding that NJZ provided "key finance and accounting services to TFMC," but he does not opine that NJZ financed the operations of TFMC or that NJZ purposefully left TFMC without sufficient operating capital. Id. at 117. Dharan concludes that TFMC was undercapitalized, in part, based on his determination that TFMC's ratio of capital to assets was about 4%. Id. at 126. This is significantly less than other mining companies operating during the same time period. Id.

The Court has reviewed the expert reports of Dovell and Dharan and finds that their opinions do not have sufficient evidentiary support for the Court to make a conclusive determination about the financial relationship between TFMC and NJZ. Dovell relies primarily on annual reports filed by TFMC, but these reports do not provide any basis for the Court to determine if TFMC had sufficient funds to meet its obligations on a day-to-day basis. The reports also do not show if TFMC was financially independent of its parent company or if TFMC was adequately capitalized. On the other hand, Dharan makes conclusions about the financial relationship between TFMC and NJZ based on non-financial records concerning the relationship between NJZ and its subsidiaries generally. This also does not provide the Court with any basis to determine if TFMC had sufficient operating capital or whether NJZ financed the operation of TFMC. The Court understands that both

Case 4:10-cv-00252-CVE-PJC Document 183 Filed 02/02/15 Page 21 of 31

experts were dealing with an incomplete historical record, but the annual reports and the practices of NJZ in general do not provide a sufficient basis for the Court to determine whether NJZ financed the operations of TFMC or if TFMC was undercapitalized.[9] The Court will take into account Dharan's opinion that NJZ generally operated its subsidiaries using a centralized accounting method, and his opinion that the "profits" of NJZ's subsidiaries may not accurately account for the funds actually held by the subsidiary. However, the annual statements reviewed by Dovell show that at least on paper TFMC appears to have been an independent and profitable company. The Court does not find that the financial evidence supports a finding that TFMC was undercapitalized or the NJZ directly funded the operations of TFMC. This does not preclude a finding that NJZ controlled or dominated the operations of TFMC, but the Court will not speculate as to the financial arrangement between TFMC and NJZ.[10]

Subsidiary Has No Business Except With Parent

Cyprus argues that there is evidence showing that all of NJZ's subsidiaries conducted business solely with NJZ, and that the Court should infer that TFMC had a similar relationship with NJZ. In a War Work report sent to the FTC, NJZ stated that "[a]s a general introduction we would

---

9 In analyzing other Doughty factors, the Court will take into account non-financial evidence that NJZ represented that TFMC was operated as a division or part of NJZ, but the financial records and annual statements in the record are not sufficient to determine NJZ's involvement in TFMC's finances and daily operations.

10 The lack of documentation also prevents the Court from reaching any conclusion as to the sixth Doughty factor (payment of expenses by parent). Cyprus relies on statements in Zinc magazine to suggest that NJZ might have paid for materials for TFMC's facility. Dkt. # 151 at 31. By itself, this does not prove that NJZ paid for expenses to operate TFMC or that NJZ paid the salaries of TFMC's employees. TCI argues that it would be speculative for the Court to assume based on the evidence cited by Cyprus that NJZ actually paid TFMC's expenses or salaries, and the Court agrees that the evidence is not sufficient to make a finding as to this factor.

Case 4:10-cv-00252-CVE-CDL Document 183 Filed 02/10/15 Page 22 of 31

say that all material is charged at cost as it passes into the next department . . . ." Dkt. # 153-2, at 34. In proceedings before the ICC, George represented that NJZ "also acts as sales agent on commission for [TFMC] as well as the other subsidiaries." Dkt. # 151-2, at 235. Finally, in an issue of Zinc magazine, NJZ explains that its subsidiaries do not make any money because the subsidiaries turn their product over to NJZ at cost. Dkt. # 153-1, at 62.

TCI cites the testimony of TFMC's traffic manager, W. A. Moore, before the ICC, in which he stated:

> Our product, metallic zinc, spelter, is always sold at a price set in the open market at St. Louis, which is a basing point for all sales of spelter in this country. That is to say, we are not able to add to our production cost a certain percentage for profit and then offer our product for sale on that basis, but on the contrary it is necessary for us to accept the best price offered in the market from day to day.

Dkt. # 166, at 41-42. The purpose of Moore's testimony was to explain the calculation of freight rates for shipments of zinc concentrates, and he was not testifying about TFMC's sales practices. The testimony establishes that zinc concentrates produced by TFMC were eventually sold on the open market, but he stops short of saying that the product was directly sold by TFMC. Based on other evidence presented to the ICC, it was still possible that the sales were conducted by NJZ. TCI takes the reference to the "open market" to mean that TFMC sold the product, but that is not the clear meaning of the reference to "open market" when other evidence presented to the ICC is taken into account. Instead, Moore referenced the "open market" as the means of setting the price for the sale of zinc concentrates.

Cyprus' evidence does show that NJZ represented to others that its subsidiaries did all or a substantial part of their business with NJZ, but Cyprus does not have any business records of TFMC. George's statement that NJZ acts as a sales agent for the subsidiaries of NJZ could be interpreted

to mean that the subsidiaries were making sales to entities other than NJZ, especially in light of Moore's statement that zinc concentrate prices were set in reference to the open market. As the Court has noted, Moore's testimony does not explain whether TFMC sold product on its own or through NJZ. The Court does not have sufficient evidence to support a conclusive finding that all of TFMC's business was conducted with NJZ, but the evidence cited by Cyprus does tend to suggest that NJZ exerted substantial authority over the business activities of TFMC.

Subsudiary Is Treated as Department or Division of Parent

TCI argues that Cyprus has not produced any evidence that NJZ expressly referred to TFMC as a department or division of NJZ. Dkt. # 161, at 32. While there may not evidence with that precise language, Cyprus has produced substantial evidence showing that TFMC was actually treated as a department or division of NJZ. During the ICC proceedings, NJZ submitted organizational charts showing its chain of command and general corporate structure, and NJZ produced a chart showing the structure of its manufacturing department. Dkt. # 153-1, at 4. TFMC and other subsidiaries of NJZ are identified as departments or divisions of the manufacturing department that work under the supervision of W.L Coursen. Id. In a separate chart, Coursen is identified as the general manager of manufacturing for NJZ. Id. at 3. Cyprus cites a 1918 issue of Zinc magazine in which NJZ explained that it was necessary to create subsidiaries due to state corporation laws, but the parent company, NJZ, was in complete control of the entire operation of its subsidiaries. Dkt. # 153-1, at 62. NJZ explained that there was no attempt at "concealment" in using a subsidiary to conduct NJZ's operations, because "the [subsidiary] does not make any money, but turns its product over to the parent company at cost." Id. This operational issue was discussed

Case 4:10-cv-00252-CVE-PJC Document 183 Filed 12/07/15 Page 24 of 31

by NJZ because someone had questioned why it operated under different names in different locations. Id.

TCI claims that the evidence presented to the ICC does not show that TFMC was treated as a department or division of NJZ, because the sole issue before the ICC was whether NJZ was acting as TFMC's agent when it filed an informal complaint concerning freight charges. Dkt. # 161, at 33. While that issue was raised before the ICC, NJZ attempted to prove the agency relationship by showing that NJZ "in fact and in actual practice does exercise such complete control in the general conduct of its and [the subsidiaries'] business . . . ." Dkt. # 166, at 110. NJZ produced evidence that the traffic manager of NJZ also occupied the same role for TFMC, and it argued to the ICC that NJZ's "executives and their staff members function without regard to corporate lines of division." Id. at 111. When viewed in light of the evidence presented, the Court finds that these statements effectively constitute an admission by NJZ that NJZ and its subsidiaries operated as a single, vertically-integrated company, and that the subsidiaries functioned as departments or divisions of the larger entity. NJZ stated that its subsidiaries "turned its product over to the parent company" at cost, and this is exactly what a department or division of a larger entity would do. Cyprus has established that TFMC was treated as a department or division of NJZ.

Directors or Officers of Subsidiary Do Not Act Independently of Parent

The parties do not dispute that NJZ and TFMC had many common officers and directors, but TCI argues that it is entitled to a presumption that officers and directors of NJZ and TFMC wore "two hats" and that the officers or directors were acting appropriately on behalf of TFMC. See Bestfoods, 524 U.S. at 69-70. However, this is a rebuttable presumption that can be overcome with evidence that officers and directors were taking action on behalf of NJZ instead of TFMC. TCI

argues that there is no evidence of daily communications between NJZ and TFMC or that NJZ was responsible for the day-to-day operation of TFMC. Dkt. # 161, at 34. In this case, the Court does not find the absence of evidence particularly meaningful, because experts for both parties have noted significant gaps in the historical record. Instead, the Court will focus on the existence of evidence in the record.

Cyprus cites the minutes of a special operating department convention held in 1920, and notes that A.D. Terrell, the general manager of TFMC and NJZ's manufacturing department, was present at the meeting.[11] J.E. Hayes, vice president of NJZ, suggested that many of subsidiaries, including TFMC, might have to curtail production and operate "at the lowest possible cost" for the benefit of NJZ's operation as a whole. Dkt. # 171-2, at 82. There is also evidence showing that NJZ required its subsidiaries to turn over product to NJZ at cost and that the subsidiaries made no money from turning product over to NJZ. Dkt. # 171-1, at 69. During the ICC proceedings, George testified that he served as the general traffic manager for TFMC and NJZ, but he and other officers of NJZ exercised there duties "without regard to corporate lines of separation . . . ." Dkt. # 171, at 93-94.

The Court finds that the evidence is sufficient to rebut any presumption that the officers and directors of NJZ wore "two hats" and that officers of NJZ and TFMC with dual roles for NJZ and TFMC took actions on behalf of TFMC. Instead, the evidence shows that the officers and directors

11 Certain evidence cited by Cyprus does not tend to support its argument that TFMC did not act independently of NJZ. Cyprus cites a decision by the State Board of Equalization of California to support its argument that NJZ claimed all profits from the operation of a subsidiary, but this decision was issued in 1943. Dkt. # 171-2, at 89-92. The decision does not concern NJZ's practices during the pertinent time period and the Court does not find that this decision is relevant.

Case 4:10-cv-00252-CVE-FHM Document 183 Filed 02/27/15 Page 26 of 31

acted for the benefit of NJZ and that NJZ considered its subsidiaries to be part a single entity that functioned without regard to the corporate separateness of its subsidiaries. TCI is correct in arguing that there is nothing inherently improper in two entities cooperating for their shared mutual benefit. Cessna Finance Corp. v. Denver Air Ctr., Inc., 1990 WL 260526 (D. Kan. Dec. 17, 1990). However, the evidence in this case does not show that the officers and directors of NJZ were working toward a shared mutual goal while maintaining clear lines between separate corporations with TFMC. Instead, the officers of NJZ often held roles for NJZ and TFMC, and there is no evidence suggesting that those officers considered the corporate separateness of TFMC as significant.

Formal Legal Requirements Not Observed By Subsidiary

The parties do not dispute that TFMC observed certain corporate formalities, but Cyprus argues that corporate formalities were not regularly observed by TFMC, and that the formalities that were observed often took place in NJZ's corporate offices. Dkt. # 171, at 30-31. The Tenth Circuit has stated that corporate formalities can include activities such as "shareholders' or directors' meetings, minute books, and separate accounting books." Home-Stake Prod. Co. v. Talon Petroleum, C.A., 907 F.2d 1012, 1018 (10th Cir. 1990). TFMC held a shareholders meeting in September 1912, but this is the only record of a shareholder meeting held before TFMC was dissolved in 1926. Dkt. # 162, at 30. TFMC did file annual statements with the state of Kansas during each year of its existence. Dkt. # 162, at 38-76; Dkt. # 163, at 1-33. TFMC appointed a registered agent to receive process. Id. at 34-35. TFMC maintained by-laws and the by-laws were amended at the September 1912 shareholders meeting. Dkt. # 162, at 30-32. TCI also argues that TFMC issued stock, owned property, and contracted and litigated in its own name. Dkt. # 161, at 36. Cyprus responds that TFMC did file annual statements with the state of Kansas, but the annual

Case 4:10-cv-00252-CVE-CDL Document 183 Filed in USDC ND/OK on 02/20/15 Page 27 of 31

statements were drafted in the corporate offices of NJZ. Beginning in 1914, TFMC's annual statements were signed and notarized in New York, where NJZ maintained its primary office.[12] Dkt. # 162, at 63; Dkt. # 163, at 1-33. Cyprus also relies on evidence that NJZ may have engaged in centralized accounting and that NJZ paid the federal capital stock tax for TFMC. Dkt. # 171-2, at 6.

In the summary judgment record, there is evidence that TFMC observed some corporate formalities. However, there is no evidence that TFMC regularly held its own shareholders' or directors' meetings, and there is evidence suggesting that TFMC's annual statements were prepared by NJZ. There is a legitimate basis for Cyprus to dispute whether TFMC observed corporate formalities, but this factor does not conclusively favor either party based on the evidence in the summary judgment record.

Other Indicia of NJZ's Disregard of TFMC's Corporate Separateness

The Court finds that it should consider certain evidence that does not fit squarely within the Doughty analysis, because Cyprus has submitted evidence tending to show that NJZ represented to others that it disregarded the corporate separateness of its subsidiaries. Cyprus argues that NJZ made affirmative representations that it completely controlled and dominated TFMC and that TFMC

---

12 The Court has reviewed TFMC's annual statements preceding 1914, and it appears that some annual statements were signed and notarized in Kansas. However, the copies of the documents submitted are difficult to read due to the age of the documents. Without clear proof that the documents were executed outside of Kansas, the Court will not infer that all of TJZ's annual statements were prepared at NJZ's offices in New York.

was treated as part of NJZ.[13] TCI responds that Cyprus is taking statements out of context, and that some of the statements may be inadmissible.

The Court has reviewed the entire transcript of the proceedings before the ICC, and it is clear that NJZ was attempting to convince the ICC that NJZ had the authority to file a complaint on behalf of TFMC. However, it is the way that NJZ set out to prove this fact that is relevant to the alter ego analysis in this case. NJZ could have made an argument that it had a limited authority to act on behalf of a single subsidiary, TFMC, for the purpose of filing a complaint with the ICC. Instead, NJZ made a more general argument that it controlled and dominated all of it subsidiaries and this was the reason that it was authorized to act on behalf on TFMC. See Dkt. # 171, at 77 ("I had authority to act as general traffic manager of [TFMC], also as general traffic manager of [NJZ] which acts for and in behalf of all of its subsidiary companies); id. at 93 ("That [NJZ] in fact and constant practice manages and directs the operations of its subsidiary companies, including [TFMC], without regard to corporate lines of separation, and constantly exercises its authority to act for and in behalf of its subsidiaries in any and all matters."); id. at 93-94 ("the lines of authority and responsibility of the officers of [NJZ] and their staff members extend to all subsidiary companies."). NJZ expressly disclaimed a more narrow argument that George was authorized to file the specific

---

13 Cyprus asks the Court to treat statements made before the ICC as judicial admissions that are binding on TCI. However, the ICC was not asked to decide whether TFMC was the alter ego of NJZ and there were no binding admissions made to that effect. Dkt. # 151, at 39. Instead, the ICC was asked to determine if NJZ was authorized to file an informal complaint concerning excessive freight charges on behalf of TFMC. A "judicial admission" is a "formal, deliberate declaration[] which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." U.S. Energy Corp. v. Nukem, Inc., 400 F.3d 822, 833 n.4 (10th Cir. 2005). NJZ did not admit that it completely disregarded the corporate separateness of TFMC, nor was this an issue in the ICC proceedings, and the Court will not treat statements made on behalf of NJZ at the May 9, 1923 hearing as judicial admissions.

claim on behalf of TFMC, and it made clear that it was relying on a more general argument that it had the authority to act for TFMC on all matters. Id. at 98-99. George also clearly stated that he was not acting only on behalf of TFMC when he submitted the informal complaint to the ICC, and he was using the word "company" to refer to the total NJZ organization. Id. at 104.

TCI asks the Court to consider the ICC's ruling to give context to the statements. Dkt. # 174, at 26. TCI also cites other statements by George in which he makes more limited assertions about NJZ's role in supervising TFMC's activities. For example, George referred to NJZ as a "sales agent on commission" for all of its subsidiaries. Dkt. # 174-3, at 64. The hearing examiner inquired as to whether George was suggesting that the ICC could completely disregard the corporate separateness of TFMC, and George responded that NJZ and TFMC were separate corporations. Id. at 104-05. George also stated that he believed that NJZ and TFMC maintained separate bank accounts. Id. at 106.

Although George made certain statements suggesting that he viewed TFMC as a separate entity, it is clear from the entirety of the transcript of the ICC proceedings that NJZ made the general argument that it completely controlled and owned TFMC and that it had the authority to act on behalf of TFMC on all matters. The Court finds that NJZ's representations to the ICC provide compelling evidence that NJZ intended for third parties to believe that TFMC functioned as part of NJZ.

Conclusion

The Court has considered all of the Doughty factors and finds and concludes that TFMC was the alter ego of NJZ under Kansas law. NJZ held itself out as the owner of TFMC's stock and the evidence shows that individuals closely connected with NJZ nominally owned TFMC's stock.

Case 4:10-cv-00252-CVE-FHM Document 183 Filed 02/20/15 Page 30 of 31

NJZ's officers and directors held the same position with TFMC, and NJZ represented that it controlled the operations of all of its subsidiaries, including TFMC. The financial evidence of TFMC's day-to-day operations is somewhat limited due to the fact that TFMC was dissolved in 1926 and few financial records were maintained following TFMC's dissolution, and the Court cannot conclusively determine if TFMC was undercapitalized or if NJZ directly funded the operation of TFMC based on the existing financial records. The Court has found that there is evidence supporting a finding that NJZ represented to third parties that TFMC did all or most of its business with NJZ, but there are no financial records to conclusively determine that TFMC actually conducted all of its business with NJZ. Cyprus has presented strong evidence that NJZ treated TFMC as a department or division of NJZ and that the officers of NJZ who served in positions for NJZ and TFMC did not consider the corporate separateness of TFMC as significant. The Court also finds that it would be a fraud or injustice to allow NJZ to represent to the ICC that it controlled or dominated the operations of TFMC and to now permit TCI to take a contrary position for the purpose of avoiding CERCLA liability. Considering the totality of the circumstances, the Court finds that Cyprus has made a clear showing that TFMC "ha[d] no separate mind, will, or existence of its own and [was] but a business conduit for the principal." Moorhouse, 913 P.2d at 181. There is no dispute that TCI is the successor-in-interest to NJZ and, based on the Court's finding that TFMC was the alter ego of NJZ, Cyprus may be able to recover contribution from TCI under a theory of indirect liability under CERCLA.

**IT IS THEREFORE ORDERED** that Plaintiff Cyprus Amax Mineral Company's Motion for Partial Summary Judgment and Integrated Brief in Support (Dkt. # 151) is **granted**, and Defendant's Motion for Summary Judgment and Integrated Memorandum in Support (Dkt. # 161) is **denied**.

**IT IS FURTHER ORDERED** that the parties are directed to file no later than **February 13, 2015** a joint status report on the issues remaining for adjudication and a proposed scheduling order.

**IT IS FURTHER ORDERED** that this matter is referred to Magistrate Judge T. Lane Wilson for a supplemental settlement conference in light of this Opinion and Order.

**DATED** this 2nd day of February, 2015.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **CYPRUS AMAX MINERALS COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-CV-0252-CVE-PJC** |
| | ) | |
| **TCI PACIFIC COMMUNICATIONS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINON AND ORDER**

Now before the Court is defendant's Motion to Declare the Temporal Scope of the Court's February 2, 2015 Order on Alter Ego Status (Dkt. # 215). Plaintiff Cyprus Amax Mineral Company (Cyprus) filed this case seeking contribution under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. (CERCLA), from defendant TCI Pacific Communications, Inc. (TCI). Cyprus alleges that TCI is the successor-in-interest to New Jersey Zinc Company (NJZ), and that Tulsa Fuel and Management Company (TFMC) was a subsidiary of NJZ. Cyprus claims that TCI is liable for environmental harm caused by TFMC's operations in Collinsville, Oklahoma, because TFMC was the alter ego of NJZ and TCI has assumed responsibility for the liabilities of NJZ. On February 2, 2015, the Court entered an opinion and order (Dkt. # 183) finding that TFMC was the alter ego of NJZ. TCI asks the Court to find that TFMC was the alter ego of NJZ only between February 26, 1918 and June 9, 1923. Dkt. # 215.

On April 26, 2011, Cyprus filed this case alleging that NJZ was the parent company of TFMC and, under an alter ego theory, that NJZ was responsible for the debts and liabilities of TFMC. TFMC and NJZ are no longer in existence, but Cyprus claimed that TCI, Viacom, CBS Corporation, and CBS Operations, Inc. were the successors-in-interest of NJZ. TCI has admitted

that it is the successor-in-interest to NJZ. Dkt. # 143, at 1. Cyprus voluntarily dismissed defendants Viacom and CBS Corporation. Dkt. ## 59, 63. The remaining defendants, TCI and CBS Operations, Inc., filed a motion (Dkt. # 53) for a ruling as to whether Kansas or Oklahoma law applied to the issue of piercing the corporate veil under an alter ego theory. The judge then assigned to the case, the Honorable Gregory K. Frizzell, found that Kansas law applied to this case, because laws of the state of incorporation ordinarily governed the disputed issue and TFMC was incorporated in Kansas. Dkt. # 89. The case was reassigned to the Honorable John E. Dowdell. Dkt. # 105. TCI and CBS Operations, Inc. filed a motion to dismiss (Dkt. # 114) Cyprus' claims for failure to state a claim upon which relief can be granted. The motion to dismiss was granted in part and denied in part. Dkt. # 142. All pending claims against CBS Operations, Inc. were dismissed with prejudice, and the unjust enrichment claim and certain of Cyprus' CERCLA claims were dismissed as to TCI. However, Counts III through VII of the amended complaint remain pending against TCI. The case was randomly reassigned to the undersigned following the recusal of Judge Dowdell. Dkt. # 144. The undersigned directed the parties to submit motions for summary judgment "on the issue of TFMC's and [NJZ's] corporate relationship, including any arguments as to piercing the corporate veil . . . ." Dkt. # 145, at 20. Cyprus and TCI filed motions for summary judgment (Dkt. ## 151, 161) concerning the corporate relationship of TFMC and NJZ.

On February 2, 2015, the Court entered a 31 page opinion and order granting Cyprus' motion for summary judgment and found that TFMC was the alter ego of NJZ. The Court provided a detailed review of the history concerning the formation and operation of TFMC, and discussed NJZ's involvement with TFMC from TFMC's formation in 1906 to its dissolution in 1926. Dkt. # 183, at 2-9. The parties and their experts noted that gaps in the historical record made it difficult

Case 4:11-cv-00252-CVE-FHM Document 243 Filed 10/31/17 Page 3 of 6

to determine the financial condition of TFMC, and each side asked the Court to make certain inferences based on the limited evidence as to TFMC's day-to-day operations. Id. at 3, 18-20, 25. Records from 1912 showed that the president of NJZ, Edgar Palmer, owned the vast majority of TFMC's stock, and the rest of TFMC's stock was owned by persons with close connections to NJZ. Id. at 16. When TFMC was dissolved in 1926, the individual stock owners did not receive a dividend, but NJZ received a dividend of $500,000. Id. The Court relied on statements made by officers of NJZ in proceedings before the Interstate Commerce Commission (ICC) as evidence that NJZ wholly dominated and controlled the operations of TFMC and that NJZ held out to others that TFMC was operated as a department or division of NJZ. Id. at 14, 16, 18, 22, 24, 28-29. In a brief submitted to the ICC, NJZ stated that it "in fact and in constant practice manages and directs the operations of its subsidiary companies, including [TFMC] without regard to corporate lines of separation, and constantly exercises its authority to act for and in behalf of its subsidiaries in any and all matters . . . ." Dkt. # 153-1, at 37. The Court declined to give significant weight to the competing opinions of the parties' accounting experts due to the lack of historical evidence, and the Court did not make a conclusive finding that TFMC was undercapitalized or that NJZ financed the operations of TFMC. Dkt. # 183, at 20-21. The Court considered statements by NJZ officers in issues of Zinc magazine and a report submitted to the Federal Trade Commission that subsidiaries of NJZ were operated for the benefit of NJZ, and any profit generated by subsidiaries, such as TFMC, flowed to and was credited to NJZ. Id. at 8-9, 25. Evidence showed that TFMC had a stockholder's meeting in 1912, but there was little other evidence showing that TFMC observed corporate formalities. Id. at 26. The Court provided a summary explaining that its decision was based on all of the evidence, not just the ICC proceedings. Id. at 30-31.

Case 4:11-cv-00252-CVE-CDL Document 243 Filed 11/01/17 Page 4 of 6

The Court entered a scheduling order for discovery and dispositive motions as to TCI's potential liability under CERCLA. Dkt. ## 186, 196. The parties' dispostive motions were due no later than July 22, 2016. Dkt. # 196. Cyprus and TCI have filed motions for summary judgment (Dkt. ## 213, 216) as to TCI's CERCLA liability, but TCI has also filed a motion (Dkt. # 215) seeking a declaration as to the temporal scope of the Courts' alter ego ruling. TCI argues that the Court found that TFMC was the alter ego of NJZ based exclusively on the evidence related to the ICC proceedings, and the Court should limit TCI's liability under CERCLA to acts that occurred between February 26, 1918 and June 9, 1923.[1] Dkt. # 215. The Court has reviewed TCI's motion and finds that it should be treated as a motion to reconsider the Court's opinion and order (Dkt. # 183). Although TCI claims that it is not challenging the Court's summary judgment ruling, TCI's motion (Dkt. # 215) is based on the same factual and legal arguments already presented to the Court, and TCI implies that Court erred by not expressly placing a temporal limitation on TCI's liability. It is clear that TCI is attempting to avoid having its motion treated as a request for reconsideration, but granting the relief sought by TCI would significantly alter or amend the Court's prior alter ego ruling and the issue raised by TCI could have been raised in TCI's motion on that issue (Dkt. # 161). The Court treats TCI's motion (Dkt. # 215) under Fed. R. Civ. P. 54(b), as the underlying order is not a final order or judgment. See Raytheon Constructors, Inc. v. Asarco Inc., 368 F.3d 1214, 1217 (10th Cir.2003). The Court may call into play the legal standards applicable to a Rule 59(e) motion to alter or amend judgment. See e.g., Official Committee of Unsecured Creditors of Color Tile, Inc.

[1] TCI has selected these dates based on the tenure of C.H. George's employment with NJZ and the date of the last filing in the ICC proceedings. Dkt. # 215, at 20. George was the primary witness at an administrative hearing before the ICC. Dkt. # 183, at 6. However, these dates are not found in the Court's opinion and order and the Court did not consider the length of George's employment or the dates of filings with the ICC as factors in its decision.

v. Coopers & Lybrand LLP, 322 F.3d 147, 167 (2d Cir. 2003). A motion to reconsider, like a motion to alter or amend judgment, should be granted only upon the following grounds: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, [or] (3) the need to correct clear error or prevent manifest injustice." Servants of the Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000); see Adams v. Reliance Standard Life Ins. Co., 225 F.3d at 1186 n. 5 (10th Cir. 2000). The Court will exercise its discretion to review TCI's motion to reconsider under the standards applicable to Rule 59(e) motions. When ruling on a Rule 59(e) motion, a party may not attempt to "revisit issues already addressed or advance arguments that could have been raised in prior briefing." Servants of the Paraclete, 204 F.3d at 1012.

The Court finds that TCI could have raised the issue of a temporal limitation as to alter ego status in its motion on that issue or in its response to Cyprus' motion on that issue, and this argument is not based on newly discovered evidence or a change in the law. Dkt. ## 161, 174. The Court also notes that TCI's motion (Dkt. # 215) was filed almost a year and a half after the Court entered its opinion and order denying TCI's earlier motion for summary judgment. If TCI believed that the Court failed to address an issue in its summary judgment ruling, TCI should have promptly raised the issue instead of waiting until the dispositive motion cutoff for the next stage of the litigation to raise this issue. See Dkt. # 196 (amended scheduling order setting dispositive motion cutoff of July 22, 2016 for summary judgment motions). TCI's motion for a temporal limitation as to its potential CERCLA liability can be denied solely on the ground that it is an improper and untimely motion to reconsider. However, the Court also finds that the motion lacks merit. The Court has reviewed all of the factual findings in its opinion and order (Dkt. # 183) and finds no basis for the temporal limitation requested by TCI. Although the Court relied on the ICC proceedings, this was not the

only evidentiary support for Cyprus' argument that TFMC was the alter ego of NJZ, and the Court relied on evidence dating from 1906 to 1926 in ruling on the parties' motions. The Court did not find that TFMC was the alter ego of NJZ solely due to George's testimony, and TCI's motion is based on an unreasonably narrow reading of the Court's opinion and order. TCI's motion to impose a temporal limitation on the Court's finding that TFMC was the alter ego of NJZ is denied.

**IT IS THEREFORE ORDERED** that defendant's Motion to Declare the Temporal Scope of the Court's February 2, 2015 Order on Alter Ego Status (Dkt. # 215) is **denied**.

**DATED** this 31st day of March, 2017.

Claire V. Eagan

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **CYPRUS AMAX MINERALS COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-CV-0252-CVE-PJC** |
| | ) | |
| **TCI PACIFIC COMMUNICATIONS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Now before the Court are Plaintiff Cyprus Amax Minerals Company's Motion for Partial Summary Judgment as to Defendant TCI Pacific Communications, Inc.'s CERCLA Liability and Integrated Brief in Support (Dkt. # 213) and Defendant's Motion for Summary Judgment and Integrated Memorandum in Support (Dkt. # 216).[1] Plaintiff Cyprus Amax Minerals Company (Cyprus) has filed a motion for partial summary judgment as to TCI Pacific Communications, Inc.'s (TCI) liability under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. (CERCLA). TCI argues that Cyprus cannot establish that TCI is liable under CERCLA and that it is entitled to summary judgment on Cyprus' contribution claims. Dkt. # 216.

**I.**

**Procedural History**

Cyprus alleges that it is the successor of a company that operated a zinc smelting facility near Collinsville, Oklahoma, and Cyprus was cooperating with state and federal authorities to clean up

[1] Defendant has also filed a Notice of Potential Citation Error in the Court's February 2, 2015 Order on Alter Ego Status (Dkt. # 214). The Court has reviewed the notice and the cited statement in the Court's prior opinion and order (Dkt. # 183), and there is no citation error.

Case 4:11-cv-00252-CVE-PJC Document 244 Filed in USDC ND/OK on 06/20/17 Page 2 of 34

environmental contamination caused by the smelting activities. Dkt. # 2, at 1-2. The original complaint named TCI, Viacom, Inc. (Viacom), CBS Corporation, and CBS Operations, Inc. as defendants. Cyprus alleges that the Bartlesville Zinc Company operated the Bartlesville Zinc Smelter (BZ Smelter), which was located approximately one mile from Collinsville, and Cyprus claims that there was another zinc smelting facility known as the Tulsa Fuel and Manufacturing Zinc Smelter (TFM Smelter) also located about one mile from Collinsville. Id. at 5. The two smelting facilities were located approximately one-quarter of a mile apart. Id. The TFM Smelter was nominally owned by the Tulsa Fuel and Manufacturing Company (TFMC) between 1911 and 1925, but Cyprus alleges that TFMC was the alter ego of the New Jersey Zinc Company (NJZ). Id. As of February 2009, Cyprus was conducting a remedial action at the BZ Smelter site pursuant to a consent decree, and the United States Environmental Protection Agency (EPA) was taking remedial action at the TFM Smelter site. Dkt. # 213-8, at 32. This case does not concern the cleanup work at the BZ or TFM Smelter sites, and Cyprus is not seeking to recover contribution for any response costs incurred at the BZ Smelter site.

In 2009, Cyprus entered into a consent decree with the Oklahoma Department of Environmental Quality (ODEQ) to perform soil sampling and remediation in Collinsville. Id. at 1-36. An action memorandum dated February 20, 2009 describing the purpose and scope of the Collinsville Soil Program (CSP) was attached to the consent decree, and the work that Cyprus agreed to perform in the consent decree was undertaken as part of the CSP. Dkt. # 213-8, at 30-36. ODEQ had determined that investigation and remediation of soil in Collinsville was necessary, because "[h]istoric smelter emissions and transport of smelter material off-site have potentially impacted soil" within Collinsville. Id. at 32. The action memorandum clearly refers to both the

TFM and BZ Smelters as sources of smelter emissions and smelter waste transported offsite. Id. at 31-32. Cyprus admitted for the purpose of the consent decree that it was liable under CERCLA and Oklahoma law. Dkt. # 227-8, at 2-36. On April 26, 2011, Cyprus filed this case seeking cost recovery and contribution under CERCLA under theories that defendants were former owners or operators of the TFM Smelter and that defendants arranged for the disposal or treatment of hazardous substances. Cyprus also alleged a claim of unjust enrichment under state law. The defendants were not the original owners of the TFM Smelter or the parent companies of TFMC, but Cyprus argued that the defendants were the successors and/or indemnitors of NJZ. Id. at 12-14.

The parties requested to initially proceed with discovery and motion practice on the issue of defendants' status as corporate successors of TFMC. Dkt. # 44. The case was assigned to the Honorable Gregory K. Frizzell, and he referred the parties to a magistrate judge for a scheduling conference. Dkt. # 48. The magistrate judge entered a scheduling order on the "corporate issues" phase of discovery. Dkt. # 49. Defendants filed a motion (Dkt. # 53) seeking a determination as to whether federal common law or Kansas law applied to the issue of piercing the corporate veil, and Cyprus responded that Oklahoma law applied to this issue. Judge Frizzell ruled that Kansas law applied to the determination of whether the corporate veil of TFMC could be pierced. Dkt. # 89. The case was reassigned to the Honorable John E. Dowdell. Dkt. # 105. Cyprus filed an amended complaint (Dkt. # 106) naming only TCI and CBS Operations, Inc. as defendants, and the defendants filed a motion to dismiss (Dkt. # 114) many of the claims alleged in the amended complaint. Judge Dowdell entered an opinion and order (Dkt. # 142) dismissing CBS Operations, Inc. as a defendant, and the only claims remaining after this ruling were Court III through VII of the amended complaint as to TCI. Count III and V seek to hold TCI liable for contribution under a theory that TCI was a

former owner or operator of a facility where a hazardous substance was released, and Cyprus alleges in Counts IV and VI that TCI is liable for contribution as an arranger for the disposal or treatment of a hazardous substance. Count VII of the amended complaint seeks a declaratory judgment that TCI is liable to Cyprus for response costs and damages associated with the remediation of contamination in Collinsville.

The case was transferred to the undersigned. The parties filed motions to exclude expert testimony concerning the corporate separateness of TFMC and NJZ, and the Court set a briefing deadline for motions for summary judgment after ruling on the Daubert[2] motions. The parties filed motions for summary judgment concerning the status of TFMC as the alter ego of NJZ. The Court considered the relevant factors under Kansas law for piercing the corporate veil and found that TFMC was operated as the alter ego of NJZ. Dkt. # 183. The Court entered an amended scheduling order (Dkt. # 196) setting the case for a non-jury trial on November 9, 2016. TCI and Cyprus filed motions for summary judgment as to TCI's liability for contribution under CERCLA. The Court struck all remaining deadlines in the scheduling order, including the non-jury trial, pending a ruling on the pending motions for summary judgment.

**Factual Background**

The TFM Smelter was owned by TFMC and it operated from 1911 to 1926, and the TFM Smelter was located about one mile south of Collinsville. Dkt. # 213-2, at 4. In 1992, the Oklahoma State Department of Health (OSDH) conducted a preliminary assessment of the TFM Smelter site for the purpose of determining whether the site posed a risk to public health, and the OSDH collected information to assist the EPA and ODEQ to determine if further action under CERCLA

---

2 Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

was warranted. Dkt. # 217-2, at 37. ODEQ later conducted a focused Site Inspection to collect additional information to consider whether the site should be added to the National Priorities List (NPL) or if no further remedial action was necessary. Id. The EPA recommended that the TFM Smelter site be added to the NPL and a search was undertaken to identify potentially responsible parties (PRPs). Id. The EPA has declared that the TFM Smelter site is a CERCLA facility and has placed the site on the NPL. Dkt. # 213-6, at 29, 42-83. From 2005 to 2006, ODEQ conducted a Remedial Investigation/Feasibility Study (RI/FS) and performed sampling of "on-site surface and subsurface soils and waste, off-site surface soils, surface water, sediment, groundwater, vegetation, and air." Dkt. # 217-2, at 6. The sampling identified elevated levels of arsenic, cadmium, and lead in the "on-site surface and subsurface soils, off-site surface soils, surface water, sediment, groundwater, and vegetation . . . ." Id. The EPA conducted a supplemental RI/FS between November 2007 and March 2008, and the objectives of the supplemental RI/FS were to obtain additional data about potential off-site contamination caused by smelter waste and to evaluate the possibility of contamination caused by airborne particulates. Dkt. # 220-2, at 11. The EPA concluded that "few offsite residential properties potentially have been impacted by site contamination and that no undisturbed air dispersion locations appears [sic] to be impacted by the release and dispersion of airborne particulates from the operating smelter . . . ." Id. at 13. However, a small number of offsite residential properties were "potentially impacted by the use of waste mass fill material" from the TFM Smelter site and the cause of contamination at other residential sites could not be definitively determined. Id.

Case 4:11-cv-00252-CVE-FHM Document 244 Filed in USDC ND/OK on 06/20/17 Page 6 of 34

In 1995, ODEQ contacted counsel for Viacom, Inc.[3] to discuss the cleanup of the TFM Smelter site. Dkt. # 213-10, at 2-3. ODEQ believed that Viacom, Inc. was the successor-in-interest to NJZ, and ODEQ cited historical evidence linking TFM and NJZ. Id.. Viacom denied that NJZ exercised control over TFM and, even if such a showing were made, it further denied that it would be liable for any activities that occurred before 1926. Id. at 18-19. In 2000, the EPA invited Viacom, Inc. to enter negotiations for the cleanup of the TFM Smelter site, and the EPA sent a special notice to Viacom, Inc. that triggered a duty for Viacom, Inc. to make a good-faith response within 60 days of receipt of the EPA's letter. Dkt. # 213-6, at 30. Viacom, Inc. again denied that TFM was controlled by NJZ, and Viacom, Inc. declined to take part in any cleanup efforts at the TFM Smelter site. Dkt. # 213-10, at 21-22. ODEQ notified Viacom, Inc. in 2009 that it had determined that waste from the TFM Smelter site had traveled off-site and that Viacom, Inc. was liable for offsite impacts. Dkt. # 213-2, at 220. In response, CBS Corporation denied that it was liable under CERCLA on the ground that TFMC was not the alter ego of NJZ. Dkt. # 213-10, at 26.

In addition to contacting PRPs for the liabilities of the TFM Smelter, ODEQ was also seeking to identify and obtain funds and assistance from the PRPs for the BZ Smelter. The BZ Smelter operated from 1911 to 1918, and it was owned and operated by the Bartlesville Zinc

---

[3] The complaint alleges that NJZ merged with Gulf & Western Industries, Inc., a Michigan corporation (Gulf & Western Michigan) in 1966, and Gulf & Western Michigan merged into Gulf & Western Industries, Inc., a Delaware corporation (Gulf & Western Delaware). Dkt. # 2, at 12. Gulf & Western Delaware subsequently changed its name to Paramount Communications, Inc. (Paramount), and Paramount was responsible for the liabilities of NJZ. Id. After other sales and mergers, Paramount merged into Viacom International, Inc., and Viacom International Inc.'s parent company, Viacom, Inc., sold Viacom International, Inc. to TCI. Id. at 13.

Company. Dkt. # 106, at 5. The BZ Smelter is located approximately one-quarter of a mile from the TFM Smelter, and the BZ Smelter is also approximately one mile from Collinsville. Id. There is no dispute that Cyprus is the successor-in-interest to the Bartlesville Zinc Company, and Cyprus does not dispute that waste from the BZ Smelter was used for projects in Collinsville. After the BZ Smelter was shut down, the Atcheson Topeka & Santa Fe Railroad installed a steam shovel at the site, and the steam shovel was used to load cinders for use as railroad ballast. Dkt. # 217-1, at 1. In May 1919, a local newspaper ran an advertisement stating that "[b]uildings of all descriptions, firewood, timber, and all kinds of materials along this line, gravel, stones for fixing roads, [and] lots of electrical wire" were for sale at the site of the former BZ Smelter. Id. at 2. However, Cyprus has produced historical evidence suggesting that smelter waste from both smelters was transported off-site and used as construction material in Collinsville. In 1912 and 1913, local newspapers reported that cinders from the "smelters" were used as railroad ballast. Dkt. # 213-2, at 44; Dkt. # 213-4, at 17. The Collinsville News reported in 1913 through 1915 that broken retorts and cinders from the smelters were used to build a road in Collinsville. Dkt. # 213-4, at 36, 39, 42, 49.

Pursuant to a consent decree between Cyprus and ODEQ, "all residential properties, commercial properties, houses of worship, childcare facilities, alleys, vacant fields, parks and schools located within the corporate limits of the City of Collinsville" or any location within one mile of this site has been declared a CERCLA facility. Dkt. # 213-8, at 7. In addition, any place where waste material from the Bartlesville Zinc Company Smelter Site can now be found is also part of the Collinsville CERCLA site. Id. The consent decree fully resolved Cyprus' liability to ODEQ for response costs for the cleanup of hazardous substances in Collinsville, and the consent decree states that the parties negotiated in good faith and the settlement was "fair, reasonable, and in the

Case 4:11-cv-00252-CVE-CDL Document 244 Filed in USDC ND/OK on Page 8 of 34

public interest." Id. at 4, 8. By entering a consent decree with ODEQ, Cyprus may not be sued for contribution for matters within the scope of the consent decress, and this includes contribution claims under state and federal law. Id. at 18-19.

Smelter operations generated many kinds of solid waste, such as broken and spent retorts and condensers, used refractory brick from furnace linings, and retort residue containing coked reducing coal. Dkt. # 213-2, at 32. The blended and oxidized ore typically found in smelter waste contained a mixture of metals, including zinc, cadmium, lead, arsenic, and sulfur. Id. Smelter waste was used to build bridge supports, roads, and a reservoir at the TFM Smelter facility. Id. at 246, 250, 257. The final remedial investigation report prepared by ODEQ for the TFM Smelter site noted that "[p]revious studies have indicated that approximately seven (7) acres of the site are covered with approximately 30,000 cubic yards of waste consisting of broken retorts and condensers, slag, building debris, ash, bricks," and other smelter waste. Dkt. # 213-4, at 4. In addition, ODEQ actually observed waste materials on the surface at the TFM Smelter site across approximately 25 acres. Id. Historical evidence shows that waste from smelter facilities was used for road construction and repair, and smelter cylinders were used in railroad repair. Dkt. # 213-2, at 44; Dkt. # 213-4, at 17; id. at 49. Newspaper articles refer to using cinders and retorts from "smelters," and this could imply that the cinder and retorts were from the BZ and TFM Smelters. Id. at 26, 36, 39, 42, 45. There is evidence that Tulsa County road crews used black smelter waste from the TFM Smelter "sometime in the 1960s." Dkt. # 213-3, at 239. In other words, there is solid smelter waste on site at the TFM Smelter and there is evidence that some of this waste was moved into Collinsville.

Air emissions were another form of waste that was generated by a zinc smelter. The parties do not dispute that the TFM Smelter generated air emissions and that the air emissions contained hazardous substances such as lead, cadmium, and arsenic. Cyprus's expert, A.J. Gravel, opines that zinc smelters produced two types of air emissions that would have carried hazardous substances away from the smelting facility. The primary source of air emissions came from furnaces used in the smelting process, and neither the BZ Smelter nor the TFM Smelter had any type of system to control air emissions from furnaces. Dkt. # 213-2, at 36-38. There were also fugitive air emissions from waste piles left at smelter sites, and this occurred when wind carried particles from smelter waste deposited on the ground. Id. at 39. The parties dispute whether the air emissions could have reached Collinsville. Gravel opines that both air emissions from furnaces and fugitive air emissions are a possible pathway for the distribution of hazardous substances from the TFM Smelter to Collinsville. Id. In 2007, ODEQ issued its final remedial investigation report for the TFM Superfund Site, and ODEQ found that the data did not "suggest an aerial dispersion plume from the TFM [Smelter] that resulted in widespread contamination." Dkt. # 229-4, at 9. ODEQ noted that the lowest concentration of metals in the soil was more than one mile from the TFM Smelter, and concentrations were typically higher in the areas near the TFM Smelter. Id. TCI's expert, Jay Vandeven, testified in his deposition that air emissions from the TFM Smelter would have followed the prevailing winds and that the aerial emissions would have traveled off-site. Dkt. # 213-2, at 205. However, Vandeven is not an expert on air modeling and he does not intend to offer an opinion as to whether air emissions from the TFM Smelter could have reached Collinsville. Dkt. # 230-2, at 15-16.

Pursuant to its consent decree with ODEQ, Cyprus has undertaken remedial work in Collinsville. The consent decree required Cyprus to implement the CSP, and sampling and remediation began in May 2009 and continued to October 2013. Dkt. # 213-2, at 91. The EPA and ODEQ had entered a memorandum of agreement (MOA) authorizing ODEQ to oversee and direct certain remedial actions pursuant to a Voluntary Cleanup Program (VCP). Dkt. # 213-8, at 87-98. Amy Brittain was the supervisor of the CSP, and she testified that the CSP was part of the VCP. Id. at 45, 47-48. ODEQ stated that the purpose of the CSP was to "sample and test soils found on residential, commercial, and public properties in or near Collinsville that have potentially been affected by the historic zinc smelters, and to remove and replace with clean material those soils that exceed standards established by the [ODEQ]." Dkt. # 213-2, at 232. Cyprus was required to develop a Remedial Action Work Plan, subject to approval by ODEQ, and ODEQ also retained the right to reject a supervising contractor. Dkt. # 213-8, at 8. The action memorandum issued by ODEQ identified both the BZ and TFM Smelters as potential sources of hazardous substances found in Collinsville. Dkt. # 213-2, at 232-33. Cyprus coordinated with ODEQ to determine the size of the site to be tested, and the size of the site was relatively large due to the possible placement of smelter materials at a significant distance from the BZ and TFM Smelters. Dkt. # 213-8, at 85. Before the consent decree had been entered, ODEQ had identified 10 properties with elevated levels of lead, cadmium, and arsenic, and Cyprus was ordered to expedite soil remediation at these properties. Dkt. # 213-6, at 109. Cyprus performed the required soil remediation on an expeditited basis following an Interim Remedial Work Action Plan approved by ODEQ. Dkt. # 213-2, at 92.

The consent decree required that all work performed by Cyprus be consistent with the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), and the soil remediation

activities were to be conducted pursuant to an action work plan developed by ODEQ. Dkt. # 213-2, at 235; Dkt. # 213-8, at 8. The soil remediation standards in the CSP were originally developed jointly by ODEQ and the EPA for the remediation of the TFM Smelter site. Dkt. # 213-10, at 44. The EPA coordinated with ODEQ concerning the preparation of the consent decree and ODEQ stayed in contact with the EPA regarding the TFM Smelter site, but ODEQ maintained oversight and control over the CSP. Dkt. # 229-8, at 8. ODEQ has determined that all of the work performed to date has been consistent with the remedial action work plan and all of the work was necessary to protect human health and the environment. Dkt. # 213-8, at 75.

The parties' experts dispute whether the remedial work undertaken by Cyprus pursuant to the consent decree was necessary and if the work was performed in compliance with the NCP. Vandeven opines that the "majority of the costs claimed by [Cyprus] were not 'necessary costs of response' under the NCP, were not incurred 'consistent' with applicable provisions of the NCP, and have not led to a CERCLA-quality cleanup." Dkt. # 230-2, at 5. Vandeven claims that ODEQ and Cyprus failed to take existing data into account when formulating the CSP, and failed to take into account "sources, migration pathways, and risks associated with the site prior to initiating the CSP," resulting in a remediation program with a "wildly excessive scope and unnecessary costs." Id. at 8. Gravel states that the CSP was performed in substantial compliance with the NCP, and his opinions are based on ODEQ's analysis of Cyprus' work and his own independent analysis. Dkt. # 213-2, at 48-65. Gravel opines that Cyprus has incurred over $30 million in recoverable response costs as of January 14, 2016, and these costs primarily include expenses incurred for investigation, sampling, and soil remediation. Id. at 67.

**II.**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

Case 4:10-cv-00252-CVE-CDL Document 244 Filed 08/20/17 Page 13 of 34

**III.**

Cyprus seeks to hold TCI liable for contribution under CERCLA, because it claims that it has incurred response costs pursuant to a consent decree with ODEQ and some of the costs can be attributed to the disposal and release of hazardous substances at the TFM Smelter site. Cyprus argues that TCI can be considered a "covered person" under CERCLA due to its status as a former owner or operator of a facility or as an arranger for the disposal of a hazardous substance. TCI argues that it cannot be held liable under CERCLA, because it did not dispose of any hazardous substance in Collinsville and Cyprus cannot show that its response costs were necessary and consistent with the NCP.

CERCLA provides two mechanisms for a party who has incurred costs associated with the cleanup of hazardous substances to recover some or all of those costs from another PRP. United States v. Colorado & Eastern R. Co., 50 F.3d 1530, 1535 (10th Cir. 1995). One method is a cost-recovery action under 42 U.S.C. § 9607(a), and the other method is a contribution claim under 42 U.S.C. § 9613(f), and Cyprus has only contribution claims remaining at this point in the case.[4] Under § 9613(f)(1), "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title . . . ." Section § 9613(f) does not itself give rise to liability under CERLCA, and it is merely a means of apportioning liability between and among PRPs. Bancamerica Commercial Corp. v. Mosher Steel of Kansas, Inc., 100 F.3d 792, 800 (10th

[4] A cost recovery claim under § 9607(a) is unavailable to Cyprus, because the Tenth Circuit has found that a party who seeks reimbursement from another PRP for cleanup costs imposed in a prior lawsuit or administrative order is barred from asserting a claim under § 9607(a). Morrison Enterprises v. McShares, Inc., 302 F.3d 1127, 1133 (10th Cir. 2002). Judge Dowdell dismissed Cyrpus' cost recovery claims in a prior opinion and order. Dkt. # 142, at 7-9.

Case 4:04-cv-00252-CVE-PJC Document 244 Filed in USDC ND/OK on 08/20/07 Page 14 of 34

Cir. 1996). To obtain contribution from a PRP, a plaintiff must initially establish that the PRP would be liable under § 9607, and then the Court proceeds to the equitable apportionment of response costs once the plaintiff has shown that the defendant is liable under § 9607. Sun Co., Inc. v. Browning-Ferris, Inc., 124 F.3d 1187, 1191 (10th Cir. 1997). There are five elements under § 9607 that a plaintiff must prove to make out a prima facie case of liability:

> (1) that the defendant is a "covered person" under CERCLA; (2) that a "release" or "threatened release" of any "hazardous substance" at the site in question has occurred; (3) that the release or threatened release caused plaintiff to incur costs; (4) that plaintiff's costs are "necessary" costs of response; and (5) that plaintiff's response action or cleanup was consistent with the NCP.

Morrison Enterprises, 302 F.3d at 1135.

Initial consideration will be given to TCI's argument that the Court must modify its analysis from the five elements stated above, because this case involves two separate sites and the requirements for "two-site" cases are distinguishable from the ordinary CERCLA claim. Dkt. # 215, at 18-20. In particular, TCI argues that Cyprus' burden to prove causation is greater in a two-site case, because the mere presence in Collinsville of hazardous substances also found at the TFM Smelter is not sufficient to show that TCI caused Cyprus to incur cleanup costs. To establish causation, TCI argues that Cyprus must "(1) identif[y] a contaminant at its site; (2) identif[y] the same (or perhaps a chemically similar) contaminant at the defendant's site; and (3) provide[] evidence of a plausible migration pathway by which the contaminant could have traveled from the defendant's facility to the plaintiff's site." Dkt. # 237, at 10 (quoting Castaic Lake Water Agency v. Whittaker Corp., 272 F. Supp. 2d 1053, 1066 (C.D. Cal. 2003)). Cyprus does not dispute that it will be required to show that the release or threatened release of hazardous substances from the TFM Smelter site caused it to incur costs for the remediation of soil in Collinsville, but Cyprus asks the

Court to reject TCI's argument that the "two-site" analysis modifies the causation element of a prima facie case under § 9607. The Court has reviewed the parties' filings and their dispute does not actually concern the elements of a prima facie case under § 9607 but, instead, the parties disagree as to Cyprus' burden to show that some substance released from the TFM Smelter actually caused Cyprus to incur cleanup costs. The Court will use the framework stated in Morrison for a prima facie case of liability under § 9607, and TCI's "two-site" argument will be considered in the context of the causation element.

**Covered Person**

The first element that Cyprus must establish is that TCI is a "covered person" under CERCLA. Under § 9607(a), there are four categories of covered persons:

> (1) the owner or operator of a vessel or a facility;
>
> (2) the person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . ."

42 U.S.C. § 9607(a). Cyprus argues that TCI is a covered person under a theory that TCI is liable for the disposal of hazardous substances that occurred when the TFM Smelter was owned and operated by NJZ and TFMC. Cyprus also argues that TCI can be held liable as an arranger, because there is evidence that waste from both the TFM and BZ Smelters was used in Collinsville. TCI

asserts that Cyprus has no evidence of a viable migration pathway from the TFM Smelter to Collinsville, and this precludes a finding that TCI disposed of a hazardous substance. TCI argues that it cannot be held liable as an "owner" or "operator," because it did not own or operate a facility within Collinsville.

In determining whether TCI is a covered person, the first question is whether hazardous waste was disposed of at the TFM Smelter. CERCLA does not directly define "disposal" but refers to the definition of "disposal" found in the Resource Conservation and Recovery Act of 1976, 42 U.S.C. 9601 § et seq. (RCRA). RCRA defines "disposal" as the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). There is no dispute that TFMC and/or NJZ disposed of hazardous substances at the TFM Smelter Site. TCI's expert, Vandeven, states that zinc smelters generated waste in the form of slag, spent retorts, spent condensers, and air emissions, and he acknowledges that the TFM Smelter had air emissions that resulted in "particulate matter being transported off-site in the direction of the prevailing wind . . . ." Dkt. # 213-2, at 205; Dkt. # 227-2, at 3. ODEQ found that it was unlikely that any type of air emission control device was used at the TFM Smelter, and ODEQ found approximately 30,000 cubic feet of waste at the TFM Smelter consisting of "broken retorts and condensers, slag, building debris, ash, bricks, and other materials from former smelting operations." Dkt. # 227-4, at 4. The issue is separate from whether any of the hazardous waste disposed of at the TFM Smelter had a viable migration pathway to Collinsville. The issue of causation is separate from whether TFMC disposed of a hazardous substance, and the Court finds

that there is evidence that TFMC or NJZ disposed of a hazardous substance by leaving smelter waste at the site of the TFM Smelter.

TCI relies on Pakootas v. Teck Cominco Metals, Ltd., 830 F.3d 975 (9th Cir. 2016), for the proposition that air emissions do not constitute "disposal" under CERCLA. In Pakootas, the Ninth Circuit found that it was bound by a prior decision that direct air emissions from a smelter could not be considered "disposal" under CERCLA. Id. at 983-85. The Tenth Circuit has not directly considered this precise issue, but the Tenth Circuit's decision in United States v. Power Engineering Co., 191 F.3d 1224 (10th Cir. 1999), suggests that the Tenth Circuit would follow Pakootas. In that case, the Tenth Circuit exercised appellate jurisdiction over a challenge by Power Engineering Co. (PEC) to a preliminary injunction entered by the district court. Id. at 1227. A key issue was whether PEC had "disposed" of a hazardous substance, and the Tenth Circuit identified the following three means of disposal:

> (1) the Facility's air scrubbers dispose a mist of hexavalent chromium onto Facility soil; (2) the Facility failed to remediate the soil contaminated by a yellow/orange liquid that leaked from air scrubbers down the west side of the Facility's main building; and (3) the Facility failed to remediate the three open waste piles of contaminated soil excavated from beneath the chrome-plating tanks and the remaining contaminated soil located beneath the chrome-plated tanks.

Id. at 1231. The Tenth Circuit explained that disposal involves the intentional placement of a hazardous substance on land or water, and it narrowly categorized emissions from the facility's air scrubbers as disposal to the extent that mist fell onto the nearby soil. This suggests that the Tenth Circuit would not consider direct air emissions as the disposal of a hazardous substance, but it does leave open the possibility that fugitive air emissions from waste left on the ground could qualify as a type of disposal. Cyprus' expert, Gravel, opines that there would have been fugitive air emissions from the TFM Smelter and that fugitive air emissions were a contributing factor in the dispersion

of hazardous substances from the TFM Smelter. Dkt. # 213-2, at 39. The Court finds that this is sufficient at the summary judgment stage to give rise to a genuine dispute that fugitive air emissions could constitute a form of disposal to establish that TCI is a covered person.

In addition to former owner or operator liability, Cyprus also argues that TCI can be deemed a covered person under a theory that TCI arranged for the disposal of a hazardous substance within Collinsville. Under 42 U.S.C. § 9607(a)(3), "any person who by contract, agreement, or otherwise arranged for the disposal or treatment . . . of hazardous substances owned or possessed by such person" can be considered a covered person for the purpose of CERCLA. CERCLA does not define the term "arranged for" but the Supreme Court has provided guidance on this issue. In Burlington Northern and Santa Fe Ry. Co. v. United States, 556 U.S. 599 (2009), the Supreme Court considered the plain meaning of the word "arranged," and determined that an entity qualifies as an arranger "when it takes intentional steps to dispose of a hazardous substance." Id. at 611. It was not sufficient that the entity knew that a hazardous substance could accidentally be spilled or leaked by a subsequent possessor, and there had to be some evidence that the entity had some intention "that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in § 6903(3)." Id. at 612. TCI argues that there is no evidence that the owners of the TFM Smelter purposefully arranged for the disposal of smelter waste. Id. at 31. However, newspaper articles suggest that both smelters made the waste available to members of the community and were aware that the waste would be disposed of within Collinsville. TCI asks the Court to infer that only the BZ smelter engaged in this type of distribution of smelter waste, but the evidence provided by the parties does not compel such an inference. Instead, the court must view

the evidence in a light most favorable to the non-moving party, and the Court finds that there is a genuine issue as to whether TFMC arranged for the disposal of smelter waste in Collinsville.

TCI argues that it cannot be a covered person under a former owner/operator theory, because it did not own or operate a facility within the area subject to remediation under the CSP. Dkt. # 216, at 17; Dkt. # 228, at 24. The term "facility" is defined as "any site or area where a hazardous substance has been deposited, stored, disposed of, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9)(B). Cyprus does not dispute that TCI cannot be considered the former owner or operator of any property within Collinsville, but it argues that the definition of "facility" is broad enough to encompass any site where a hazardous substance was initially deposited and any additional sites where a hazardous substance came to be located. Dkt. # 213, at 28. The Court agrees that the term "facility" in this case includes the TFM Smelter site and the CSP, because the same hazardous substances were found at both sites and there is a significant likelihood that some of the hazardous substances found in the area of the CSP came from the TFM Smelter. The Court also notes that the primary case cited by TCI supports the imposition of CERCLA liability against the owner or former owner of a facility where a hazardous substance was disposed of and that substance migrated to a facility owned by the plaintiff. See Castaic Lake Water Agency, 272 F. Supp. 2d at 1068-69. The Court will separately consider whether Cyprus has produced evidence that there was a plausible migration pathway that hazardous substances from the TFM Smelter actually did reach the Collinsville Townsite. However, Cyprus has produced evidence giving rise to a genuine dispute of material fact that TCI is the former owner or operator of a facility at which the disposal of hazardous waste occurred.

Case 4:10-cv-00252-CVE-CDL Document 244 Filed 03/20/17 Page 20 of 34

**<u>Release or Threatened Release of a Hazardous Substance</u>**

Cyprus argues that it can establish the second element of a § 9607(a) claim against TCI, because there is evidence of a release or threatened release of a hazardous substance from the TFM Smelter site. CERCLA defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant . . . ." 42 U.S.C. § 9601(22). There is no threshold amount of a release or threatened release to establish liability under CERCLA, and any amount of release is sufficient to satisfy this element. <u>Horsehead Indus., Inc. v. St. Joe Mineral Corp.</u>, 1996 WL 33415778, *15 (N.D. Okla. Apr. 2, 1996); <u>Dartron Corp. v. Uniroyal Chem. Co.</u>, 917 F. Supp. 1173, 1183 (N.D. Ohio 1996).

The Court has reviewed TCI's briefing and it does not appear that TCI contests that there was a "release" of hazardous substances at the TFM Smelter. Instead, TCI argues that there is no evidence establishing that the hazardous substances found in Collinsville came from the TFM Smelter, and this argument is more appropriately considered under the causation prong of a § 9607 claim. For the same reasons as stated in the context of the Court's "disposal" analysis, the Court finds that the hazardous substances were released from the TFM Smelter. <u>See</u> <u>Sycamore Indus. Park Assoc. V. Ericsson, Inc.</u>, 546 F.3d 847, 853-53 (7th Cir. 2008) (noting that the definitions of "disposal" and "release" substantially overlap); <u>City of Wichita, Kansas v. Trustees of APCO Oil Corp. Liquidating Trust</u>, 306 F. Supp. 2d 1040, 1053 n.10 (D. Kan. 2003) (same). The Court also notes that while the term "disposal" may not include direct air emissions, the term "release" includes "emitting . . . into the environment." "Environment" is defined to include "ambient air within the

Case 4:10-cv-00252-CVE-PJC Document 244 Filed in USDC ND/OK on 01/20/17 Page 21 of 34

United States." 42 U.S.C. § 9601(8). TCI's expert acknowledges that air emissions from the TFM smelter contained particulate matter that could have contained hazardous substances, and the term "release" expressly includes "emitting" or "discharging" of any hazardous substance, pollutant, or contaminant. Dkt. # 213-2, at 205. Air emissions took place in the form of direct air emissions from the smelting process and fugitive air emissions from smelter waste left at the site of the TFM Smelter. Dkt. # 213-2, at 36-38. Cyprus has also offered evidence that waste from the TFM and BZ Smelters was used in road building and other construction projects in Collinsville, and this can also be considered the "release" of a hazardous substance under CERCLA. United States v. Asarco, Inc., 392 F. Supp. 2d 1197, 1204-05 (D. Idaho 2005).

**Causation**

The most significant dispute between the parties concerns the third element of Cyprus's claim, which is whether the release or threatened release of the hazardous substances from the TFM Smelter caused Cyprus to incur cleanup costs. TCI does not dispute that Cyprus incurred cleanup costs, but it does dispute that there is a plausible migration pathway for hazardous substances from the TFM Smelter to Collinsville. According to TCI, Cyprus has the burden to prove a causal connection between the contaminants found in the Collinsville Townsite and the TFM Smelter in order to establish a prima facie case of CERCLA liability in a two-site case. Dkt. # 216, at 19. TCI cites Castaic Lake Water Agency, and argues that plaintiff should initially be required to establish three elements to prove causation in a two-site case: (1) the plaintiff must identify a contaminant at its site; (2) the plaintiff must identify the same contaminant at the defendant's site; and (3) the plaintiff must provide evidence of a plausible migration pathway from the defendant's site to the plaintiff's site. Id. at 1065. If the plaintiff meets this burden, the defendant must come forward with

evidence tending to show that there is a genuine dispute as to a material fact that would tend to disprove causation. Id.

TCI argues that there is no evidence supporting Cyprus' assertion that air emissions from the TFM Smelter caused Cyprus to incur cleanup costs, because a remedial investigation conducted at the request of ODEQ and the EPA found no environmental impact associated with the dispersion of airborne particulates. Dkt. # 216, at 23-27. In 2007, ODEQ issued a final remedial investigation report concerning the TFM Smelter Superfund Site. The report noted that the BZ Smelter is approximately one-quarter mile from the TFM Smelter, and the TFM Smelter is one and one-third mile from downtown Collinsville. Dkt. # 217-2, at 4. The TFM Smelter site is covered with about 30,000 cubic yards of smelter waste, and the waste piles are uncovered and run-off is not controlled. Id. ODEQ's investigation noted the presence of many metals in the contaminated area, but ODEQ focused on areas of concentration of arsenic, cadmium, lead, and zinc. Id. at 6. Soil sampling was conducted off-site on properties up to one and a half miles from the TFM Smelter, and ODEQ concluded that the "data did not suggest an aerial dispersion from the TFM [Smelter] that resulted in widespread contamination." Id. at 8. Soil sampling was conducted at targeted locations, such as schools, playgrounds, and parks, and other locations ranging from one-half mile to one and a half miles from the TFM Smelter, and properties closer to or adjacent to the TFM Smelter exhibited higher levels of metals in the soil. Dkt. # 217-2, at 93. The EPA ordered a supplemental remedial investigation of the TFM Smelter Superfund Site, and the supplemental remedial investigation included air dispersion modeling. Dkt. # 217-3, at 41, 46. The supplemental remedial investigation concluded that "only a small number of offsite residential sample locations–5 percent–are potentially

impacted by the use of waste mass fill material, with no impact associated with the dispersion of airborne particulates on to the ground in the area surrounding the site." Dkt. # 220-3, at 32.

Cyprus responds that the testing conducted by ODEQ and the EPA was flawed, and even after the remedial investigations ODEQ has consistently referred to aerial dispersion as a plausible migration pathway for the release of hazardous substances from the TFM Smelter site. Dkt. # 227, at 23-27. Cyprus also asserts that a plausible migration pathway can exist even without evidence of actual contamination in Collinsville, because the issue is whether a plausible pathway for the release of a hazardous substance caused Cyprus to incur costs to investigate potential contamination, even if such contamination did not actually occur. Id. at 21. Cyprus initially notes that ODEQ and the EPA investigated the potential for aerial dispersion of hazardous substances from the TFM Smelter because it is a plausible migration pathway. Id. at 22 It appears that ODEQ still considers aerial emissions from both smelters as a historic source of contamination, even though its remedial investigation suggested that aerial emissions have not impacted the soil within the CSP. Dkt. # 227-2, at 233; Dkt. # 227-10, at 44. Cyprus' air modeling expert, Robert Gasparini, Ph.D., testified in his deposition that the data used to create an air dispersion model for the supplemental remedial investigation was incomplete, and he disagrees with the conclusion that there was no contamination from the TFM Smelter caused by aerial dispersion. Dkt. # 227-16, at 32-35. A representative of CH2M, the company that performed the air modeling and soil sampling for the supplemental remedial investigation, testified in her deposition that approximately five percent of the budget was devoted to air modeling, and the air modeling was completed in a three to four week period. Dkt. # 227-12, at 36-37. She also testified that it was difficult to find a pattern or trend to create a model due to the passage of time and the existence of other possible sources of contamination. Id. at 39-43.

Case 4:11-cv-00252-CVE-FHM Document 244 Filed in USDC ND/OK on 06/20/17 Page 24 of 84

TCI's air modeling expert, David Keen, created his own air modeling and he admitted that it was possible that aerial emissions from the TFM Smelter reached Collinsville. Dkt. # 227-2, at 212-17.

The Court has reviewed the evidence submitted by both parties and finds that there is a genuine dispute as to whether air emissions from the TFM Smelter were a plausible migration pathway for hazardous substances found within the area of the CSP. Remedial investigations by ODEQ and the EPA found little evidence suggesting that aerial dispersion from the TFM Smelter caused hazardous substances to become located in Collinsville, but Cyprus' expert, Gasparini, has questioned the reliability of the modeling and the conclusions reached by ODEQ and the EPA, and TCI has not moved to exclude Gasparini's opinions. There is evidence that ODEQ still considers aerial emissions as a potential source for the release of hazardous substances, and it is not clear that the remedial investigations devoted substantial resources to the creation of a reliable air dispersion model. The company performing the air modeling for the EPA also acknowledged that the passage of time made it difficult to create a reliable air dispersion model or sort out the potential causes of contamination. The Court cannot rule out aerial dispersion as a potential source for the release of hazardous substances from the TFM Smelter, and finds that there is a genuine dispute as to whether air emissions from the TFM Smelter could be a plausible migration pathway for the distribution of hazardous substances. Cyprus is also correct that is not necessary for it to prove actual contamination within Collinsville if there was a plausible migration pathway that reasonably caused it to incur response costs to investigate such contamination. Dedham Water Co. v. Cumberland Farms Diary, Inc., 889 F. 2d 1146, 1154 (1st Cir. 1989); Asarco LLC v. Cemex, Inc., 21 F. Supp. 3d 784 , 807 (W.D. Tex. Mar. 31, 2014); LeClercq v. Lockformer, 2002 WL 907657, *2 (N.D. Ill. May 6, 2002). In addition, the Court notes that aerial dispersion is not the only type of release of

Case 4:11-cv-00252-CVE-CDL Document 244 Filed 06/20/17 Page 25 of 84

a hazardous substance identified by Cyprus and, if Cyprus can establish that it incurred costs to investigate or remediate contamination caused by the use of smelter waste in construction or road building projects, this would also meet Cyprus's burden to show that the release or threatened release of a hazardous substance caused Cyprus to reasonably incur response costs.

**Necessary Costs of Response and Consistency with the NCP**

Cyprus argues that the response costs it has incurred to comply with the consent decree are "necessary" and that the cleanup work performed has been consistent with the NCP. Dkt. # 213, at 33-39. TCI asserts that the cleanup costs incurred by Cyprus were not in response to any "actual and real threat to human health or the environment" and the scope of the work performed by Cyprus was excessive in light of the minimal amounts of hazardous substances found within Collinsville. Dkt. # 228, at 40-46. The evidence related to the fourth element (necessity of response costs) and the fifth element (Consistency with the NCP) significantly overlaps, and the Court will summarize the evidence relevant to both elements.

The EPA and ODEQ have found elevated concentrations of metals in the soil within Collinsville and, "[d]ue to the close proximity of the two former smelter sites to the town of Collinsville, the agencies believe that past smelter operations could have resulted in the presence of metals" in Collinsville. Dkt. # 213-6, at 109. The EPA and ODEQ sampled about 200 properties in Collinsville and 10 of the properties, or 5 percent, had concentrations of metals that exceeded the remediation standards for the TFM Superfund Site. Dkt. # 213-2, at 90. In February 2009, ODEQ issued an action memorandum stating that "[h]istoric smelter emissions and transport of smelter material off-site have potentially impacted soil with the city of Collinsville to levels above remediation standards . . . ." Id. at 233. Due to the random distribution of properties with elevated

Case 4:11-cv-00252-CVE-CDL Document 244 Filed in USDC ND/OK on 06/20/17 Page 26 of 84

metal levels, it was necessary to conduct large-scale sampling, because no discernable pattern for property locations with elevated metal levels could be established. Id. The agencies determined that a large-scale soil remediation program was necessary for Collinsville. Id. ODEQ believed that both the TFM and BZ Smelters were responsible for the higher concentration of metals in the soil, but only Cyprus agreed to participate in the remediation of soil for the CSP. Id. The consent decree agreed to by ODEQ and Cyprus defines the "Site" for the CSP to be "all residential properties, commercial properties, houses of worship, childcare facilities, alleys, vacant fields, parks and schools located within the corporate limits of the City of Collinsville or within one mile of such limits . . . ." Dkt. # 213-8, at 7. All work performed by Cyprus to comply with the consent decree was required to be consistent with the NCP. Id. at 8.

ODEQ issued an action memorandum stating that the proposed soil remediation program was consistent with the NCP, and the risk of "imminent and substantial endangerment to public health, or welfare, or the environment" warranted a large scale remediation program. Dkt. # 213-2, at 234. Cyprus completed the work required by the remedial action plan for the CSP and ODEQ found that the work was performed to ODEQ's satisfaction. Dkt. # 213-8, at 68. In addition to the work required for the CSP, Cyprus also remediated soil at selected properties on an expedited basis, and ODEQ believed that this work needed to be performed quickly due to the presence of children at those locations. Id. at 69. Cyprus' expert, Gravel, states that the evidence shows that ODEQ has found that Cyprus' work was necessary and consistent with the NCP, but Gravel has undertaken his own analysis of these issues. Dkt. # 213-2, at 49-50. Gravel determined that the CSP complied with the NCP in terms of selecting an adequate remedy and the community outreach associated with the selected remedy. Id. at 57-58. Gravel concluded that scope of soil sampling was reasonable and

Case 4:11-cv-00252-CVE-PJC Document 244 Filed in USDC ND/OK on 06/20/17 Page 27 of 84

necessary, and the actual soil remediation activities taken up to the present date represent a CERCLA quality cleanup. Id. at 65. As to the costs incurred by Cyprus, Gravel opines that the net amount of costs that can be recovered by Cyprus is $30,014,871 plus $887,970 in prejudgment interest, for a total of $30,902,841. Id. at 67.

CERCLA response costs include "the costs of investigating and remedying the effects of a release or threatened release of a hazardous substance into the environment." Young v. United States, 394 F.3d 858, 863 (10th Cir. 2005). However, the party seeking to recover contribution from another PRP bears the burden to show that the costs incurred are "necessary," which means that the costs must be "closely tied" to the cleanup of a hazardous substance. Atlantic Richfield Co. v. United States, 181 F. Supp. 3d 898 (D.N.M. Feb. 9, 2016). This typically includes costs for "investigating and remedying the effects of a release or threatened release of a hazardous substance into the environment." Young, 394 F.3d at 863. In addition to showing that response costs are "necessary," Cyprus must also show that the work it has performed is consistent with the NCP. County Line Inv. Co. v. Tinney, 933 F.2d 1508, 1512 (10th Cir. 1991). "The NCP is EPA's regulatory template for a 'CERCLA quality cleanup.'" Public Serv. Co. of Colorado v. Gates Rubber Co., 175 F.3d 1177, 1181 (10th Cir. 1999). "The NCP is a long and detailed list of procedures that must be carried out by federal and state governments when they are responding to hazardous waste releases," and most of the requirements have been made applicable to private parties performing their own cleanup at CERCLA sites. Morrison Enterprises, 302 F.3d at 1136. It can be a difficult burden for a plaintiff to establish compliance with the NCP, but this burden is much easier in cases where the plaintiff is conducting a cleanup pursuant to a consent decree with a state or federal agency. In cases where a party is conducting a cleanup pursuant to oversight by

a state agency, the party is entitled to a rebuttable presumption that its work complied with the NCP when the EPA has determined that the cleanup was being handled in a manner consistent with national standards. Id. at 1138. Cleanups performed by private parties are not required to strictly comply with the NCP, and work will be found consistent with the NCP based on a substantial compliance standard. Public Serv. Co. of Colorado, 175 F.3d at 1182.

The Court finds that Cyprus has produced evidence that at least some of the response cost it incurred were necessary. TCI argues that the scope of work performed by Cyprus was excessive and not reasonably related to the level of contamination present in Collinsville.[5] Dkt. # 228, at 43. TCI also asserts that Cyprus engaged in an overly broad scope of work to avoid potential class action liability for environmental contamination. Id. TCI's arguments concern the amount of response costs that may be deemed necessary, but the evidence is clear that some of the response costs incurred by Cyprus went directly to the investigation of the release of a hazardous substance and the remediation of soil in areas where the concentration of metals exceeded the standard set out in the consent decree. Dkt. # 213-2, at 111-200. TCI may have grounds to challenge whether many of these costs were directly tied to the investigation or cleanup caused by the release of a hazardous substance, but this goes to the amount of recoverable costs, rather than whether Cyprus can establish a prima facie case of CERCLA liability. Gravel's report shows that he considered each invoice submitted to Cyprus by a vendor to determine whether the work performed was necessary and

[5] TCI also argues that Cyprus had no objective basis to believe that air emissions could have been a source for the distribution of hazardous substances and, therefore, it was unnecessary for Cyprus to incur costs to investigate possible contamination caused by aerial dispersion. Dkt. # 228, at 42. The Court has already determined there is a genuine dispute as to whether a release of hazardous substances in the form of air emissions could have reached Collinsville, and this finding also prevents the Court from entering summary judgment on the ground that costs to investigate possible aerial dispersion were unnecessary.

Case 4:11-cv-00252-CVE-CDL Document 244 Filed in USDC ND/OK on 05/01/17 Page 29 of 34

properly documented, and he found that most of the costs incurred by Cyprus were closely tied to the cleanup of hazardous substances. Id. at 69. This opinion was based on his own analysis and the deposition testimony of ODEQ's representative. Gravel found that $2,816,431 of the costs invoiced to Cyprus could not be recovered under CERCLA due to lack of documentation or the failure to establish that the costs were necessary. Id. TCI's expert, Vandeven, acknowledged at least some of work performed by Cyprus was necessary, and he did not opine that Cyprus had not incurred any necessary costs. Dkt. # 213-2, at 206. The evidence shows that there may be a basis to dispute the necessity of certain response costs incurred by Cyprus, but Cyprus has produced evidence giving rise to a genuine dispute that some of its response costs were necessary.

The Court also finds that there is a genuine dispute as to whether the work performed by Cyprus was consistent with the NCP. The EPA and ODEQ entered into a MOA defining their respective roles and responsibilities with respect to the VCP, and the CSP is part of the VCP. Dkt. # 213-8, at 48, 87-98. The MOA states that the EPA and ODEQ were working in a coordinated manner with the intention of avoiding duplication of effort, and ODEQ should notify the EPA of work under the VCP. Dkt. # 213-8, at 91. While the VSP is managed by ODEQ, decisions on whether a proposed cleanup is necessary and the quality of the work performed are governed by state and federal law. Id. at 93. Specifically as to the CSP, Cyprus was required to create a remedial action plan that was subject to approval by ODEQ, and the consent decree between Cyprus and ODEQ states that all work undertaken at the CSP be consistent with the NCP. Id. at 8. In a February 20, 2009 action memorandum, ODEQ states that ODEQ and the EPA determined that a large-scale soil remediation progrom was necessary in Collinsville, and ODEQ would ensure that all cleanup work complied with applicable regulations. Dkt. # 213-2, at 235. ODEQ has found that

all of the work performed by Cyprus is consistent with the requirements of the NCP, and ODEQ did not invoke the dispute resolution mechanism to challenge the quality of Cyprus' work. Dkt. # 213-8, at 71-75. Cyprus has also offered the opinions of an expert, Gravel, that the investigation and cleanup work was performed in substantial compliance with the NCP and that the work has been approved by ODEQ. Dkt. # 213-2, at 63-65. TCI argues that Cyprus and ODEQ did not comply with the terms of the MOA, and the rebuttable presumption of compliance with the NCP does not apply due to the lack of EPA involvement with the selection of a remedy and approval of Cyprus' work. Dkt. # 228, at 45. TCI has also submitted an affidavit from Vandeven in which he challenges the basis for Gravel's opinions, and Vandeven opines that the work performed by Cyprus was not a CERCLA quality cleanup. Dkt. # 230-2, at 9-14. At this stage of the case, the Court must view the evidence in a light most favorable to the plaintiff, and the Court may not simply disregard Gravel's opinions and other evidence tending to show that ODEQ believed that Cyprus' work substantially complied with the NCP. Cyprus has produced evidence showing that there is a genuine dispute as to whether its cleanup work performed as part of the CSP substantially complied with the NCP.

**IV.**

Based on these findings, the Court finds that Cyprus has produced evidence raising a genuine dispute as to each element of a CERCLA claim under § 9607(a), and Cyprus may be able to obtain contribution from TCI. Due to the existence of genuine disputes as to material facts, the Court finds that Cyprus's motion for partial summary judgment (Dkt. # 213) and Cyprus's motion for summary judgment (Dkt. # 216) should be denied on the issue of TCI's liability for contribution under

Case 4:11-cv-00252-CVE-FHM Document 244 Filed in USDC ND/OK on 06/20/17 Page 31 of 84

CERCLA.[6] However, TCI's motion for summary judgment includes other arguments that could limit its liability under CERCLA, and the Court will consider these arguments separately as they do not neatly fit with the analytical framework provided by the Tenth Circuit in Morrison Enterprises. These arguments primarily concern the relationship between NJZ and TFMC, and TCI's contribution liability for certain types of response costs incurred by Cyprus.

**Relationship Between NJZ and TFMC**

TCI argues that Cyprus cannot establish a prima facie case of former owner or operator liability against TCI, because TCI's predecessor, NJZ, did not actually own or operate the TFM Smelter facility. Dkt. # 216, at 36. TCI also argues that it cannot be held liable for the disposal of hazardous substances that occurred after 1926, because the evidence is undisputed that TFMC ceased operating in 1926.[7] Id. at 37.

The Court has reviewed TCI's arguments and finds that TCI is effectively seeking reconsideration of the Court's ruling that TFMC was the alter ego of NJZ. The Court previously acknowledged that NJZ did not actually own the stock of TFMC, but TFMC's stock was owned by employees or officers of NJZ and NJZ represented to the International Commerce Commission (ICC) that it owned the stock of TFMC. Dkt. # 183, at 16. There was insufficient evidence to show

---

[6] The Court notes that there are numerous genuine disputes as to material facts, and these disputes concern TCI's liability as a former owner or operator and arranger under CERCLA.

[7] In a prior opinion and order (Dkt. # 243), the Court denied TCI's motion to place a temporal scope on its potential CERCLA liability. The Court rejected TCI's argument that the Court had implicitly limited TCI's liability to acts occurring between February 26, 1918 and June 9, 1923. In any event, such a temporal limitation would not prevent Cyprus from seeking to hold TCI liable for response costs caused by the "release," as opposed to the "disposal," of hazardous substances that occurred after the stated time period. See Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc., 191 F.3d 409, 414 (4th Cir. 1999).

Case 4:11-cv-00252-CVE-FHM Document 244 Filed in USDC ND/OK on 06/20/17 Page 32 of 84

that TFMC's sole purchaser was NJZ, but the evidence did show that NJZ exerted substantial authority over sales by TFMC and that NJZ held itself out as operating TFMC as a division or department of NJZ. Id. at 23-24. TCI argued that the Supreme Court has recognized that there is a rebuttable presumption in CERCLA cases that officers and directors with positions in parent and subsidiary wore "two hats." However, the Court found that Cyprus had produced sufficient evidence to rebut this presumption and there was no evidence that corporate officers with positions in NJZ and TFMC "considered the corporate separateness of TFMC as significant." Id. at 26.

TCI seems to be making a distinction between ownership and control over TFMC and the operation of the TFM Smelter, and it argues that it cannot be held directly liable under CERCLA for any hazardous substances disposed of at the site of the TFM Smelter. Dkt. # 216, at 36. This argument ignores the factual findings in the prior opinion and order (Dkt. # 183) and the Supreme Court's decision in United States v. Bestfoods, 524 U.S. 51 (1998). This Court previously considered TCI's arguments that NJZ did not own or control the operations of TFMC, and the Court concluded that Cyprus had shown that TFMC was the alter ego of NJZ and that Cyprus may be able to recover from TCI under a theory of indirect liability under CERCLA. Dkt. # 183, at 29-30. In Bestfoods, the Supreme Court distinguished between indirect or derivative liability of a parent company for the acts of its subsidiary, and direct liability for the ownership or operation of a polluting facility by the parent company. Bestfoods, 524 U.S. at 64. Although this Court did not conclusively rule on the issue of direct liability, its factual findings at a minimum permit Cyprus to proceed with its claims for indirect liability against TCI and TCI can be held liable for contribution based on the disposal of hazardous substances at the TFM Smelter.

Case 4:11-cv-00252-CVE-CDL Document 244 Filed in USDC ND/OK on 06/20/17 Page 33 of 34

**Response Costs Related to Paved Surfaces and Groundwater Contamination**

TCI argues that it cannot be held liable for response costs related to the use of smelter waste in road building and related activities, because Cyprus did not incur response costs to remedy this type of contamination. Dkt. # 216, at 38. TCI also argues that Cyprus has not incurred response costs related to the investigation and cleanup of groundwater contamination. Cyprus responds that the evidence shows that smelter waste used to repair roads and driveways in Collinsville, and the evidence shows that Cyprus incurred approximately $50,000 of response costs to investigate potential ground water contamination. Dkt. # 227, at 44.

The Court has reviewed the evidence and finds that the arguments of the parties are not sufficiently developed to permit the entry of summary judgment on TCI's contribution liability for costs related to paved surfaces and groundwater contamination. There is no dispute that smelter waste was used for road paving and building, but TCI argues that Cyprus has no evidence that it has any response costs related to this use of smelter waste. Cyprus responds that smelter waste "could" have been placed in staging areas or dispersed in transit as it was transported for road building or paving. Dkt. # 227, at 44. It would be premature to rule on this issue based on the evidence presented by the parties, and at a minimum there is a genuine dispute as to whether the use of smelter waste to construct or repair paved surfaces caused Cyprus to incur response costs. As to groundwater contamination, Cyrpus argues that it incurred response costs to investigate groundwater contamination, and it would also be premature for the Court to determine if these costs can be recovered in a contribution claim against TCI.

**IT IS THEREFORE ORDERED** that Plaintiff Cyprus Amax Minerals Company's Motion for Partial Summary Judgment as to Defendant TCI Pacific Communications, Inc.'s CERCLA Liability and Integrated Brief in Support (Dkt. # 213) and Defendant's Motion for Summary Judgment and Integrated Memorandum in Support (Dkt. # 216) are **denied**.

**IT IS FURTHER ORDERED** that the parties shall file a joint status report no later than **July 11, 2017** with proposed scheduling deadlines for a non-jury trial and dates when the parties will be available for a supplemental settlement conference.

**DATED** this 20th day of June, 2017.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **CYPRUS AMAX MINERALS COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-CV-0252-CVE-CDL** |
| | ) | |
| **TCI PACIFIC COMMUNICATIONS, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Cyprus Amax Minerals Company (Cyprus) filed this case seeking contribution from TCI Pacific Communication, LLC (TCI) under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. (CERCLA). Cyprus' claims concern the historical operations of two zinc smelting facilities near Collinsville, Oklahoma, and Cyprus seeks to recover a share of the costs that it incurred as a part of a soil sampling and cleanup program in Collinsville to remove hazardous substances associated with historical zinc smelting operations. The complaint (Dkt. # 2) alleged cost recovery claims under CERCLA against TCI Pacific Communications, LLC (TCI) under theories that TCI was a former owner or operator of a smelting facility (count I) and that TCI arranged for the disposal of a hazardous substance (count II). Cyprus also sought contribution from TCI under former owner or operator (counts III, V) and arranger (count IV, VI) theories of liability under CERCLA. Cyprus requested a declaratory judgment (count VII) that TCI is liable for a share of future costs that Cyprus will incur for the remediation of hazardous substances in Collinsville, and Cyprus also alleged a claim for unjust enrichment (count VIII).

Viacom, Inc. (Viacom), CBS Corporation, and CBS Operations, Inc. were also named as defendants in the original complaint.

TCI filed a motion (Dkt. # 53) seeking a determination that Kansas law or federal common law applied to Cyprus' request to pierce the corporate veil of a predecessor company of TCI, New Jersey Zinc Company (NJZ). The Honorable Gregory K. Frizzell granted the motion and determined that Kansas law governed the issue of piercing the corporate veil. Dkt. # 89. The case was reassigned to the Honorable John E. Dowdell. Cyprus filed an amended complaint (Dkt. # 106) naming TCI and CBS Operations, Inc. as defendants, but the amended complaint did not add any new claims. Defendants filed a motion to dismiss CBS Operations, Inc. as a defendant and to dismiss certain claims against TCI. Judge Dowdell ruled that CBS Operations, Inc. should be terminated as a party, and that counts I, II, and VIII of the amended complaint should be dismissed. The case was randomly reassigned to the undersigned after Judge Dowdell recused.

Following the ruling on the motion to dismiss, the claims remaining for adjudication are counts III through VII of the amended complaint. Cyprus seeks contribution under a theory that TCI is liable as a former owner or operator of a facility where a hazardous substance was released, and counts IV and VI seek contribution under a theory that TCI is liable as an arranger of the disposal or treatment of a hazardous substance. Count VII requests a declaratory judgment for a share of future response costs that Cyprus may incur. The Court issued an opinion and order (Dkt. # 183) finding that the former Tulsa Fuel and Management Company (TFMC) was the alter ego of NJZ, and TCI does not dispute that it is the successor in interest to NJZ. The Court subsequently denied both parties' motions for summary judgment. Dkt. # 244. A non-jury trial was held February 26 to

Case 4:11-cv-00252-CVE-CDL Document 332 Filed 03/31/21 Page 3 of 47

March 2, 2018. Having considered the evidence and submissions of the parties, the Court hereby enters its findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. Background of Historical Zinc Smelting Operations Near Collinsville

1. The Bartlesville Zinc Smelter (BZ Smelter) operated from 1911 to 1918 and was located approximately one mile from Collinsville. Cyprus admits that the BZ Smelter was owned by the Bartlesville Zinc Company, which is a former subsidiary of a corporate predecessor of Cyprus. Dkt. # 106, at 5.

2. The Tulsa Fuel and Manufacturing Company Zinc Smelter (TFM Smelter) was owned by TFMC, and the TFM Smelter was located approximately a quarter-mile from the BZ Smelter. The TFM Smelter was located about one and one-quarter miles from Collinsville, and it operated from 1911 to 1926. Id. The Court determined in a prior opinion and order (Dkt. # 183) that TFMC was the alter ego of NJZ and that Cyprus could assert CERCLA contribution claims against TCI for any liability for the release of hazardous substances at the TFM Smelter site.

3. The BZ Smelter and the TFM Smelter used horizontal retort furnaces to extract zinc from zinc ore. Dkt. # 302, at 3. The raw material was first placed in a roaster to remove sulfur and sulfur dioxide, and the material was then placed in a furnace block for the extraction of the zinc. Dkt. # 310, at 20. Retorts were placed against the furnace block and condensers were used to cool the zinc vapor into molten zinc. Id. at 21. Each retort was approximately four feet long and eight inches wide, and a retort was about one inch thick. Dkt # 310, at 22.

4. The smelter operations generated three types of waste. First, the roasting facilities and furnace blocks generated air emissions that were vented from the smelter through roof vents or

Case 4:11-cv-00252-CVE-CDL Document 332 Filed 03/31/21 Page 4 of 47

smokestacks. Dkt. # 302, at 3; Dkt. # 310, at 21. Second, the smelting process also resulted in the creation of solid waste in the form of used or broken retorts, condensers, and refractory bricks. Id. at 21-22. Another form of solid waste was retort residue generated by the smelting process, and the retort residue would have been scraped from retorts and left in a residue pile on site. Id. at 22.

5. Defendant's historical expert, Jennifer Stevens, Ph. D., testified that there was a high demand for zinc in 1912, but the industry took a downturn in 1913. Dkt. # 313, at 22. However, the demand for zinc increased in 1914 at the beginning of World War I, because European smelting facilities closed during the war and the United States increased zinc production to meet the increased demand. Id. at 23.

6. The Bartlesville Zinc Company owned a 220 acre tract of land located about one mile from Collinsville, and the BZ Smelter occupied approximately 40 acres of the site. Dkt. # 307, at 132; Defendant's Ex. 166, at 166.0002. According to a report issued by the United States Geological Survey (USGS), the BZ Smelter was the largest zinc smelter operating in the United States for the year 1912, and it had a smelting capacity of 8,604 retorts. Defendant's Ex. 12, at 012.0006. The BZ Smelter retort capacity increased by 2,688 retorts in 1915, and the USGS reported that the BZ Smelter was the largest zinc smelter in the world. Defendant's Ex. 45, at 045.0040.

7. The TFM Smelter was located on a smaller parcel of land and, in 1912, the TFM Smelter had a smelting capacity of 6,232 retorts. Plaintiff's Ex. 93, at CA-C0086233. The smelting capacity of the TFM Smelter remained relatively consistent until 1922 when there was a sharp drop in the demand for zinc, and the TFM Smelter gradually cut production until it closed permanently in 1926. Dkt. # 311, at 101-02.

**Cleanup of Smelter Sites**

8. In the early 1990s, the Oklahoma Department of Environmental Quality (ODEQ) began to investigate whether the BZ Smelter site would be eligible for the federal Superfund program and, in September 1995, it issued a site inspection narrative report for the BZ Smelter site. Dkt. # 307, at 52; Plaintiff's Ex. 267. The report notes that the BZ Smelter is close in proximity to the former TFM Smelter and that both smelter sites "share a common surface water pathway and a common air/particulate dispersion pathway." Plaintiff's Ex. 267, at CBS_OPS-107027. The report identified Cyprus as the potentially responsible party (PRP) for the BZ Smelter site. Soil sampling found elevated levels of metals in the soil within the boundaries of the BZ Smelter and also within a nearby residential neighborhood. Id. at CBS_OPS-017031. The report noted that it was not possible to attribute offsite contamination to the BZ Smelter or the TFM Smelter, because the smelters shared common pathways of dispersion and both facilities generated the same types of waste materials. Id.

9. In May 1996, Cyprus and ODEQ entered into a consent agreement in which Cyprus agreed to perform a focused remedial investigation and feasibility study (RI/FS) of the BZ Smelter site, and TFMC and its successors were identified as PRPs for contamination on or near the BZ Smelter site. Plaintiff's Ex. 270, at 1-3. Cyprus' contractor, Exponent, prepared a Focused Remedial Investigation Report, and the primary exposure pathways for contaminants included "incidental ingestion of soil, inhalation of airborne particulates from soil, and dermal contact with soil (quantified for cadmium only)." Joint Ex. 5, at CBS_OPS-019452. The report concluded that exposure to contaminated soil was the primary "medium of concern" from the perspective of preventing harm to people on or nearby the BZ Smelter site. Id. at CBS_OPS-019453. The feasibility study focused solely on remedial actions for the cleanup of contaminated soil. Joint Ex. 6, at CBS_OPS-016894.

10. In 1992, the Oklahoma State Department of Health opened an investigation into potential contamination at the TFM Smelter site, and a site inspection report issued by ODEQ in September 1994 found that no measures had been taken to prevent the offsite migration of contaminants from the TFM Smelter site. Plaintiff's Ex. 263; Plaintiff's Ex. 264, at TFDEQ014723. The report noted the potential for offsite aerial migration of contaminants, but this was not within the scope of the site inspection. Id. at TFDEQ014738. Soil and water sampling revealed elevated levels of arsenic, lead, and cadmium on-site, and there was a substantial volume of smelter waste that had been left at the site after the TFM Smelter ceased operations. Id. at TFDEQ014723.

11. The United States Environmental Protection Agency (EPA) conducted its own Hazard Risk Scoring for the TFM Smelter site and placed the TFM Smelter site on the National Priorities List. Dkt. # 307, at 49-50. The EPA entered into a cooperative agreement with ODEQ for remediation of the TFM Smelter site, and ODEQ became the lead agency for the site. Id. at 50. ODEQ hired Burns & McDonnell Engineering Company, Inc. (Burns & McDonnell) to complete a RI/FS for the TFM Smelter site.

12. Burns & McDonnell issued its RI/FS report in August 2007, and the entire TFM Smelter site consists of just more than 60 acres of land. Plaintiff's Ex. 288, at CBS_OPS-026722. Approximately 30,000 cubic yards of waste material, such as broken retorts and condensers, had been left on the site after TFMC ceased operations in 1926, and the waste piles were not covered. Id. Although previous investigations noted higher levels of many metals, the contaminants of potential concern for the remedial investigation were arsenic, cadmium, lead, and zinc. Id. at CBS_OPS-026724. Burns & McDonnell conducted sampling on-site and offsite and concluded that

Case 4:11-cv-00252-CVE-CDL Document 332 Filed in USDC ND/OK on 03/31/21 Page 7 of 47

contamination at the TFM Smelter site had caused elevated levels of one or more metals at offsite locations. Id. at CBS_OPS-026725.

13. Soil sampling was conducted outside the TFM Smelter site to determine "the presence and extent of contamination due to potential aerial distribution of metals from the TFM smokestack and historical placement." Id. at CBS_OPS-026726. The data did not support a finding that aerial dispersion of contaminants from the TFM Smelter was a likely pathway for higher metal levels in offsite properties. Id. Instead, Burns & McDonnell concluded that the historical placement of smelter waste in the community was the likely cause for the presence of contaminants in the soil, because smelter waste was visible in adjacent properties with metal levels in excess of the screening levels. Id. at CBS_OPS-026811.

14. The EPA hired CH2M Hill to conduct a supplemental RI/FS to "1) to obtain sufficient data to evaluate the potential soil contamination of offsite residual properties resulting from the use of smelter waste as fill material and 2) to evaluate the potential soil contamination of the area surrounding the site resulting from the release and dispersion of airborne particulates . . . ." Plaintiff's Ex. 301, at CA-C0042553. CH2M Hill developed an air dispersion model to guide in the selection of sites for soil sampling, but the supplemental RI/FS noted that there was little historical information concerning the operation of the TFM Smelter. Id. at CA-0042585. CH2M Hill knew the period of operation of the facility and the approximate location of emission sources, but it did not know certain details about the furnaces, the size of the particulates, the exhaust temperature, and velocity and emission rates for the particulates. Id. CH2M Hill relied on local meteorological data and known information about the location of the emission sources, and it made assumptions concerning the unknown variables to complete the air dispersion modeling. Id. The modeling

Case 4:11-cv-00252-CVE-CDL Document 332 Filed in USDC ND/OK on 03/31/21 Page 8 of 47

provided contour plots showing where higher amounts of particulates would likely have impacted, and the greatest deposition was on-site or very near the TFM Smelter site. Id. at CA-C0042586. Some amounts of particulates were likely carried downwind, and the modeling estimated that 0.6 percent of the maximum deposition could have been carried one and a half miles from the TFM Smelter site. Id.

15. CH2M Hill collected soil samples from residential properties in Collinsville and also conducted more focused sampling in an attempt to determine if aerial dispersion was a likely pathway for the distribution of contaminants from the TFM Smelter. Id. at CA-C0042595. Sampling was also conducted at 201 residential properties to assess the extent to which smelter waste was used as fill material by local residents in Collinsville, and 10 of the properties had an excess level of lead, arsenic, or cadmium. Id. at CA-C0042653. Visible smelter waste was present at two of the locations, and the other eight properties were located in an older part of Collinsville that was directly north of the TFM Smelter site. Id. at CA-C0042654. Out of the eight properties without visible smelter waste, CH2M Hill concluded that five of these properties were located near older roads that were made using smelter waste. Id. As for aerial dispersion of particulates, the targeted sampling did not reveal contamination in the areas that were most likely to be affected according to CH2M Hill's air dispersion modeling, and the evidence did not support a finding that airborne particulates were the cause of contamination near the TFM Smelter site. Id. Instead, contaminated residential soil was likely attributable to the historical placement of smelter waste, and there was no discernable trend or pattern to the placement of these materials. Id. at CA-C0042655.

16. In November 2008, the EPA issued a Record of Decision (ROD) for the TFM Smelter site selecting a remedy for the cleanup of approximately 200,000 cubic yards of soil and waste material

located at the site. Joint Ex. 10, at CA-C0031129. ODEQ performed the remedy selected by the EPA, which included the excavation of contaminated soil and waste materials at the site. Dkt. # 307, at 70. The remedy focused on the cleanup of the TFM Smelter site, and the EPA deferred to ODEQ for cleanup of offsite residential properties. Id.

**The 2009 Consent Decree**

16. On May 28, 2009, ODEQ filed a case in the United States District Court for the Northern District of Oklahoma seeking judicial approval of a proposed consent decree between ODEQ and Cyprus. Oklahoma Department of Environmental Quality v. Cyprus Amax Minerals Company, 09-CV-326-TCK-FHM (N.D. Okla); Plaintiff's Ex. 320.

17. The consent decree defines the "Site" to be remediated as follows:

> "Site" shall mean all residential properties, commercial properties, houses of worship, childcare facilities, alleys, vacant fields, parks and schools located within the corporate limits of the City of Collinsville or within one mile of such limits or anywhere Waste Materials from the former Bartlesville Zinc Company Smelter Site have come to be located. "Waste Materials" shall mean (1) any "hazardous substance" under § 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any "pollutant or contaminant" under § 101(33) of CERCLA, 42 U.S.C. § 9601(33); and (3) any "waste" under [OKLA. STAT. tit. 27A, §§ 1-1-201(16)].

ODEQ had used a similar definition of "Site" for the cleanup of other smelter sites, and ODEQ believed that limiting the "Site" to properties within Collinsville only would exclude potentially contaminated residential properties. Dkt. # 307, at 95.

18. Cyprus agreed to develop and implement a remedial action work plan within 60 days of the date the consent decree became effective. Plaintiff's Ex. 320, at CBS_OPS-018251. In exchange, ODEQ agreed not to sue or bring any other civil or administrative actions against Cyprus. Id. at CBS_OPS-018258. The consent decree provided Cyprus protection from the contribution claims

of other PRPs to "the fullest extent allowed by law," but the consent decree does not prevent Cyprus from seeking contribution from other PRPs. Id. at CBS_OPS-018261.

19. Pursuant to the consent decree, Cyprus agreed to remediate 10 properties on an expedited basis that had been identified as having exceedances of lead, arsenic or cadmium during the initial sampling. Joint Ex. 17, at CBS_OPS-021803; Dkt. # 307, at 71-72. ODEQ wanted these properties cleaned up as soon as possible, because these were "high access" areas such as parks and schools and children would likely come into contact with contaminated soil. Dkt. # 307, at 71-72, 79-80. Two additional properties where daycare facilities were located were added to the interim remedial action as more soil sampling was conducted in Collinsville. Joint Ex. 17, at CBS_OPS-019768. The remedy requested by ODEQ was the removal of soil to a depth where the average concentration of lead, arsenic, and cadmium were below screening levels, and this included the removal of any visible smelter waste on the properties. Joint Ex. 16, at CBS_OPS-021807. Cyprus completed the work in 2010 and 150 cubic yards of smelter waste were removed from 5 of the remediated properties. Joint Ex. 17, at CBS_OPS-019771.

**The Collinsville Soil Program**

20. On February 20, 2009, the ODEQ issued the Collinsville Soil Program (CSP) Action Memorandum for the evaluation of potential smelter impacts within Collinsville and adjacent areas. Joint Ex. 11, at CBS_OPS-013214. ODEQ "identified a need to assess and, if necessary, cleanup areas outside the two smelter sites," and ODEQ listed "[h]istoric smelter emissions and transport of smelter material offsite" as the pathways for migration of contaminants from the smelters to offsite areas. Id. at CBS_OPS-013215. ODEQ stated that approximately five percent of properties that had been evaluated contained concentrations of at least one metal in excess of the CSP remediation

Case 4:11-cv-00252-CVE-CDL Document 332 Filed in USDC ND/OK on 03/31/21 Page 11 of 47

standards, and there was no discernable pattern for the distribution of the contaminants. Id. The number of properties needing remediation could not be determined until additional sampling was completed. Id.

21. The CSP Action Memorandum explains that sampling of residential properties would be conducted on a voluntary basis, and Cyprus would engage in community outreach to inform residents of the availability of soil sampling under the CSP. Id. at CBS_OPS-013216. Each property would be divided into yard areas and soil samples at various depths would be taken from each area, and any yard area containing average metal concentrations in excess of the CSP remediation standards would be remediated. Id. at CBS_OPS-013217. Cyprus agreed to perform the remedy selected by ODEQ as part of the consent decree, and a copy of the CSP Action Memorandum was attached to the consent decree.

22. Cyprus' contractor, Shaw Environmental, Inc. (Shaw), prepared a Soil Sampling and Analysis Plan for the CSP, and the study area for the CSP was approximately 48 square miles. Joint Ex. No. 14, at CA-C0031635; Dkt. # 314, at 48-49. The study area was divided into subareas referred to as "Downtown" and "Surrounding Area," and the entire study area included approximately 8,000 properties. Joint Ex. No. 24, at CA-C0399876. Properties were eligible for sampling under the voluntary soil sampling program if the property was developed or planned for development for private or public use and there was sufficient accessible area for sampling and excavation. Id. Undeveloped and industrial properties were not included with the scope of the soil sampling program. Id. ODEQ requested that Cyprus focus on the Downtown subarea due to the higher volume of exceedances in that area, but contaminated properties were spread throughout the study area. Dkt. # 307, at 79, 88.

Case 4:11-cv-00252-CVE-CDL Document 332 Filed in USDC ND/OK on 03/31/21 Page 12 of 47

23. Shaw developed a Remedial Action Work Plan based on recommendations from ODEQ and the EPA that a comprehensive soil remediation program was needed to protect local residents from high concentrations of metals in the soil that could not be explained by natural causes alone, and the higher levels of metals were attributed to the presence of the two former zinc smelting facilities near Collinsville. Joint Ex. 18, at CBS_OPS-021429. The objective of the CSP cleanup was to "excavate and replace soil within individual yard areas at a given property where soil concentrations of arsenic, cadmium, or lead exceed the [ODEQ] remediation standards. Id. at CBS_OPS-021430. However, as laid out in the Soil Sampling and Analysis Plan, a large scale sampling program was necessary to identify properties with metal exceedances, and the sampling was part of the remedy that ODEQ was requiring Cyprus to perform under the CSP. Joint Ex. 14, at CA-C0031634.

24. To encourage participation in the voluntary soil sampling program, Cyprus established a local office in Collinsville and published announcements in The Collinsville News. Joint Ex. 24, at CA-C0399879. Cyprus held two open house events at the Collinsville high school and set up a website with information about the soil sampling program. Id. At the request of ODEQ, Cyprus also sent letters to each owner of a property eligible for sampling and sent representatives to make door-to-door contact with Collinsville residents. Id. at CA-C0399880; Dkt. # 307, at 77-78. Out of 7,968 eligible properties, Cyprus conducted sampling at 3,492 properties and a total of 78,786 samples were taken during the CSP. Joint Ex. 24, at CA-C0399885.

25. Sampling for the CSP primarily concluded by June 2013, and soil cleanup of contaminated properties took place between August 2012 and September 2013. Id. at CA-C0399888. A total of 322 residential properties had an exceedance of lead, arsenic, or cadmium, and three non-residential

properties also had exceedances of lead and arsenic Id. at CA-C0399886. Certain properties had an exceedance of a single metal, such as arsenic, and ODEQ required Cyprus to remediate all properties, because ODEQ viewed the presence of a high concentration of a single metal as a significant risk to human health and safety. Dkt. # 307, at 89-90. ODEQ did not independently determine the cause of the presence of a hazardous substance at each property unless Cyprus requested a consultation, and ODEQ relied of the findings in the CSP Action Memorandum that waste material from the smelter sites was responsible for contamination with the CSP study area. Id. at 17.

26. In one instance, Cyprus made a request to ODEQ to be relieved from remediating certain properties with metal exceedances, because the exceedances were likely not attributable to waste materials from the smelter facilities. Cyprus' project manager, Alicia Voss, believed that two adjacent properties referred to as the Tillman and Vargas properties had metal exceedances for reasons other than smelter waste, and she advised ODEQ that these properties were outside the scope of the CSP. Dkt. # 308, at 102-03. The properties were located at the site of a former coal strip mine, and arsenic was found at all levels of the soil due to shale and coal deposits. Id. at 103-104. ODEQ agreed that Cyprus was not required to perform soil remediation at these properties. Id. at 106.

**TCI Declined to Participate in the Cleanup of the TFM Smelter and the CSP**

27. Cyprus' original complaint named TCI, Viacom, CBS Corporation, and CBS Operations, Inc. as defendants. Jeffrey Groy, senior counsel for CBS Corporation, testified that NJZ merged into another entity known as "Gulf and Western," and TCI is the corporate successor to Gulf and Western. Dkt. # 311, at 77. Viacom Inc., CBS Corporation, and CBS Operations, Inc. had a

corporate relationship with Gulf and Western or a related entity, Paramount Communications, Inc., and Viacom, Inc., CBS Corporation, and CBS Operations, Inc. communicated with the EPA or ODEQ concerning potential liability for the TFM Smelter site and offsite areas affected by hazardous substances disposed of at the TFM Smelter site. See Dkt. # 2, at 12-13.

28. On April 13, 1995, Cyprus sent a letter to Viacom requesting that it agree to voluntarily participate in a cleanup of the TFM Smelter and offsite areas, because Viacom had a close connection to NJZ and the TFM Smelter. Plaintiff's Ex. 491. Cyprus stated that the BZ and TFM Smelters shared the same waterways and airways, and it would be beneficial for Cyprus and Viacom to cooperate with at least the offsite cleanup. Id. Viacom took the position that it had no corporate relationship with TFMC and, even if there were a relationship, the TFM Smelter was no longer operating when Viacom acquired NJZ. Plaintiff's Ex. 492.

29. ODEQ sent a follow-up letter to Viacom's attorney, Groy, supplying documentation showing that NJZ exercised a significant level of control over the operations of TFMC, and ODEQ invited Viacom to participate in a voluntary cleanup of the TFM Smelter site. Plaintiff's Ex. 493. Groy responded that the evidence provided by ODEQ did not demonstrate that NJZ exercised any control over the operations of TFMC, and Groy asserted that a court would not be likely to pierce the corporate veil to impose liability on a successor entity of NJZ. Plaintiff's Ex. 494.

30. In April 1999, the EPA sent a request for information to Viacom about contamination located at the TFM Smelter, and the EPA subsequently sent a formal invitation for Viacom to participate in the cleanup of the TFM Smelter site. Plaintiff's Ex. 497, 498. Groy met with representatives of the EPA, but Viacom declined to commit to participating in a cleanup of the TFM Smelter site. Plaintiff's Ex. 499.

31. The EPA remained in contact with Groy about the potential cleanup of the TFM Smelter site, and Viacom continued to assert that NJZ and its corporate successors had no liability for the disposal of hazardous substances by TFMC. Plaintiff's Ex. 503. In 2009, ODEQ sent a letter to Groy affirmatively stating that the corporate successors of NJZ were liable for the cleanup of the TFM Smelter site and offsite impacts caused by the disposal of hazardous substances at the TFM Smelter. Plaintiff's Ex. 513. TCI, Viacom, CBS, Corporation, and CBS Operations, Inc. have refused to participate in the cleanup of the TFM Smelter site or the CSP, and Groy testified that the Court's opinion and order (Dkt. # 183) finding that TFMC was the alter ego of NJZ had no effect on TCI's decision regarding NJZ's liability for the disposal of hazardous substances by TFMC. Dkt. # 311, at 79.

## II. Elements of CERCLA Liability

### Covered Person

32. The Court must initially consider whether TCI is a "covered person" for the purpose of CERCLA liability. An entity may be deemed a "covered person" if it is the "owner or operator of a vessel or facility" where a hazardous substance was disposed or it was "the person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substance were disposed . . . ." 42 U.S.C. § 9607(a). Cyprus also argues that TCI could be liable under a theory that TCI "by contract, agreement, or otherwise arranged for disposal or treatment" of a hazardous substance. Id. However, Cyprus acknowledged during its closing argument that arranger liability will not apply if the Court determines that the smelter facilities and the study area of the CSP are one facility for the purpose of CERCLA liability. Dkt. # 319, at 19. The Court previously determined that the term "facility" includes the two smelter sites and the study area of the

CSP, and the evidence presented at trial has not caused the Court to revisit this finding. Dkt. # 244, at 19. Therefore, arranger liability does not apply in this case and judgment should be entered in favor of TCI on these claims (Counts IV and VI).

33. TFMC was the owner of the TFM Smelter, and TFMC was a subsidiary of NJZ. The Court determined in a prior opinion and order that TFMC was the alter ego of NJZ, and TCI is the successor entity to NJZ. Dkt. # 183. Therefore, TCI may be held liable for contribution to Cyprus under a former owner or operator theory if Cyprus can show that hazardous substances disposed of at the TFM Smelter were found in the CSP study area and those hazardous substances caused Cyprus to incur response costs.

34. The parties' dispute on this element of CERCLA liability primarily focuses on whether TCI disposed of a hazardous substance within the CSP study area. The evidence presented at trial focused on two potential pathways for smelter waste to move from the TFM Smelter to areas within or near Collinsville. First, Cyprus argues that air emissions from the TFM Smelter were carried north from the smelting facilities, and particulates containing hazardous substances deposited in the soil in Collinsville. Second, Cyprus argues that waste materials from the TFM and BZ Smelters were taken from the smelter facilities by members of the community and were intentionally placed in the soil within the CSP study area.

**Aerial Dispersion**

35. The parties dispute whether direct air emissions can legally constitute a plausible migration pathway of particulates from the TFM Smelter to the CSP study area. In a prior opinion and order, the Court determined that air emissions generated by operation of a smelter facility do not qualify as "disposal" under § 9607, but the Court left open the possibility that fugitive air emissions from

waste intentionally placed on the TFM Smelter site could have been a contributing factor in the dispersion of contaminants. Dkt. # 244, at 17. Due to the volume of evidence presented concerning air emissions at trial, the Court will consider as a factual matter whether aerial dispersion of contaminants from smokestacks or furnaces at the TFM Smelter actually impacted or deposited within the CSP study area.

36. The EPA and ODEQ believed that aerial dispersion of particulates from the BZ and TFM Smelters could have been a potential migration pathway for contaminants, and the EPA retained CH2M Hill to investigate this possibility. Plaintiff's Ex. 301, at CA-C0042553. The EPA directed CH2M Hill to "[d]evelop[] an air dispersion model to guide in the selection of soil sample locations" and to "[o]btain[] signed access agreements to permit CH2M Hill onto residential properties to collect soil samples . . . ." Id.

37. CH2M Hill performed aerial dispersion modeling and determined that sites within 1.5 radial miles of the TFM Smelter would most likely have been affected by airborne particulates from the smelter site. Id. at CA-C0042554. CH2M Hill obtained the necessary agreements and conducted sampling at 201 residential properties and 10 undisturbed air dispersion locations, and CH2M Hill found 18 metal exceedances at 10 residential properties. Id. Two of the residential properties contained visible smelter material and the EPA concluded that the exceedances at the remaining eight properties were likely due to the historical placement of smelter waste material. Id. at CA-C0042555.

38. Based on the sampling, the EPA concluded that approximately five percent of offsite residential properties were potentially affected by contamination from the historical placement of smelter waste, and there was no pattern or trend in the contaminated locations that would support

Case 4:11-cv-00252-CVE-PJC Document 332 Filed in USDC ND/OK on 03/31/21 Page 18 of 47

a finding that aerial dispersion from the TFM Smelter was responsible for the presence of hazardous substances in Collinsville. Id. at CA-C0042655.

39. Cyprus retained Roberto Gasparini, Ph. D., to review CH2M Hill's aerial dispersion modeling, but Dr. Gasparini did not conduct his own modeling. Dkt. # 310, at 104, 115. Dr. Gasparini testified that historical air modeling requires accurate data about emission rates, particulate size and weights, the source from which the particulates were emitted, and the direction and speed of the prevailing winds. Id. at 107-12.

40. Limited meteorological data was available from the relevant time period of 1911 to 1926, and there was no historical data concerning wind speed and direction that could be used for historical air modeling. Id. at 110. To conduct historical air modeling, it is necessary to use a wind rose of the prevailing winds based on contemporary data from a meteorological site, and there were several sites from which this data could be obtained. Id. at 112-14. CH2M Hill used data from a meteorological site at Skiatook, Oklahoma, but there are also meteorological sites at Claremore, Catoosa, and the Tulsa International Airport. Id. at 118-19. Dr. Gasparini concluded that it was inappropriate to rely on data from the Skiatook meteorological station, and he believed that the Tulsa site had a longer history of meteorological data and a less obstructed location to obtain wind data. Id. at 123-30.

41. As to emission data, there was no historical data available and CH2M Hill relied on emission data from another remedial investigation of a smelter site. Id. at 132. Dr. Gasparini did not believe the data used by CH2M Hill was representative of actual emissions from 1911 to 1926, and he believed that the emission rate used by CH2M Hill was arbitrary. Id. Dr. Gasparini and TCI's air modeling expert, David Keen, both agreed that all of the air modeling performed allowed for the

potential deposition of some amount of particulates carried by the prevailing winds into Collinsville. Dkt. # 310, at 139-40; Dkt. # 314, at 26-27.

42. Even if the Court assumes that aerial dispersion is "disposal" as a matter of law, the Court finds no evidence of a pattern or trend from the actual sampling conducted in the CSP study area that would support a finding that aerial dispersion was a viable migration pathway for contaminants from the TFM Smelter. The location of contaminated properties within the CSP study area is random and not consistent with an aerial plume associated with the dispersion of airborne particulates. Aerial dispersion may have been theoretically possible under modeling performed by CH2M Hill and Dr. Keen, but Cyprus has not shown that aerial dispersion is a viable migration pathway that can be verified with evidence derived from soil sampling within the CSP study area. As noted by TCI's expert, Jay Vandeven, the TFM and BZ Smelters operated over 100 years ago for a relatively short period of time, and intervening events such as the Dust Bowl and the passage of time would have obscured or destroyed evidence of aerial dispersion. Dkt. # 314, at 85. The Court also notes that any alleged errors in the air modeling are irrelevant, because Cyprus actually conducted sampling throughout the CSP study area and no pattern for the location of hazardous substances emerged. Cyprus has not shown by a preponderance of the evidence that aerial dispersion resulted in the disposal of hazardous substances into the CSP study area and, as a factual matter, the Court does not find that aerial dispersion of particulates is a viable migration pathway for hazardous substances to travel from the TFM Smelter to Collinsville.

**Historical Placement of Smelter Waste**

43. Cyprus argues that the historical placement of smelter waste on residential and other properties within the facility was a viable migration pathway for hazardous substances to have

Case 4:11-cv-00252-CVE-CDL Document 332 Filed in USDC ND/OK on 03/30/21 Page 20 of 47

traveled from the TFM Smelter to the CSP study area. TCI's witnesses do not dispute that this was a common practice in the relevant time period, but TCI argues that any smelter waste found in the facility came from the BZ Smelter only.

44. ODEQ's representative, Amy Brittain, testified that smelter waste was widely used by residents of Collinsville, and this practice was common to other smelter sites at which she has supervised remedial work. Dkt. # 307, at 74, 113. ODEQ tracked locations where visible smelter waste was found during its investigation. Id. at 66. The maps prepared by ODEQ were offered as demonstrative exhibits at trial and there was no pattern or trend as to the placement of smelter waste.

45. Due to the lack of a pattern or trend concerning the location of smelter waste in the community, ODEQ had concerns about children and families being exposed to harmful contaminants in smelter waste, and ODEQ encouraged the citizens of Collinsville to have their property sampled for hazardous substances associated with smelter waste. Id. at 76-77. Cyprus established an office in Collinsville to promote the CSP, and Cyprus contacted local residents and engaged in community outreach to encourage residents to participate in voluntary soil sampling. Id. at 78-79.

46. ODEQ had no way to distinguish whether visible smelter material originated from the BZ or TFM Smelter, and ODEQ assumed that any visible smelter waste found in the CSP study area could have originated from either smelter site. Dkt. # 308, at 17, 29. Cyprus' expert, A.J. Gravel, testified that there are few historical records concerning the operation of the BZ and TFM Smelters or the removal of waste from the sites. Dkt. # 310, at 17. Most of the records that are available are not primary sources, such as corporate records, but most of the information that he relied upon to form his opinions came from secondary sources such as newspapers or trade literature. Id. He also noted that the BZ and TFM Smelters were unregulated by any governmental entity, and the type of

environmental data available from government sources in the present is not available for historical smelter sites. Id. at 18.

47. Gravel testified that smelter waste was historically used by residents of communities in which a smelter operated for road and sidewalk building and smelter waste was directly placed on residential properties for various purposes, and this practice occurred "without exception" at every smelter site that he has visited. Dkt. # 310, at 26. Smelter waste was plentiful and took up space at the smelter facility, and smelter facilities regularly made the waste materials available to employees or members of the community to take home. Id. at 29.

48. Articles in the Collinsville Times discuss the use of broken retorts and clinkers as fill for building roads in and around Collinsville. On April 24, 1913, the Collinsville Times reported that local citizens formed a committee for the purpose of repairing a road using broken retorts and cinders from "the smelters." Plaintiff's Ex. 108. The committee members visited "the smelters" and arranged for the transportation of the broken retorts and clinkers to the place where the road was being constructed. Plaintiff's Ex. 109. The smelters donated fifty railroad cars full of smelter waste for the project, and Gravel testified that 50 railroad cars would have equaled two and a half tons of smelter waste. Plaintiff's Ex. 110; Dkt. # 310, at 33. Both the BZ and TFM Smelters were operating when this occurred, but the newspaper articles do not specify if the waste material came from one or both smelters.

49. The Collinsville Star reported on March 24, 1917 that a road was constructed using broken retorts and cinders from smelting facilities. Plantiff's Ex. 178. The first load of broken retorts was from the BZ Smelter, but the article states that 151 loads of broken retorts and 50 loads of cinders

Case 4:11-cv-00252-CVE-CDL Document 332 Filed 03/01/21 Page 22 of 47

were delivered later in the day without specifying whether the deliveries came from the BZ or TFM Smelters. Id.

50. On February 11, 1915, the Collinsville News reported that the city of Collinsville used broken retorts and cinders to repair a section of South 12th Street, and Dr. Stevens observed that this road leads to the BZ Smelter. Defendant's Ex. 50; Dkt. # 313, at 31. The article does not state whether the broken retorts and cinders came from the BZ or TFM Smelter.

51. Dr. Stevens testified about a series of newspaper articles concerning an event known as "Good Roads Day" that was held in Collinsville in March 1917. The Business Men's League in Collinsville organized an effort to improve local roads, and smelter waste from the BZ Smelter was used as construction material for the road improvements. Defendant's Exs. 82, 83, 84, 87.

52. Dr. Stevens' testimony makes little or no mention of the routine use of smelter waste by the residents of Collinsville, and her testimony is focused on large-scale community projects involving the use of smelter waste. The Court does not find that her testimony is particularly helpful or relevant to resolving whether the smelter waste actually remediated by Cyprus came from the BZ or TFM Smelter. The soil sampling and remedial work for which Cyprus seeks contribution primarily took place at residential properties, and there is no evidence submitted by either party suggesting that small-scale use of smelter waste by local residents would have been reported in local newspapers. Even if the Court assumes that Dr. Stevens is correct that smelter waste for road building came only from the BZ Smelter, the evidence cited by Dr. Stevens does not assist the Court in determining whether waste from the BZ and TFM Smelters was used by the residents of Collinsville for small-scale or residential projects.

Case 4:11-cv-00252-CVE-CDL Document 332 Filed in USDC ND/OK on 03/03/21 Page 23 of 47

53. Vandeven testified that the operations of the BZ and TFM smelters were substantially the same with some subtle differences, and the two facilities were essentially next door to each other. The BZ smelter had a heap-roasting operation and was larger than the TFM Smelter, but the TFM Smelter operated for a longer period of time. Id. at 46.

54. Vandeven examined the geographical features of the areas encompassing the Smelter sites and the CSP, and he noted that there were coal deposits and shale formations very close to the surface. Id. at 50-51. This results in a naturally occurring concentration of arsenic in the soil. Id. Vandeven also testified that man-made sources of lead, such as lead based fuel or paint, could also contribute to elevated lead levels in the soil. Id. at 53. The chemical signature of waste from a zinc smelter includes elevated concentrations of arsenic, lead, cadmium, and zinc. Id. at 55.

55. The BZ smelter used a "clinkering" or "heap-roasting" process in which the residue from the retorts was spread out on the ground and roasted a second time to concentrate silver in the ore. Id. at 56. The ore would then have been sent offsite for further recovery of valuable metals. Id. The TFM Smelter did not employ a similar process. Id.

56. Aerial photographs from 1943 showed the condition of the BZ and TFM Smelter sites before either site was remediated. Vandeven noted that he could not determine where most of the waste material from the BZ Smelter would have been placed, but there were visible piles of waste left at the TFM Smelter. Id. at 61. There was limited access by road to the waste piles at the TFM Smelter, and the public may have had easier access to waste materials at the BZ Smelter. Id. at 62-63.

57. Vandeven's opinion that smelter waste was not removed off site from the TFM Smelter relies, in part, on Dr. Stevens' expert report. Dr. Vandeven opined that smelter waste was more

Case 4:11-cv-00252-CVE-FHM Document 332 Filed in USDC ND/OK on 03/31/21 Page 24 of 47

easily accessible from the BZ Smelter and it would have been difficult for members of the public to access smelter waste at the TFM Smelter. Id. at 72.

58. Gravel testified that it would not have been "newsworthy" for ordinary citizens to take smelter waste and use it for home improvement projects, and newspaper articles mention only large-scale use of smelter waste in the community. Dkt. # 310, at 37. Gravel opined that references to "smelters" in local newspapers and the common historical use of smelter material for household projects supported an inference that the citizens of Collinsville removed smelter waste from the BZ and TFM Smelters. Id. at 93.

59. The evidence is undisputed that smelter waste has been found on residential properties, and the focus of the CSP has been the cleanup of this type of smelter waste, rather than any smelter waste that was used as road construction material. The Court does not find that evidence concerning the source of smelter waste used in road construction is particularly helpful in assessing whether the citizens of Collinsville obtained smelter waste from the BZ or TFM Smelter for residential projects. Even if road building were relevant, most of the newspaper articles cited by the parties do not clearly state whether the smelter waste came from the BZ or TFM Smelter. There are significant gaps in the historical record due to the passage of time and the lack of governmental environmental records, and the Court does not construe ambiguous references in newspapers to "the smelters" to refer only to the BZ Smelter.

60. The Court finds that the placement of smelter waste in residential areas by members of the community is a viable migration pathway for the disposal of a hazardous substance within the CSP. Gravel's testimony concerning the historical use of smelter testimony is credible and is supported by evidence showing that smelter waste has regularly been found during soil sampling conducted

during the CSP. Brittain also testified that she has worked on cleanups at other smelter sites, and residential use of smelter waste is a common feature in communities near former smelter sites. The Court also finds that it was reasonable for ODEQ to assume that visible smelter waste in the CSP study area could have come from either the BZ Smelter or the TFM Smelter. TCI has not shown that there is any means of differentiating between waste generated by the smelter facilities, and ODEQ or Cyprus was not required to tie the waste to a particular smelting facility to establish that waste from the TFM Smelter migrated into Collinsville. Cyprus has met its burden to show that TCI may be liable under CERCLA as a former owner or operator of a facility where a hazardous substance was disposed.

**<u>Release of Hazardous Substances by TCI Caused Cyprus to Incur Response Costs</u>**

61. CERCLA defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22). The Court has already determined that Cyprus has met its burden to show by a preponderance of the evidence that waste materials from the TFM Smelter were placed inside the CSP study area. Based on this finding, the Court finds that the release of hazardous substances from the TFM Smelter caused Cyprus to incur response costs to sample for and remediate contamination caused by the placement of waste materials in the CSP study area.

62. Cyprus incurred a substantial amount of costs to investigate the possibility that aerial dispersion of particulates during the operation of the smelting facilities caused or contributed to the presence of hazardous substances in Collinsville. The Court has rejected Cyprus' assertion that air

Case 4:11-cv-00252-CVE-CDL Document 332 Filed in USDC ND/OK on 03/30/21 Page 26 of 47

emissions from the smelter facilities constitute a plausible migration pathway for the presence of hazardous substances within the CSP study area. However, ODEQ had a reasonable basis to explore whether air emissions from the BZ and TFM Smelters caused or contributed to the presence of hazardous substances in Collinsville and, as the Court has noted in a prior opinion and order, it is not necessary for Cyprus to prove actual contamination from air emissions to recover the costs of investigating a likely cause of contamination. Dkt. # 244, at 24.

63. TCI challenges specific recovery costs incurred by Cyprus, such as the remediation of properties with single metal exceedances and sampling costs related to aerial dispersion, and TCI argues that such costs were unnecessary. However, Cyprus has met its burden to show that the release or threatened release of hazardous substances from the TFM Smelter caused it to incur response costs, and it is not necessary at this stage of the analysis for Cyprus to prove that all of its response costs are recoverable. The Court will consider TCI's arguments concerning the recovery of disputed response costs in the context of the necessity of the work and compliance with the National Contingency Plan (NCP).

**<u>Necessity of Work</u>**

64. Cyprus has the burden to show that the costs incurred in the performance of the CSP were necessary, and there must be a nexus between the costs and an actual effort to respond to environmental contamination. Cyprus claims that it incurred $31,700,156 in costs that were necessary to respond to the release or threatened of a hazardous substance. Dkt. # 310, at 60; Plaintiff's Ex. 12A, at 1.

65. Gravel reviewed invoices submitted by ODEQ, Arcadis, Bridgewater Group, Candy Thomas & Associates, Conestoga Rovers & Associates, Dynamic Carpet Care LLC, Environmental

Case 4:11-cv-00252-CVE-PJC Document 332 Filed in USDC ND/OK on 03/02/21 Page 27 of 47

Restoration LLC, Brenda Stadel d/b/a Grapevine Design, Mike Cooper, Peter Webb Public Relation, Shaw Environmental, SID Steadman, and Western EcoSystems Tech, and the total amount paid by Cyprus was $32,831,303. Plaintiff's Ex. 12A, at 1. Gravel determined that not all of the costs paid by Cyprus were necessary response costs, and he reduced this amount to $31,700,156 for the purpose of Cyprus' contribution claim. Dkt. # 310, at 60.

66. Initial sampling results in Collinsville showed that approximately five percent of residential properties were contaminated by one or more metals associated with smelter waste. Joint Ex. 11, at CBS_OPS-013215. The BZ and TFM Smelters are located approximately one mile from Collinsville and approximately one-quarter of a mile apart from each other, and it was reasonable for ODEQ to believe that additional sampling of residential properties was necessary to determine if waste materials from the smelter sites was the cause of the contamination.

67. TCI argues that certain metals could be present in the soil in the CSP study area due to other natural and manmade causes that have nothing to do with the presence of the BZ and TFM Smelters. From about 1900 to 1920, coal mining was widespread in and around Collinsville, and coal mining took place on approximately 800 acres in the Collinsville area. Dkt. # 314, at 50; Defendant's Ex. 590. The former Collinsville Strip mine was located in the northeast area of Collinsille several miles away from the smelter facilities, but coal mining also took place near the BZ and TFM Smelters. Defendant's Ex. 558, at DX558.0305; Defendant's Ex. 590, at DX590.001. Vandeven testified that the Seminole formation and the Dawson coal deposits are located near Collinsville, and these areas have a high level of naturally-occurring arsenic. Dkt. # 314, at 50-52.

68. Vandeven testified that single metal exceedances were not necessarily caused by smelter waste, and other causes could have been lead-based paint and fuel, herbicides, treated wood, and

Case 4:11-cv-00252-CVE-CDL Document 332 Filed in USDC ND/OK on 03/02/21 Page 28 of 47

environmental factors such as shallow sub-surface concentrations of shale and coal. Dkt. # 314, at 50-53. Certain pesticides used in Oklahoma also contained arsenic. Deposition of John Fenn, at 116.

69. The most substantial response costs incurred by Cyprus during the CSP were the costs associated with taking almost 79,000 soil samples. Vandeven claims that Cyprus could have substantially reduced its response costs by using information already in its possession to limit the number of samples, and he challenged the size of the study area and the voluntary nature of the soil sampling program. Dkt. # 314, at 93-95. He further testified that most of the remediation costs incurred by Cyprus were attributable to arsenic-only cleanups, and he believes that the presence of arsenic alone was not indicative of smelter waste. Id. at 96-97.

70. The Court notes the large size of the CSP study area and the large number of soil samples in relationship to the amount of affected properties, but finds that this case presents a unique situation in which it was reasonable for Cyprus to incur substantial sampling costs in relation to the much smaller amount of costs incurred for actual remediation. Brittain testified that there was no discernable pattern or trend to the location of visible smelter material or the locations with exceedances of certain metals, and ODEQ determined that it was necessary for the health and well-being of people living in Collinsville to locate and remove contamination caused by smelter waste. Dkt. # 307, at 76. Contaminated properties were found throughout the CSP study area and 9.3 percent properties sampled showed exceedances for at least one the metals. Joint Ex. 24, at CA-C0399886. The evidence also shows that the overall size of the study area was approximately 48 square acres, but the vast majority of the sampling took place in the downtown area of Collinsville

where there was the greatest risk of harm to people in the community from exposure to hazardous substances.

71. The Court rejects TCI's argument that certain response costs were unnecessary due to the possibility that metals could have been present due to other causes, such as coal strip mining or naturally occurring mineral formations. Contaminants such as lead or arsenic could exist in certain areas within the CSP study area for reasons other than the operation of the former BZ and TFM Smelters, but this does not mean that smelter waste would not also be present in those same areas. The evidence establishes that smelter waste was distributed randomly throughout the community, and ODEQ, not Cyprus, determined that it was necessary for the health and safety of the residents of Collinsville to remediate properties with an exceedance of a single metal. Dkt. # 308, at 89. Vandeven testified that remedial work is generally deemed necessary if the work was ordered by a state agency. Dkt. # 316, at 37-38. TCI argues that Cyprus made no effort to determine the source of contamination found within the CSP study area, but TCI has offered no evidence that this type of analysis would have been successful or cost-effective.

72. Voss testified that there were at least two instances in which Cyprus declined to remediate arsenic-only exceedances, because the arsenic was present four feet below the surface and all the way up to the surface. Dkt. # 308, at 103. Cyprus conducted historical research and found that coal strip mining had previously taken place on the properties, and Cyprus determined that the coal mining, not smelter waste, caused the arsenic exceedance. Id. This evidence establishes that Cyprus was aware of other causes of single metal exceedances and took action to mitigate its response costs when smelter waste was not the likely cause of the exceedance.

Case 4:11-cv-00252-CVE-CDL Document 332 Filed in USDC ND/OK on 03/01/21 Page 30 of 47

73. The Court notes Vandeven's criticism of the voluntary sampling program and the large number of soil samples taken during the CSP, and his opinions would have greater weight in a situation where the location of hazardous substances was known before the selection of a remedy. However, the Court agrees with Gravel's expert testimony that soil sampling was part of the selected remedy, and a larger amount of sampling than in an ordinary CERCLA cleanup can be deemed necessary under the specific facts of this case. Dkt. # 310, at 55.

75. The Court has reviewed Gravel's testimony and his summary of the costs incurred by Cyprus (Plaintiff's Ex. 12A), and finds that Cyprus incurred $31,700,156 in necessary response costs due to the release of a hazardous substance from the BZ and TFM Smelters.

**Substantial Compliance with NCP**

76. The final element of a prima facie case for CERLCA liability is that the response costs incurred by Cyprus were consistent with the NCP, and the Court must determine if the cleanup conducted pursuant to the CSP substantially complied with the NCP.

77. Cyprus conducted work under the CSP pursuant to a consent decree with ODEQ and, in a previous opinion and order, the Court deferred a determination of whether Cyprus is entitled to presumption of compliance with the NCP. Dkt. # 244, at 28-30. Based on the evidence submitted at trial, the Court finds that Cyprus is entitled to a rebuttable presumption that work performed pursuant to the consent decree and ordered by ODEQ was consistent with the NCP.

78. TCI argues that Gravel is not qualified to offer expert testimony on the issue of compliance with the NCP, because he lacks training and expertise and he has not previously been qualified as an expert on this issue. Dkt. # 310, at 13. TCI claims that Gravel has not personally supervised a hazardous waste investigation or remedial action at a site, and he does not have a technical or

Case 4:11-cv-00252-CVE-CDL Document 332 Filed in USDC ND/OK on 03/31/21 Page 31 of 47

scientific background in actually selecting a remedy. Id. at 63-66. The Court rejects TCI's argument as to Gravel's qualifications to offer expert testimony on Cyprus' compliance with the NCP. Gravel is a senior managing director for FTI Consulting and he is the co-leader of the company's environmental solutions practice. Id. at 6. Gravel has a master's degree in international business from the University of Maryland, and his employment is focused on forensic history and environmental cost analysis. Id. at 7. Gravel has provided consulting services for businesses and governmental agencies at hundreds of sites across the United States, and he has been retained as an expert witness in 22 cases. Id. at 9-10. He has provided consulting services for cleanups of various types of smelting facilities, including zinc smelters. Id. at 11. The Court finds that Gravel is qualified to as to the issue of NCP compliance based on his education, work experience, and expertise in the cleanup of smelter sites.

79. Gravel testified that he was initially surprised at the size of the sampling area and the sampling costs when he began to form an opinion as to Cyprus' compliance with the NCP. Id. at 53-54. However, sampling did not occur in the entire 48 square mile area, and sampling was limited to approximately 7 square miles of the total sampling area of the CSP. Id. Gravel also noted that sampling usually occurs for the purpose of an RI/FS to select a remedy, but the sampling costs at issue in this case were primarily incurred to determine which specific properties needed to be remediated. Id. at 55. Gravel believes that additional testing after selection of a remedy was a cost-saving measure to avoid unnecessary remediation. Id. at 56.

80. Gravel views the CSP as an extension of the cleanup of the BZ and TFM Smelters, and the remedy selected for the CSP, soil removal, was the same remedy used for the smelter facilities. Id. at 56-57. In terms of a "CERCLA quality cleanup," the focus is on the remedy selected in order to

ensure that the remedy meets the requirements of the NCP, and the NCP is not focused on the quality or amount of sampling. Id. at 57. Gravel testified that selected remedy was protective of human health, because removal of contaminated soil was a permanent means to prevent human exposure to hazardous substances within the CSP study area. Id. Gravel also testified that the selected remedy was cost effective, and the effectiveness of the remedy was established by the use of the same remedy for the cleanup of the BZ and TFM Smelters. Id.

81. Gravel opines that the remediation work performed to complete the CSP substantially complied with the NCP, and he reached this independently of any legal presumption that could be applicable in cases where the cleanup is performed pursuant to a consent decree. Id. at 58-59. He testified that he was contacted by Cyprus before any litigation was filed to verify whether the cleanup complied with the NCP, and Cyprus wanted an independent opinion in addition to the ODEQ's approval of Cyprus' work. Id. at 59.

82. Gravel acknowledged that the EPA concluded that there was no discernable pattern of contamination consistent with aerial dispersion of contaminates within one and a half miles of the TFM Smelter, and he did not dispute the EPA's findings that any contamination found on sampled properties was likely due to the random placement of smelter waste. Id. at 73-76. ODEQ was concerned about the presence of hazardous substances within the CSP study area due to the presence of smelter waste, and ODEQ reasonably wanted Cyprus to conduct sampling in residential areas or areas that could be developed in the future. Id. at 77-78, 84-86.

83. Gravel conducted historical research and found newspaper articles and documents referencing the removal of waste materials from "smelters," but these documents did not specifically reference the "Tulsa Fuel and Manufacturing" Smelter. Id. at 90-91. Even without such a specific

Case 4:11-cv-00252-CVE-CDL Document 332 Filed in USDC ND/OK on Page 33 of 47

reference to the TFM Smelter, Gravel opined that the removal of smelter waste from zinc smelters was such a common practice that it is reasonable to infer that smelter waste was removed from both the BZ and TFM Smelters for use in Collinsville. Id. at 92-93.

84. Vandeven was highly critical of the cleanup performed by Cyprus and he testified that the cleanup was not consistent with the NCP. He testified that any cleanup should be guided by a conceptual site model to develop an understanding of the pathways of contamination and exposure scenarios, and he believes that a conceptual site model is essential to developing a remedy that is cost-effective and protective of human health. Dkt. # 314, at 38-40. He acknowledged that it is often difficult to create a conceptual site model at older sites. Id. at 42. Vandeven testified that Cyprus had a substantial amount of data available before beginning work on the CSP, and he opined that Cyprus should have used this data to implement a more limited sampling program. Id. at 79-80.

85. EPA guidance for the cleanup of lead usually involves taking more samples closer to the known source of exposure and sampling further out in a concentric and systematic manner until clean sampling is obtained. Id. at 91. Vandeven criticized the random nature of the sampling and the size of the sampling area, and he opined that Cyprus did not do enough to consider other sources of potential contamination before conducting sampling. Id. at 92-95.

86. Vandeven concluded that the sampling and cleanup performed by Cyprus was not consistent with the NCP. He opines that there was no evidence of aerial dispersion of particulates from the smelter, and there was no need for a widespread sampling program as part of the CSP. Dkt. # 316, at 9-11. He agreed that some of the costs incurred to remediate visible smelter material in the community could be necessary and consistent with the NCP, but this was a relatively small amount of the costs incurred by Cyprus. Id. at 11.

Case 4:11-cv-00252-CVE-FHM Document 332 Filed in USDC ND/OK on 03/30/21 Page 34 of 47

87. Vandeven acknowledged that remedial work is generally deemed necessary if it is ordered by a state agency. Id. at 37. He also testified that ODEQ approved of the work performed by Cyprus. Id. at 77. However, he opined that ODEQ's approval of the work does not mean that the cleanup complied with the NCP, and he concluded that the cleanup was not consistent with the NCP. Id. at 77-78.

88. The Court finds that Vandeven's criticisms of the volume of sampling and the size of the sampling area are not entitled to substantial weight, because his assertions go primarily to sampling activities related to aerial dispersion. There is overwhelming evidence in the record that the primary source of hazardous substances within the CSP study area was the historical placement of smelter waste, and the placement of smelter waste was random and not susceptible to any pattern or trend. Cyprus could not have limited sampling based on prior data, because this type of sampling would not have met ODEQ's goal of removing hazardous substances from areas of Collinsville where people would likely come into contact with the hazardous substances.

89. The Court also rejects Vandeven's opinion that Cyprus should have refrained from sampling if there were other potentially other factors present that would have explained the presence of a hazardous substance. The presence of other potential causes for the presence of a hazardous substance would not have negated the need for sampling to determine whether smelter waste was also present, and there is sufficient evidence in the record that Cyprus considered environmental factors as a cause of contamination before performing remedial work.

90. The Court finds that TCI has not rebutted the presumption that Cyprus' work substantially complied with the NCP, and Cyrpus has established this element of a prima facie case of CERCLA liability.

Case 4:11-cv-00252-CVE-FHM Document 332 Filed in USDC ND/OK on 03/31/21 Page 35 of 47

**Apportionment of Response Costs**

91. The Court must next determine how the response costs should be apportioned between Cyprus and TCI. In making this determination, the Court's goal is to apportion the costs "using such equitable factors as the Court deems appropriate." 42 U.S.C. § 9613(f)(1).

92. The parties agree that neither the TFM nor BZ Smelters maintained data concerning the amount of waste generated when each smelter was operational or how much of that waste was moved offsite. Cyprus' expert, Richard White, generated a "production proxy to measure the ability of each of these two smelters to contribute waste." Dkt. # 311, at 92. White rejected the use of a mass balancing test to determine how much waste migrated into CSP study area based on the amount of waste still present at either site, because he did not have sufficient data to determine how much of different types of waste was actually generated at the TFM or BZ Smelters. Id. at 93-94.

93. The USGS kept data as to the production capacity of smelters across the country, but this data does not reflect actual utilization of any particular smelting facility and White reviewed secondary sources to determine if the TFM or BZ Smelters were running at full capacity for the full time period. Id. at 95. White performed a mathematical calculation of capacity times utilization to come up with a proxy for the amount of waste likely generated by each facility, and he made adjustments or corrections to utilization to account for strikes, work stoppages, or other events that would have affected utilization of a particular facility. Id. at 96.

94. The USGS tracked the number of retorts at each smelting facility. For example, the evidence shows that in 1912 the BZ Smelter had 5,184 retorts and the TFM Smelter had 6,232 retorts. Plaintiff's Ex. 93, at CA-C0086233; Dkt. # 311, at 97. White gathered the capacity data for the years of operation of the TFM and BZ Smelters, and the BZ Smelter later had a substantially higher

capacity during its years of operation. Plaintiff's Ex. 556, at 2. However, the TFM Smelter operated approximately eight years longer than that BZ Smelter. Id. After making adjustments for utlization, White opined that the BZ Smelter used 58,816 retorts and the TFM Smelter used 56,810 during their respective years of operation. Id. White used these numbers as a proxy for actual production of the smelters, and he concluded that the BZ Smelter was responsible for 50.87 percent of waste production and the TFM Smelter was responsible for 49.13 percent of the waste production in the Collinsville area. Dkt. # 311, at 103.

95. White also reviewed a publication called Zinc Magazine, which was printed by NJZ, and Zinc Magazine began including employment data concerning NJZ's facilities in 1923. Dkt. # 311, at 108. The data establishes that the TFM Smelter maintained a workforce through the first four months of 1926, and the workforce for the smelter in 1925 and 1926 was relatively consistent. Id. at 109. Therefore, he included the first four months of 1926 to determine the amount of waste material generated at the TFM Smelter.

96. TCI challenges the reliability of White's conclusions as to the relative amount of waste generated by the TFM and BZ smelters. However, TCI has not offered an alternative method to determine either the production capacity or actual waste generated by the smelters. There are undoubtedly gaps in the historical record that could affect each smelter's capacity or the utilization of the smelter, but White's method provides a reasonable factual basis for the Court to estimate each party's potential responsibility for contaminants found in the facility.

97. Dr. Stevens' testimony cites specific historical events that may have affected the utilization of the BZ or TFM Smelters. White considered events that affected the zinc industry as a whole when

adjusting the production of each facility, but he did not take into account more localized events that could have affected production. Dkt. # 311, at 117.

98. A January 1914 newspaper article states that two of the furnaces at the TFM Smelter had been shut off since July 1913. Defendant's Ex. 36. Dr. Stevens testified that a local newspaper article showed that 375 workers at the TFM Smelter went on strike to demand higher wages. Dkt. # 313, at 26. The newspaper article appeared in the Tulsa World on May 30, 1918. Defendant's Ex. 24. Dr. Stevens also testified that the TFM Smelter shut down briefly in 1917 due to a shortage of gas, but her testimony and a newspaper article show that the shortage of gas affected both the TFM and BZ Smelters. Dkt. # 313, at 52; Defendant's Ex. 95.

99. The demand for zinc dropped sharply after the conclusion of World War I, and the TFM Smelter shut down for a period of time in 1921. Dkt. # 313, at 58. TCI has also provided newspaper articles showing that Spanish Flu heavily impacted the residents of Collinsville in 1918, although the articles do not directly establish that the Spanish Flu affected production at the TFM Smelter. Defendant's Exs. 656, 657, 658, 659, 660.

100. The Court finds that White's methodology provides a reasonable method for determining the amount of waste material generated by each smelter facility, and his production proxy provides a starting point for the Court's apportionment of response costs. However, it is not clear from White's testimony if he took into account the more localized events referenced by Dr. Stevens that may have impacted production at the TFM Smelter, and the Court finds that a downward adjustment should be made to account for evidence provided by Dr. Stevens. TCI has shown that the demand for zinc dropped after the conclusion of World War I and there was a direct local impact that was felt at the TFM Smelter. The Court also takes into account that the TFM Smelter continued to operate until

Case 4:11-cv-00252-CVE-FHM Document 332 Filed in USDC ND/OK on 03/30/21 Page 38 of 47

1926 and, given the substantially longer duration of the TFM Smelter, the Court finds that the TFM Smelter was responsible for approximately 40 percent of the waste materials generated by the two smelters.

101. Certain equitable factors that are often considered when apportioning response costs are somewhat neutral in this case. For example, there is no way to distinguish between waste generated by the TFM or BZ Smelters, and the degree of toxicity of the hazardous substances is not as harmful as in some environmental contamination cases. The Court finds that each party is equally responsible for the presence of waste materials in the CSP study area, and the owners of the TFM and BZ Smelters took no steps to mitigate the spread of hazardous substances when the facilities were operational.

102. In addition to the amount of waste generated by each party, the Court finds that the most substantial factor is the degree of cooperation shown by Cyprus with state and federal officials to prevent harm to the public. In 1996, Cyprus entered into a consent agreement with ODEQ for the cleanup of the BZ Smelter site, and Cyprus agreed to cooperate with the cleanup of hazardous substances that may have migrated offsite. Cyprus fully cooperated with ODEQ in the creation and execution of the CSP, and Cyprus entered into a consent decree with ODEQ. In contrast, TCI and related entities rejected requests from the EPA, ODEQ, and Cyprus to participate in the cleanup of the TFM Smelter and the CSP study area. TCI argues that it had a "good faith legal defense" to assert that it was not liable the cleanup of the TFM Smelter and offsite areas impacted by smelter waste. In a prior opinion and order (Dkt. # 183), the Court found that TFMC was operated as the alter ego of NJZ, and the evidence supporting this finding was compelling. Much of the evidence showing NJZ's substantial control over the operations of TFMC was in TCI's possession when it

declined to participate in the cleanup of the TFM Smelter and the CSP study area. The Court gives this equitable factor substantial weight and will make an upward adjustment based on TCI's refusal to participate in the CSP.

103. The Court finds that Cyprus is entitled to contribution for 45 percent of the response costs it incurred during the CSP, and Cyprus will be award contribution in the amount of $14,265,070.20.

**II. CONCLUSIONS OF LAW**

1. Congress enacted CERCLA in 1980 "in response to the serious environmental and health risks posed by industrial pollution," and it was intended to encourage the "'timely cleanup of hazardous waste sites' and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." Burlington Northern & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 602 (2009).

2. "The remedy that Congress felt it needed in CERCLA is sweeping: *everyone* who is potentially responsible for hazardous waste contamination may be forced to contribute to the costs of cleanup." Chevron Mining Inc. v. United States, 863 F.3d 1261 (10th Cir. 2017) (quoting United States v. Bestfoods, 524 U.S. 51, 56 n.1 (1998)).

3. CERCLA imposes strict liability on potentially responsible parties (PRPs) for the costs of cleanup and remediation regardless of the PRP's fault. United States v. Colorado & Eastern R. Co., 50 F.3d 1530,1535 (10th Cir. 1995).

4. Liability under CERCLA does not need to be proven by direct evidence and may be inferred from the totality of the circumstances. Chevron Mining, Inc., 863 F.3d at 1271. "This is particularly true for cases involving older hazardous substance disposal, 'as eyewitness testimony or other direct evidence concerning specific disposal practices . . . is rarely available.'" Id.

5. Section 9613(f) of CERCLA provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title . . . ." Section § 9613(f) does not itself give rise to liability under CERLCA, and it is merely a means of apportioning liability between PRPs. Bancamerica Commercial Corp. v. Mosher Steel of Kansas, Inc., 100 F.3d 792, 800 (10th Cir. 1996).

6. To obtain contribution from a PRP, a plaintiff must initially establish that the PRP would be liable under § 9607, and then the Court proceeds to the equitable apportionment of response costs once the plaintiff has shown that the defendant is liable. Sun Co., Inc. v. Browning-Ferris, Inc., 124 F.3d 1187, 1191 (10th Cir. 1997).

7. There are five elements under § 9607 that a must be proven to make out a prima facie case of liability:

> (1) that the defendant is a "covered person" under CERCLA; (2) that a "release" or "threatened release" of any "hazardous substance" at the site in question has occurred; (3) that the release or threatened release caused plaintiff to incur costs; (4) that plaintiff's costs are "necessary" costs of response; and (5) that plaintiff's response action or cleanup was consistent with the NCP.

Morrison Enterprises v. McShares, 302 F.3d 1127, 1135 (10th Cir. 2002). TCI does not dispute that Cyprus is a PRP who is permitted to proceed with a contribution claim against other PRPs.

8. CERCLA defines the term "facility" broadly and, under § 9601(9), a facility includes "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ."

A facility may include "numerous distinct parcels of land, sites, or areas, and the contaminated natural formations and objects on or in them." Chevron Mining, Inc., 863 F.3d at 1270.

9. The Tenth Circuit has explained that a "facility" can be covered under the catch-all provision of § 9601(9)(B), even if it does not have any of the specific buildings or features referenced in § 9601(9)(1)(A). Sierra Club v. Seaboard Farms Inc., 387 F.3d 1167, 1171-72 (10th Cir. 2004). Federal courts have construed the term "facility" in the broadest possible terms, and a facility will ordinarily encompass the entire site or area where hazardous substances came to be located. Id. at 1175. The evidence presented at trial establishes that hazardous substances from the BZ and TFM Smelters came to be located on site and offsite within the CSP study area, and the Court finds that entire area should be treated a single facility for the purpose of plaintiff's CERCLA claim.

10. Under § 9607(a), there are four categories of covered persons:

> (1) the owner or operator of a vessel or a facility;
>
> (2) the person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . ."

42 U.S.C. § 9607(a).

11. The Tenth Circuit has determined that a party qualifies as an "arranger" if three elements are established: "(1) the party must be a 'person' as defined in CERCLA; (2) the party must 'own' or 'possess' the hazardous substance prior to the disposal; and (3) the party must, 'by contract, agreement or otherwise,' arrange for the transport or disposal of such hazardous substances." Chevron Mining Inc., 863 F.3d at 1279. As to the third element, a party's knowledge that the buyer may improperly dispose of a hazardous substance is insufficient, and arranger liability applies only if the seller intended "that at least a portion of the product be disposed of during the transfer process by one or more methods described in [42 U.S.C. § 6903(3)]." Burlington Northern and Santa Fe Ry. Co. v. United States, 556 U.S. 599, 612 (2009).

12. Cyprus also seeks to hold TCI liable under a theory that TCI is responsible for the liabilities of NJZ, and NJZ was the alter ego of a former owner or operator of the TFM Smelter. The Court has determined that TFMC was operated as the alter ego of NJZ, and TCI is the corporate successor to NJZ. Dkt. # 183. Under § 9607(a)(2), NJZ was a "person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of," and the Supreme Court has ruled that a corporate parent can be held indirectly liable in situations when a subsidiary operates a polluting facility. United States v. Bestfoods, 524 U.S. 51, 64-67 (1998). As the corporate successor to NJZ, TCI qualifies as a covered person under a former owner or operator theory.

13. In a previous opinion and order, the Court considered TCI's argument based on Pakootas v. Teck Cominco Metals, Ltd., 830 F. 3d 975 (9th Cir. 2016), that direct air emissions do not constitute "disposal" under § 9607. Dkt. # 244, at 16-17. The Court determined that the Tenth Circuit would likely conclude that direct air emissions from a facility would not qualify as "disposal." Dkt. # 244,

at 17 (citing United States v. Power Engineering Co., 191 F.3d 1224 (10th Cir. 1999)). The Court has also determined that there is insufficient evidence to prove as a factual matter that aerial dispersion is a viable migration pathway from the TFM Smelter to the CSP study area.

14. CERCLA defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant . . . ." 42 U.S.C. § 9601(22). There is no threshold amount of a release or threatened release to establish liability under CERCLA, and any amount of release is sufficient to satisfy this element. Horsehead Indus., Inc. v. St. Joe Mineral Corp., 1996 WL 33415778, *15 (N.D. Okla. Apr. 2, 1996); Dartron Corp. v. Uniroyal Chem. Co., 917 F. Supp. 1173, 1183 (N.D. Ohio 1996).

15. CERCLA response costs include "the costs of investigating and remedying the effects of a release or threatened release of a hazardous substance into the environment." Young v. United States, 394 F.3d 858, 863 (10th Cir. 2005). However, the party seeking to recover contribution from another PRP bears the burden to show that the costs incurred are "necessary," which means that the costs must be "closely tied" to the cleanup of a hazardous substance. Atlantic Richfield Co. v. United States, 181 F. Supp. 3d 898 (D.N.M. Feb. 9, 2016). This typically includes costs for "investigating and remedying the effects of a release or threatened release of a hazardous substance into the environment." Young, 394 F.3d at 863.

16. In addition to showing that response costs are "necessary," Cyprus must also show that the work it has performed is consistent with the NCP. County Line Inv. Co. v. Tinney, 933 F.2d 1508, 1512 (10th Cir. 1991). "The NCP is EPA's regulatory template for a 'CERCLA quality cleanup.'"

Public Serv. Co. of Colorado v. Gates Rubber Co., 175 F.3d 1177, 1181 (10th Cir. 1999). "The NCP is a long and detailed list of procedures that must be carried out by federal and state governments when they are responding to hazardous waste releases," and most of the requirements have been made applicable to private parties performing their own cleanup at CERCLA sites. Morrison Enterprises, 302 F.3d at 1136. A cleanup performed by a private party will be considered consistent with the NCP if the cleanup substantially complies with the requirements of the NCP. 40 C.F.R. § 300.700(c)(3)(1); Public Serv. Co. of Colorado v. Gates Rubber Co., 175 F.3d 1177, 1181-82 (10th Cir. 1999).

17. A private party conducting remedial work pursuant to an administrative order issued by the EPA is entitled to an irrebuttable presumption that the work complied with the NCP. Morrison Enterprises, 302 F.3d at 1136-37. However, the same presumption does not necessarily apply to cleanups conducted pursuant to a consent decree with a state environmental agency, and the Tenth Circuit has held that a rebuttable presumption of compliance with the NCP applies when work is undertaken pursuant to a consent decree with a state agency. Id. at 1138. Other courts have applied a presumption of compliance with the NCP when a PRP conducts a cleanup pursuant to a consent decree and the state finds that the PRP conducted work in compliance with the consent decree. Niagara Mohawk Power Corp. v. Chevron USA, Inc., 596 F.3d 112, 137 (2d Cir. 2010); NutraSweet Co. v. X-L Engineering Co., 277 F.3d 776, 791 (7th Cir. 2000).

18. The Court finds that a rebuttable presumption of compliance with the NCP is applicable in this case. ODEQ and the EPA executed a Memorandum of Agreement in 1999 authorizing ODEQ to enter consent decrees with PRPs who agreed to participate in ODEQ's Voluntary Cleanup Program. Joint Ex. 4. The EPA selected a remedy for the cleanup of the TFM Smelter site, and the

EPA deferred to ODEQ for the cleanup of offsite residential soil. Dkt. # 307, at 70. Cyprus performed remedial work pursuant to a consent decree with ODEQ, and ODEQ supervised and ultimately approved the work performed by Cyprus. Dkt. # 307, at 72-73, 99. ODEQ reported to the EPA as work progressed on the cleanup of the TFM Smelter and nearby areas affected by contamination from the TFM Smelter, and the remedial work that ODEQ directed Cyprus to perform was based on guidance from the EPA. Id. at 50, 62, 70.

19. "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the Court deems appropriate." 42 U.S.C. § 9613(f)(1). "In any given case, 'a court may consider several factors, a few factors, or only one determining factor, . . . depending on the totality of the circumstances presented to the court.'" United States v. Colorado and Eastern R. Co., 50 F.3d 1530, 1536 (10th Cir. 1995). These factors include, but are not limited to, "(i) the ability of the party to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (ii) the amount of hazardous waste involved; (iii) the degree of toxicity of the hazardous waste involved; (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (vi) the degree of cooperation by the parties with the Federal, State or local officials to prevent any harm to the public health or the environment. Id. at 1536 n.5.

20. Cyprus seeks declaratory relief that it is entitled to contribution for a proportionate share of any future response costs incurred as part of the CSP. Dkt. # 106, at 36. Under 42 U.S.C. § 9613(g)(2), "the court shall enter a declaratory judgment on liability for response costs or damages

Case 4:11-cv-00252-CVE-CDL Document 332 Filed in USDC ND/OK on 03/30/21 Page 46 of 47

that will be binding on any subsequent action or actions to recover further response costs or damages." Courts have found that this requirement applies to contribution claims under CERCLA. ASARCO LLC v. Atlantic Richfield Co., LLC, 975 F.3d 859, 866 (9th Cir. 2020); New York v. Solvent Chemical Co., Inc., 664 F.3d 22, 26-27 (2d Cir. 2011); United States v. Davis, 261 F.3d 1, 46 (1st Cir. 2001). The Tenth Circuit has determined that district courts may issue a declaratory judgment as to liability for future response costs, but this does not preclude a defendant from challenging whether certain costs are recoverable under CERCLA. United States v. Hardage, 982 F.2d 1436, 1445 (10th Cir. 1992). The Court finds that Cyprus is entitled to declaratory relief as to liability for a proportionate share of any future response incurred as part of the CSP.

21. Cyprus asks the Court to impose a "recalcitrance" penalty against TCI for its refusal to participate in the CSP. Cyprus acknowledges that the failure to cooperate in a cleanup is an equitable factor that the Court may consider in the allocation of response costs, but Cyprus is seeking an upward adjustment or penalty in addition to consideration of TCI's failure to cooperate as an equitable consideration. The Court has found no Tenth Circuit precedent support an additional penalty or upward adjustment outside of the balancing of the equitable factors, and the Court has already given substantial weight to TCI's failure to cooperate with the EPA and ODEQ when determining the proper allocation of response costs. The Court declines to impose the "recalcitrance" penalty sought by Cyprus.

22. Prejudment interest may be awarded to a successful plaintiff asserting a contribution claim under § 9613(f). Bancamerica Commercial Corp., 100 F.3d at 801. Prejudgment interest accrues from the "(i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned." Id. at 801. Cyprus requests prejudgment interest in the amended complaint

(Dkt. # 106, at 30), but Cyprus offered no evidence at trial concerning its entitlement to prejudgment interest or the amount of prejudgment interest sought. The Court will permit Cyprus to file a post-judgment motion seeking an award of prejudgment interest but, based on the record before the Court, it would be premature for the Court to find that an award of prejudgment interest is appropriate.

**IT IS THEREFORE ORDERED** that judgment will be entered in favor of plaintiff Cyprus Amax Minerals Company and against defendant TCI Pacific Communications, LLC as to Counts III and V of the amended complaint in the amount of $14,265,070.20, plus post-judgment interest thereon from this date at the rate of .07 % per annum, plus the costs of this action.

**IT IS FURTHER ORDERED** that a declaratory judgment will be entered in favor of plaintiff Cyprus Amax Minerals Company declaring that defendant TCI Pacific Communications, LLC is liable for 45 percent of future response costs, if any, incurred by plaintiff to complete the CSP.

**IT IS FURTHER ORDERED** that judgment will be entered in favor of TCI Pacific Communications, LLC and against plaintiff Cyprus Amax Minerals Company as to Counts IV and VI of the amended complaint.

**DATED** this 31st day of March, 2021.

Claire V. Eagan
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

Case 4:11-cv-00252-CVE-CDL Document 333 Filed in USDC ND/OK on 03/31/21

FILED
Mar 31 2021
Mark C. McCartt, Clerk

**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **CYPRUS AMAX MINERALS COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 11-CV-0252-CVE-CDL** |
| | ) | |
| **TCI PACIFIC COMMUNICATIONS, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## JUDGMENT

The Court held a non-jury trial from February 26 to March 2, 2018, and the parties have submitted proposed findings of fact and conclusions of law. The Court has considered the trial testimony, the exhibits submitted by the parties, and the proposed findings of fact and conclusions of law, and has entered findings of fact and conclusions of law (Dkt. # 332). Counts I, II, and VIII were previously dismissed, and this is a final judgment terminating this case.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that judgment is entered in favor of plaintiff Cyprus Amax Minerals Company and against defendant TCI Pacific Communications, LLC as to Counts III and V of the amended complaint for contribution in the amount of $14,265,070.20, plus post-judgment interest thereon from this date at the rate of .07 % per annum, plus the costs of this action.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that declaratory judgment is entered in favor of plaintiff Cyprus Amax Minerals Company and against defendant TCI Pacific Communications, LLC as to Count VII of the amended complaint, and the Court hereby declares that defendant TCI Pacific Communications, LLC is liable for 45 % of future response costs, if any, incurred by plaintiff Cyprus Amax Minerals Company to complete the Collinsville Soil Program.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that judgment is entered in favor of TCI Pacific Communications, LLC and against plaintiff Cyprus Amax Minerals Company as to Counts IV and VI of the amended complaint.

**DATED** this 31st day of March, 2021.

Claire V. Eagan

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **CYPRUS AMAX MINERALS COMPANY,** | ) | |
| **Plaintiff,** | ) | **Case No. 11-cv-0252-CVE-CDL** |
| **v.** | ) | |
| **TCI PACIFIC COMMUNICATIONS, LLC,** | ) | |
| **Defendant.** | ) | |

**NOTICE OF APPEAL**
**BY DEFENDANT TCI PACIFIC COMMUNICATIONS, LLC**

Defendant TCI Pacific Communications, LLC ("Defendant" or "TCI") hereby files this *Notice of Appeal* to the United States Court of Appeals for the Tenth Circuit from this District Court's *Findings of Fact and Conclusions of Law* (Doc. 332) and *Judgment* (Doc. 333) entered in this action on March 31, 2021. For the avoidance of doubt, Defendant appeals from any and all rulings adverse to Defendant that were made at any time in this litigation before, during, or after trial including, without limitation, in the Court's: *Opinion and Order* at Doc. No. 183; *Opinion and Order* at Doc. No. 243; *Opinion and Order* at Doc. No. 244; *Findings of Fact and Conclusions of Law* (Doc. No. 332); and *Judgment* (Doc. No. 333).

Respectfully submitted,

BY: /s/ *Mark D. Coldiron*
Mark D. Coldiron, OBA #1774
Paula M. Jantzen, OBA #20464
RYAN WHALEY COLDIRON JANTZEN
PETERS & WEBBER PLLC
400 N. Walnut Avenue
Oklahoma City, Oklahoma 73104
(405) 239-6040 Telephone
(405) 239-6766 Facsimile
mcoldiron@ryanwhaley.com
pjantzen@ryanwhaley.com

-and-

Paul D. Steinman, PA. Bar #49730
Cozen O'Connor
301 Grant Street
41st Floor – One Oxford Center
Pittsburgh, PA 15219
(412) 620-6544 Telephone
(412) 275-2390 Facsimile
psteinman@cozen.com

**Counsel for TCI Pacific Communications, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of April, 2021, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Timothy James Bomhoff
McAfee & Taft A Professional Corporation
211 N. Robinson, 10th Fl.
Oklahoma City, OK 73102
Email: tim.bomhoff@mcafeetaft.com

Michael F. Smith
McAfee & Taft
Williams Center Tower II
Two W. Second Street, Suite 1100
Tulsa, OK 74103
Email: Michael.smith@mcafeetaft.com

John F. Stoviak
Cathleen M. Devlin
Christina D. Riggs
Patrick M. Hromisin
Amy L. Piccola
Saul Ewing LLP (Philadelphia)
1500 Market St. 38th Fl
Philadelphia, PA 19102-2186
Email: jstoviak@saul.com
Email: cdevlin@saul.com
Email: criggs@saul.com
Email: phromisin@saul.com
Email: APiccola@saul.com
Counsel for Plaintiff

/s/ *Mark D. Coldiron*